**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| DARLENE GIBBS, STEPHANIE EDWARDS, LULA WILLIAMS, PATRICK INSCHO, LAWRENCE MWETHUKU, SHARON BURNEY, CHASTITY MCNEIL, ALICIA PATTERSON, JERI BRENNAN, EARL BROWNE, KIMETRA BRICE, JILL NOVOROT *on behalf of themselves and all individuals similarly situated* | Civil Action No. 3:20-cv-632 |
| Plaintiffs, | |
| v. | |
| ELEVATE CREDIT, INC., | |
| Defendant. | |

### CLASS ACTION COMPLAINT

COME NOW Plaintiffs Darlene Gibbs, Stephanie Edwards, Lula Williams, Patrick Inscho, Lawrence Mwethuku, Sharon Burney, Chastity McNeil, Alicia Patterson, Jeri Brennan, Earl Browne, Kimetra Brice, Jill Novorot (collectively, the "Plaintiffs"), *on behalf of themselves and all individuals similarly situated*, by counsel, and for their Class Action Complaint against Defendant Elevate Credit, Inc. ("Elevate"), they allege as follows:

### INTRODUCTION

1.     As this Court is aware, Plaintiffs filed various cases related to Think Finance's billion-dollar illegal lending scheme designed to ostensibly evade state usury laws by originating high interest loans in the name of entities formed by Native American tribes. *See, e.g.*, *Gibbs v. Rees*, Case No. 3:17-cv-00386 (E.D. Va. 2017); *Gibbs v. Plain Green, LLC*, Case No. 3:17-cv-00495 (E.D. Va. 2017); *Gibbs v. Haynes Investments*, *LLC*, Case No. 3:18-cv-00048 (E.D. Va.

2018); *Gibbs v. Curry*, Case No. 3:18-cv-00654 (E.D. Va. 2018); *Gibbs v. TCV V, L.P.*, Case No. 3:19-cv-789 (E.D. Va. 2019). Those cases focused on the role and liability of Think Finance and its chief executive officer, shareholders, investors, and business partners in what is referred to throughout this Complaint as the "Tribal Loan Enterprise" or "Enterprise."

2.      This case is the final chapter of this litigation, which has already resulted in over $400 million in relief to consumers victimized by Think Finance's predatory lending scheme that profited from the collection of unlawful interest. After regulatory efforts uncovered Think Finance's illegal lending practices in 2013, Think Finance began developing and ultimately completed a corporate spin-off in May 2014 in an effort to protect itself from legal liability by shielding its assets from collection. As a result of the spin-off, Think Finance was separated into two companies, including a newly created company named Elevate.

3.      As detailed in a memorandum to Think Finance's Board of Directors dated December 11, 2013, the purpose of the spin-off was "to separate the tribal and non-tribal businesses" because of Think Finance's anticipated massive liability relating to its tribal products. Ex. 1, Dec. 11, 2013 Memorandum at 3. This self-described "draconian organizational change" was designed to insulate and protect the hundreds of millions of dollars generated by Think Finance's non-tribal lending products, which could have been used to pay Think Finance's $1.13 billion in liability to consumers. *Id*.

4.      Seeking to avoid facing the consequences for its widespread misconduct, Think Finance completed the spin-off in May 2014, roughly seven months after a federal court issued an opinion rebuking the legality of its business model. *See Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 355 (S.D.N.Y. Sept. 30, 2013). Although

concealed by the pleadings, this litigation was spearheaded and funded by Think Finance even though the Otoe-Missouria Tribe and Great Plains Lending, LLC were the named plaintiffs.

5.      This action seeks to pierce the corporate veil of Elevate and hold it responsible for the misconduct of its predecessor, Think Finance. In Virginia, "no single rule or criterion" is "applied to determine whether piercing the corporate veil is justified." *O'Hazza v. Exec. Credit Corp.*, 431 S.E.2d 318, 320 (Va. 1993). Rather, the decision to pierce the corporate veil is a fact-specific determination, which focuses on whether the corporation was used "to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage." *Id*. (citing *Lewis Trucking Corp. v. Commonwealth,* 147 S.E.2d 747, 753 (Va. 1966)). Similarly, Virginia law will set aside a fraudulent conveyance, like the one in this case, designed to "hinder or defraud" creditors. Va. Code § 55-80. Under the fraudulent transaction theory of successor liability, a successor corporation takes on the liabilities of its predecessor if "the transaction is fraudulent," with the following recognized as "badges of fraud" and of relevance here: (1) inadequacy of consideration; (2) transfers in anticipation of suit or execution; and (3) insolvency caused by the transfer. *United States ex rel. Bunk v. Gov't Logistics N.V.*, 842 F.3d 261, 273 (4th Cir. 2016). Florida and California law are similar in these respects.

6.      In addition, Elevate directly violated §§ 1962 (c) and (d) of RICO by entering into a series of agreements by which Elevate continued to aid, abet, assist, and facilitate Think Finance's misconduct after it was spun off. These agreements included a "Data Sharing and Support Agreement," financing agreements, a "Shared Employees" agreement, and a "Shared Services Agreement." By continuing to participate in and aid the enterprise, Elevate is jointly and severally liable to consumers.

7.     As the alter-ego of and successor in liability to Think Finance and by virtue of Think Finance's unlawful collection of usurious and illegal debts from consumers, Elevate is liable for the same violations of state usury and consumer protection laws, including the $1.13 billion allowed claim in Think Finance's bankruptcy proceeding.

## JURISDICTION

8.     This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as a majority of Plaintiffs are residents of this District and Division and a substantial part of Plaintiffs' claims occurred in Virginia.

## PARTIES

10.     Plaintiff Lula Williams ("Williams") is a natural person and resident of this Division and District.

11.     Plaintiff Stephanie Edwards ("Edwards") is a natural person and resident of the Commonwealth of Virginia.

12.     Plaintiff Darlene Gibbs ("Gibbs") is a natural person and resident of the Commonwealth of Virginia.

13.     Plaintiff Patrick Inscho ("Inscho") is a natural person and resident of the Commonwealth of Virginia.

14.     Plaintiff Lawrence Mwethuku ("Mwethuku") is a natural person and resident of the Commonwealth of Virginia.

15.     Plaintiff Alicia Patterson ("Patterson") is a natural person and resident of the State of Florida.

16.     Plaintiff Sharon Burney ("Burney") is a natural person and resident of the State of Florida.

17.     Plaintiff Chastity McNeil ("McNeil") is a natural person and resident of the State of Florida.

18.     Plaintiff Jeri Brennan ("Brennan") is a natural person and resident of the State of Florida.

19.     Plaintiff Kimetra Brice ("Brice") is a natural person and resident of the State of California.

20.     Plaintiff Earl Browne ("Browne") is a natural person and resident of the State of California.

21.     Plaintiff Jill Darlene Novorot ("Novorot") is a natural person and resident of the State of California.

22.     Defendant Elevate Credit Service, LLC ("Elevate") is a Delaware limited liability company with its principal office at 4150 International Plaza, Suite 300, Fort Worth, Texas 76109. Through a corporate spinoff, Think Finance created Elevate in May 2014 as part of a scheme to generate windfall profits for its owners—the same owners of Elevate—by protecting Think Finance's assets from collection by consumer borrower creditors. Think Finance did so by transferring its non-troubled assets for zero consideration to the newly formed Elevate. After the spinoff, Elevate's employees and executives continued to assist Think Finance in its predatory rent-a-tribe lending scheme through shared employees and services.

## BACKGROUND

**A.**   **Virginia, Florida, and California law prohibit usury and provide for strict licensing requirements to protect consumers from predatory and abusive lending practices.**

23.    More than forty years before the signing of the Declaration of Independence, Virginia enacted its first usury law, which capped interest rates at 6 percent. John W. Edmonds III, *Virginia Law of Interest and Usury*, 10 U. Rich. L.R. 77, 77 (1975), *available at* https://scholarship.richmond.edu/cgi/viewcontent.cgi?article=1313&context=lawreview.

24.    Virginia's "usury laws serve a beneficial public purpose and are to be liberally construed with a view to advance the remedy and suppress the mischief." *Radford v. Cmty. Mortg. & Inv. Corp.*, 312 S.E.2d 282, 285 (Va. 1984).

25.    The Supreme Court of Virginia has repeatedly acknowledged that Virginia's "usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated, and the court should therefore be chary in permitting this policy to be thwarted." *Id*. (quoting *Heubusch & Reynolds v. Boone*, 192 S.E.2d 783, 789 (Va. 1972)).

26.    In accordance with this longstanding public policy, a person may not charge an annual percentage rate ("APR") exceeding 12% without first obtaining a consumer finance license from the Commonwealth. Va. Code §§ 6.2-1501(A), 6.2-303(A).

27.    If a person violates the interest rate cap, Virginia's Consumer Finance Act imposes severe consequences, including criminal liability and forfeiture of all principal, interest, and any charges related to the loan. Va. Code § 6.2-1540 (making it a class 2 misdemeanor for any person who violates or participates in the violation of Virginia's interest rate cap); Va. Code § 6.2-1541(A) (declaring such loans "void" and the principal uncollectible).

28.    Virginia's Consumer Finance Act is a remedial statute that "originated to protect needy consumers from unjust terms and exploitation surrounding lending practices." *Com. v. Car*

*Pawn of Virginia, Inc.*, 1995 WL 17044380, at *4 (Va. Cir. 1995); *see also Greenberg v. Com. ex rel. Atty. Gen.*, 499 S.E.2d 266, 269 (Va. 1998). Thus, it was designed to protect Virginia consumers from the very type of abusive lending practic Defendant participated in, which sought to evade state lending laws, including Virginia's, by entering into ventures with Native American tribes "so they can use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders & Tribes: Are Both Tribal Sovereignty & Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 758-59 (2012)).

29.     Like Virginia, Florida and California have enacted usury laws that prohibit lenders from making high interest loans.

30.     Prior to even becoming a member of the Union in 1845, the Florida legislature passed laws prohibiting usury as early as 1822.[1] As the Florida Supreme Court noted, "The very purpose of statutes prohibiting usury is to bind the power of creditors over necessitous debtors and prevent them from extorting harsh and undue terms in the making of loans." *Chandler v. Kendrick*, 146 So. 551, 552 (Fla. 1933).

31.     Pursuant to Florida Statute § 687.03, interest rates greater than 18% per annum on loans in the amount of $500,000 or less are usurious. Those who violate the usury provisions must forfeit "the entire interest so charged, or contracted to be charged" and double the amount of usurious interest paid. Fla. Stat. § 687.04.

---

[1] *See* Jeremiah W. Blydenburgh, *A Treatise On The Law Of Usury; To Which Are Added, The Statutes Of Several States Relating To Interest Now In Force*, 172 (1844), *available at* https://books.google.com/books?id=6Fk9AAAAIAAJ&printsec=frontcover&source=gbs_ge_su mmary_r&cad=0#v=onepage&q&f=false.

32.     Additionally, in Florida, lenders must be licensed by the Office of Financial Regulation, and loans of $25,000 or less with interest exceeding 18% per annum are void and unenforceable. Fla. Stat. § 516.02(1-2). Even with a license, a lender may not charge interest exceeding 30% on the first $3,000 of the principal amount, 24% on the part of the principal amount exceeding $3,000 and up to $4,000, and 18% on that part of the principal amount exceeding $4,000 and up to $25,000. Fla. Stat. § 516.031(1).

33.     If a lender (licensed or unlicensed) charges interest greater than legally permitted, the loan is void and unenforceable. Fla. Stat. § 516.02(2)(c).

34.     Further, under Florida law, it is a criminal offense to make usurious loans at rates of 25% of higher. Fla. Stat. § 687.071. Loan contracts in excess of the 25% threshold triggering criminal liability for usury are similarly "void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

35.     The Florida Attorney General has made clear that payday loans and similar loans are subject to Florida's usury laws. Fla. AGO 2000-26 (Fla. A.G.), 2000 WL 543211.

36.     Similarly, California has regulated maximum interest rates since 1872. *See* Robert R. Rickett, *California's Model Approach to Usury*, 18 Stan. L. Rev. 1381, 1385 (1966). Currently, the law of usury in California is based upon California Constitution article XV, section 1, which limits the interest payable "[f]or any loan or forbearance of any money." *Sw. Concrete Products v. Gosh Constr. Corp.*, 798 P.2d 1247, 1249 (Cal. 1990) (quoting Cal. Const. Art. XV § 1).

37.     Thus, "unless a lender falls into one of the exemptions approved by the state legislature, it may not charge more than 10% interest per annum on a loan." *Dev. Acquisition Group, LLC v. ea Consulting, Inc.*, 776 F. Supp. 2d 1161, 1164 (E.D. Cal. 2011) (citing CAL. CONST. ART. XV § 1). "An interest rate in excess of 10% is usurious, and if a lender negotiates

a loan at a usurious rate absent a qualified exemption, the agreement shall be void and the lender will have no action at law to recover any interest." *Id.* (citing Cal. Civ. Code § 1916–2).

38.     California's usury laws "are primarily designed to penalize those who take advantage of 'unwary and necessitous borrowers.'" *See id.* at 1166 (quoting *Fox v. Peck Iron and Metal Co., Inc.*, 25 B.R. 674, 692-93 (Bankr. S.D. Cal. 1982)).

39.     Thus, California law allows consumers to recover all interest paid on usurious loans in excess of 10% within the past two years, plus treble damages for any interest paid within the year preceding the filing of this action, as well as Plaintiffs' attorney's fees and costs. Cal. Civ. Code § 1916-3; *Dev. Acquisition Group*, 776 F. Supp. 2d at 1165; Rickett, *supra*, at 1391.

**B.     The rent-a-tribe model was developed to evade state usury laws, such as those of Virginia, Florida, and California.**

40.     Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a repayment system that involves the lender withdrawing funds directly from the borrower's bank account."[2] These types of debt traps "are heavily marketed to financially vulnerable consumers."[3]

41.     Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005, "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra* ¶ 28, at 759 (quoting Karen E. Francis, Note, *Rollover,*

---

[2] *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

[3] *See CFPB Finalizes Rule To Stop Payday Debt Traps*, CFPB (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. "A debt trap results when a borrower is repeatedly unable to repay a loan and must reborrow, paying additional fees each time." *See Payday, Vehicle Title, and Certain High-Cost Installment Loans*, *supra* note 2, at 1853.

*Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611-12 (2010)).

42.     It is no secret that "internet payday lenders have a weak history of complying with state laws." *Id*. at 764. Prior to the rent-a-tribe business model, some payday lenders, including Think Finance, entered into partnerships with national banks to avoid compliance with state laws.[4]

43.     Beginning in 2005, federal regulators began cracking down on rent-a-bank arrangements, and they were nearly eliminated by 2010—largely by the assessment of penalties and fines against participating banks. *See, e.g.*, Creola Johnson, *America's First Consumer Financial Watchdog Is on A Leash: Can the CFPB Use Its Authority to Declare Payday-Loan Practices Unfair, Abusive, and Deceptive?*, 61 Cath. U. L. Rev. 381, 399 n.16 (2012).

44.     In response to the crackdown on rent-a-bank arrangements, several payday lenders reincarnated the lending model through associations with Native American tribes to avoid state laws. *Id*.; *see also* Martin & Schwartz, *supra* at ¶ 28.

45.     "In these partnerships, online payday lenders register businesses on Native American lands and claim to be exempt from lawsuits and state usury caps under tribal sovereign immunity. Using this doctrine, lenders argue that because their businesses are located on or headquartered within the borders of a Native American reservation, they are bound by the laws of that reservation only, not the laws of the state in which the reservation is located or the state in which the borrower resides." Johnson, *supra* ¶ 43, at 399 (footnotes omitted).

---

[4] *See, e.g.*, Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp.*, *Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* at 17-22 (2001), *available at* http://www.consumerfed.org/pdfs/paydayreport.pdf.

46.     A central feature of the rent-a-tribe business model is the choice-of-law provision used in the scheme's lending agreements. Non-tribal participants assert they have no liability for their violations of state and federal laws because only tribal law applies to the loans. But such claims have been uniformly denied by courts from a variety of jurisdictions across the country, including by the Fourth Circuit Court of Appeals and this Court with respect to the very loan agreements at issue here, thus demonstrating the illegality of the instant rent-a-tribe lending scheme.[5] Indeed, the Supreme Court most recently denied a petition for certiorari by another participant in the rent-a-tribe lending scheme alleged here, who sought review of the Second Circuit's decision striking down the choice-of-law provisions in the same form loan agreements at issue here, which the Second Circuit described as "transparent attempts to deploy tribal sovereign immunity to skirt state and federal consumer protection laws." *See Gingras v. Think Finance*, 922 F.3d. 112, 126 (2d Cir. 2019), *cert. denied*, 2020 WL 129562 (U.S. Jan. 13, 2010) (No. 19-331).

**C.     Think Finance adopted the tribal lending model to evade state usury laws, such as those of Virginia, Florida, and California.**

47.     Think Finance and its subsidiaries (collectively "Think Finance") operated a usurious lending scheme, which sought to evade the usury laws of certain states by using the Chippewa Cree, Otoe-Missouria, and Tunica-Biloxi Tribe (collectively, the "Tribes") as the

---

[5] *See Gibbs v. Haynes Investments, LLC*, No. 19-1434, 2020 WL 4118239, at *6 (4th Cir. July 21, 2020); *Gibbs v. Stinson,* No. 3:18CV676, 2019 WL 4752792, at *14-18 (E.D. Va. Sept. 30, 2019); *see also Gingras v. Think Finance*, 922 F.3d. 112 (2d Cir. 2019); *Brice v. 7HBF No. 2, Ltd.*, No. 19-CV-01481-WHO, 2019 WL 5684529 (N.D. Cal. Nov. 1, 2019); *Brice v. Plain Green*, 372 F. Supp. 3d 955 (N.D. Cal. 2019); *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016); *W. Sky Fin., LLC v. State ex rel. Olens*, 300 Ga. 340, 348 (2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, No. 13-60066-CIV, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin.*, LLC, No. 13 CVS 16487, 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes*, 811 F.3d at 675; *Rideout v. CashCall, Inc.*, No.  2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

conduit for their loans. Under the tribal lending model, loans were made in the name of Plain Green, LLC ("Plain Green"), Great Plains Lending, LLC ("Great Plains"), and Mobiloans, LLC ("Mobiloans")—three entities formed under tribal law to serve as the fronts to disguise Think Finance's role and to ostensibly shield the scheme by exploiting tribal sovereign immunity. In return for the use of their name, the tribal companies received a nominal flat fee of the revenue from the loans, but they otherwise had no control over the income, expenses, or day-to-day operations of the businesses.

48.     Prior to the creation of the lending scheme at issue, Think Finance used a rent-a-bank lending model. *See* Ex. 2 (First Bank of Delaware and ThinkCash PowerPoint entitled "Universal Fund Investor Overview").

49.     Under this arrangement, loans were originated in the name of First Bank of Delaware, but the bank served as nothing more than a nominal lender on behalf of Think Cash, Inc. ("Think Cash"), Think Finance's predecessor. *Id*. at TF-PA-504641.

50.     In return for the use of its name, First Bank of Delaware received 10% of the revenue from the loans. *Id*. at TF-PA-504640.

51.     By contrast, through its wholly owned subsidiary TC Administrative, Think Cash received the "excess" of the cash flow after accounting for losses, management fees, and fixed rate interest payments to investors, *i.e.*, the third parties who invested money to allow Think Cash to grow the scheme. *Id*. at TF-PA-504640.

52.     In August 2010, the Federal Deposit Insurance Corporation ("FDIC") took steps to shut down ThinkCash's arrangement with First Bank of Delaware through a cease and desist order directing it to terminate its relationship with "all third-party lending programs." *See, e.g., In the Matter of First National Bank,* Case No. FDIC-07-256b, Order to Cease and Desist, Order for

12

Restitution, and Order to Pay (Oct. 9, 2008) (requiring First Bank of Delaware to terminate "all relationships with third-party providers and the termination of all third-party lending programs or any agreements or arrangements with third-party providers that exhibit the characteristics of a 'Rent-a-BIN' or 'Rent-a-ICA' arrangement"). In response, First Bank of Delaware notified Think Finance that that they were going to terminate the program. Ex. 3, Rees Dep. at 157:2-3.

53.     Not to be deterred, the owners and executives of Think Finance identified what they believed would be a solution—they decided to adapt their business model to use a tribal entity as a conduit for the loan. The purpose of adopting the rent-a-tribe model was to avoid banking regulatory issues and leverage Think Finance's existing sourcing, underwriting, and servicing platforms from the discredited rent-a-bank model.

54.     Think Finance modeled its rent-a-tribe scheme after CashCall, Inc., which they identified as their main competitor, and Think Finance retained the same legal counsel used by CashCall to construct its tribal lending model, Claudia Callaway.[6]

55.     Instead of using a national bank as a nominal lender, Think Finance would use a business entity organized under the laws of a Native American tribe as the nominal lender. The

---

[6] Callaway's advice to her clients is well-documented in the CashCall litigation. *See Consumer Fin. Prot. Bureau v. CashCall, Inc.,* 2016 WL 4820635, at *2 (C.D. Cal. 2016). As detailed in the court's findings of fact, Callaway was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." *Id.* Callaway presented herself to her clients as someone who could "'facilitate relationships' and provide opportunities" for payday lenders "to diversify and structure a lending model within requirements of law to 'avoid enforcement actions by state and federal regulators." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2018 WL 485963, at *2 (C.D. Cal. 2018) (finding of fact and conclusion of law after bench trial). Callaway advised her clients that "because the loans made pursuant to the Tribal Lending Model were originated by a tribe or tribal member, the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id.* at 3.

entity organized under tribal law would originate installment loans that were substantially similar to the loans originated under the rent-a-bank arrangement.

56.     According to the CEO of Think Finance, Kenneth Rees, the company "had a business model" that "worked well" with First Bank of Delaware, and it wanted its tribal lending arrangement "to replicate that as much as possible." Ex. 3, Rees Dep. at 183:17-22.

**D.      Think Finance solicited the Otoe-Missouria Tribe to form Great Plains in furtherance of the usurious lending scheme.**

57.     On or around January 12, 2011, for example, representatives of Think Finance met with members of the Otoe-Missouria Tribe. *See generally* Ex. 4 (Think Finance PowerPoint entitled "Great Plains Lending Meeting").

58.     Prior to this meeting, employees of Think Finance created a PowerPoint presentation entitled "Great Plains Lending Meeting," which contained an agenda of key points to present to the Otoe-Missouria Tribe. *Id*. at 1.

59.     The agenda of key points included a company overview of Think Finance, an overview of the loan program, the structure of the arrangement, contractual arrangements, operational responsibilities, and next steps. *Id*. at 2, 9-10.

60.     Great Plains had not been formed as of the date of this meeting, and, the presentation identified one of the "next steps" as "[c]reate tribal entity—Great Plains Lending, LLC." *Id*. at 13.

61.     The other steps included setting up a "tribal bank account at FBD," "[r]eview/approve consumer legal documents," and "[r]eview/sign contractual agreements." *Id*.

62.     Although Great Plains had not been incorporated as of the meeting, Think Finance had already registered the domain name for the Great Plains website and developed the text and graphics for the website—samples of which were included in the PowerPoints. *Id*. at 5.

63.     In February 2011, Think Finance held another meeting with the Otoe-Missouria Tribe to promote the potential venture. *See generally* Ex. 5.

64.     As part of this process, Think Finance created a PowerPoint entitled "Emergency Cash Lending—A New Source of Tribal Revenue." *Id*. at 1.

65.     The PowerPoint claimed that "[o]nline emergency cash lending" represented "a significant opportunity for increased tribal revenue" and that Think Finance had "a unique turnkey solution for helping tribes enter this lucrative market." *Id*. at 2.

66.      The "[t]urn-key solution include[d] technology, marketing, risk management, compliance support, and access to capital funding," which could be "[u]p and running 90 days from signed contracts." *Id*. at 3.

67.     More specifically, Think Finance touted that it had: (1) a "proven technology platform," that had "millions of transactions processed to date," (2) a "marketing machine" that had "100,000 applications monthly," (3) "best in class underwriting," (4) "access to third party capital," including "up to $150" million for funding the loans, and (5) "extensive compliance experience," including multiple "successful FDIC and state exams." *Id*. at 6.

68.     Think Finance further explained that "[u]sing Think Finance technology and services," would allow tribes to "generate millions of dollars in cash flow with no investment in technology, lending capital, or marketing costs, and with no risk of loss." *Id*. at 2.

69.     The primary sources of this revenue were "[e]mergency cash users—mainstream Americans," who were "65% female," with household income of "$25K-50K" who primarily needed the emergency loans for unexpected bills, medical costs, car repairs, or to avoid overdrafts. *Id*. at 4.

70.     The PowerPoint further claimed that "Recent Rulings Have Confirmed that Tribes Can Provide These Services without State Regulatory Jurisdiction." *Id*. at 4.

71.     On February 24, 2011, the Otoe-Missouria accepted Think Finance's proposal and Ken Rees signed a "Trademark and URL Assignment Agreement," transferring the web address, www.greatplainslending.com, to Great Plains for $100.00. *See* Ex. 6.

72.     That same day, Rees sent an e-mail attaching the URL Agreement to Think Finance's key executives and instructing them to "start your engines!!" *See* Ex. 7.

**E.      Think Finance solicited the Chippewa Cree Tribe to form Plain Green in furtherance of the rent-a-tribe scheme.**

73.     On March 11, 2011, Think Finance entered into an initial term sheet with the Chippewa Cree Tribe, Victory Park (through its ownership of GPLS),[7] and Haynes Investments, LLC ("Haynes Investments") for another rent-a-tribe venture.

74.     Consistent with the rent-a-bank arrangement, Think Finance agreed to provide the infrastructure to run the lending operations, including the software, "risk management, application processing, underwriting assistance, payment processing, and ongoing service support" for consumer loans in the name of the Chippewa Cree Tribe. Ex. 8 at 1 (Term Sheet for Think Finance-Chippewa Cree Transaction).

75.     In return, the Chippewa Cree Tribe agreed to commit "its best efforts" to complete certain "critical path items" within 14 days, including forming Plain Green, revising the Tribal Transaction Code to allow for the arrangement's lending products, setting up bank accounts and ACH processing for Plain Green, and obtaining separate originating and servicing addresses for Plain Green. *Id*. at 3.

---

[7] Victory Park Capital Advisors, LLC ("Victory Park") is a private equity firm headquartered in Chicago, which invested and participated in Think Finance's rent-a-tribe predatory lending enterprise.

76.     In return for the use of its name, Plain Green received "4.5% of cash revenue received" on the loans, as well as reimbursement for expenses. *Id*. at 3.

77.     The Chippewa Cree Tribe was not required to contribute any of its own money to fund the loans or operations. *Id*. at 1.

78.     Rather, Haynes Investments agreed to "provide funding to the Tribe to enable it to make each of the Loans," and to fund Plain Green's bank account with "sufficient monies to fund one business day of Loans[.]" *Id*. at 1.

79.     Because of Think Finance's control and role, Plain Green's former CEO and COO, Billi Anne Raining Bird, recently testified that she agreed with the characterization that Plain Green was a "rent-a-tribe," including that the tribes served purely as figureheads with no involvement or control over any aspect of the lending business. Ex. 9, Raining Bird Dep. at 52:13-55:4, 69:2-75:10, 85:18-86:10, 139:8-141:1.

80.     She further testified that Plain Green didn't have any meaningful control over the lending business; rather Think Finance offered a small percentage to the Tribe on a take it or leave it basis. *Id*. at 52:13-55:4, 69:2-75:10. Plain Green didn't even review the loan applications, which were automatically processed regardless of whether Plain Green provided the pro forma approval it was supposed to provide. *Id*. at 58:13-59:21, 168:16-22. And, Think Finance intentionally tried to conceal information from Plain Green so that it was dependent on Think Finance, who could then continue to demand the vast majority of the profits from the lending business. *Id*. at 85:8-22; 102:3-18, 139:8-141:15.

**F.      Think Finance received unlawful interest and principal on the void loans.**

81.      Although, as Ms. Raining Bird testified, the Tribal Fronts received a miniscule portion of Think Finance's profits, the Enterprise generated billions of dollars of revenue, with Think Finance and its owners profiting handsomely.

82.      In ten years of Think Finance's operation, the company went from a $17 million-dollar company to a $700 million dollar company—building its profitability off the backs of consumers who were charged unlawful interest on loans far in excess of that allowed by relevant state laws.

83.      For example, between October 23, 2013 and June 1, 2016, Think Finance collected through Plain Green $80,327,521 from California consumers, representing $37,332,248 in repaid principal, $42,638,916 in interest and $356,357 in fees.

84.      Between May 19, 2013 and October 20, 2017, Think Finance collected through Plain Green $50,942,975.88 from Virginia consumers, which includes $22,155,557.32 in repaid principal and $28,787,418.56 in interest and fees.

85.      Between September 22, 2013 and June 1, 2016, Think Finance collected through Plain Green $76,039,347 from Florida consumers, which includes $32,196,529 in repaid principal, $43,529,675 in interest, and $313,143 in fees.

86.      As for Great Plains, between October 23, 2013 and April 1, 2018, Think Finance collected $48,266,421 from California consumers, representing $19,396,445 in principal, $28,360,221 in interest and $509,755 in fees.

87.      Between May 19, 2013 and October 20, 2017, Think Finance collected through Great Plains $18,498,414.81 from Virginia consumers, which includes $7,096,354.96 in repaid principal and $11,402,059.85 in interest and fees.

88.     Between September 22, 2013 and April 1, 2018, Think Finance collected through Great Plains $51,027,783 from Florida consumers, which includes $18,927,899 in principal, $31,661,055 in interest and $438,829 in fees.

89.     This is collectively nearly over $325 million just from Virginia, Florida, and California consumers for the time periods identified and for only Great Plains and Plain Green, of which over half (approximately $187.64 million) constituted usurious interest in plain violation of Virginia, Florida, and California law.

90.     In its bankruptcy proceedings, Think Finance agreed to an allowed claim by consumer borrowers nationwide of $1.13 billion asserted as having been unlawfully charged and collected, reflecting the magnitude of Think Finance's predatory lending scheme.

91.     Think Finance's enormous revenue and corresponding profits resulted from the illegal collection of usurious loans in Virginia, Florida, California, and other states.

92.     Under the terms of Think Finance's standard Loan Agreements, the interest rates charged were significantly greater than that allowed under Virginia, Florida, and California law (12%, 18%, and 10% APR respectively)—often between 118% and 448%, if not higher.

93.     For example, Plaintiff Inscho was charged with an APR of 448%—over 37 times the 12% interest cap in Virginia. Va. Code § 6.2-303(A).

94.     Similarly, Plaintiff Gibbs was charged with an APR of 277.92%, and Plaintiff Williams was charged with an APR of 247.88%.

95.     Likewise, Plaintiff McNeil's loan carried an interest rate of 349.05%—over 19 times the 18% interest cap in Florida for unlicensed loan companies. *See* Fla. Stat. § 516.01(2), 516.02(2)(a).

96.     Similarly, Plaintiff Patterson's loans with Plain Green carried interest rates of 200%, 248.54%, and 258.09%.

97.     Burney's loans with Great Plains carried interest rates of, *inter alia*, 154.59%, 249.30%, and 348.52%. Her loans with Plain Green likewise carried interest rates ranging from 139% to 236%.

98.     Plaintiff Brennan's loan with Great Plains carried an interest rate of 176.5%.

99.     Plaintiff Brice was charged with an APR of 287.86%—over 37 times the 10% interest cap permitted under California's Constitution. Cal. Const. Art. XV § 1.

100.    Neither Think Finance nor any of the other participants in the lending scheme had a consumer finance license permitting them to make loans charging interest in excess of 12% APR in Virginia or 18% in Florida, nor did they ever attempt to obtain such a license. *See* Va. Code § 6.2-1501; Fla. Stat. § 516.01(2), 516.02(2)(a).

101.    Accordingly, the loans were null and void in Virginia and Florida and exceeded the lawful usury rate in California, such that it was unlawful for Think Finance or any of its affiliated entities to collect or receive interest or charges on the loans in excess of the applicable state usury rates or even any principal in Virginia or Florida, including the amounts paid by Plaintiffs. Va. Code § 6.2-1541(A); Fla. Stat. § 516.02(2)(c); Fla. Stat. § 687.147; CAL. CONST. Art. XV § 1.

102.    As a result of the illegal loans, Think Finance and other members of the Enterprise received at least: (i) $711.02 from Ms. Gibbs; (ii) $15,369.15 from Ms. Edwards; (iii) $1,858.67 from Ms. Williams; (iv) $6,042.19 from Mr. Mwethuku; (v) $16,210.84 from Mr. Inscho; (vi) $40,000 from Ms. Burney; (vii) $2,867 from Ms. McNeil; (viii) $14,500 from Ms. Patterson; (ix) $4,444.72 from Ms. Brennan; (x) $2,634.40 from Ms. Brice; (xi) $10,250.20 from Mr. Browne;

and (xii) $6,244 from Ms. Novorot. The majority of these amounts were credited to interest and fees.

**G.      Events leading to the spinoff and creation of Elevate.**

103.    In or about early 2012, Think Finance became concerned that its lucrative cash stream associated with its rent-a-tribe model was at risk due to attacks by federal and state regulators, causing it to seek out a "legal 'dream team' in preparation for potential litigation from consumer groups, state AGs, FTC/CFPB." Ex. 10 at SEQ-CA0007269; *see also* Ex. 11 at SEQ-CA0007398 (powerpoint presentation detailing potential alternatives to tribal lending, including migrating to offshore lending or finding a bank partner to use as the conduit for the loans).

104.    Shortly thereafter, on June 12, 2012, the Consumer Financial Protection Bureau ("CFPB") issued Civil Investigative Demands ("CIDs") to Great Plains, Plain Green, and Mobiloans, which Think Finance unsuccessfully sought to set aside. *Consumer Fin. Prot. Bureau v. Great Plains Lending, LLC*, 2014 WL 12685941, at *1 (C.D. Cal. May 27, 2014) (providing background on CID issued to Great Plains in 2012), *aff'd*, 846 F.3d 1049 (9th Cir. 2017).

105.    Later that year, the Department of Justice ("DOJ") initiated what was referred to as "Operation Chokepoint," pursuant to which the DOJ and FDIC sought to prevent Automated Clearing House ("ACH") processors from engaging in electronic fund transfers for online payday lenders engaged in consumer fraud, such as Think Finance's rent-a-tribe lending business.

106.    Several internal documents produced by Think Finance show that it considered Operation Chokepoint as a major threat to its business model, especially its tribal lending products.

107.    On August 6, 2013, the biggest threat to the tribal lending model came when the New York Department of Financial Services ("DFS") issued a cease and desist letter to 35 online lending companies, including Great Plains. The Official Website of New York State, *Press Room*, *Cuomo Administration Demands 35 Companies Cease and Desist Offering Illegal Online Payday*

*Loans   That   Harm   New   York   Consumers*   (Aug.   6,   2013),   *available   at*
https://www.governor.ny.gov/news/cuomo-administration-demands-35-companies-cease-and-
desist-offering-illegal-online-payday-loans.

108.    The cease and desist was issued after an "extensive" investigation "uncovered that
those companies were offering payday loans to consumers over the Internet in violation of New
York law, including some loans with annual interest rates as high as 1,095 percent." *Id.*

109.    In addition to the cease and desist sent to the payday lenders, the Superintendent of
Financial Services, Benjamin Lawsky, also sent letters to 117 banks and the National Automated
Clearinghouse Association, requesting that "they work with DFS to cut off access to New York
customer accounts for illegal payday lenders." *Id.*

110.    In his public comments on the letters, Mr. Lawsky explained: "Companies that
abuse New York consumers should know that they can't simply hide from the law in cyberspace.
We[ a]re going to use every tool in our tool-belt to eradicate these illegal payday loans that trap
families in destructive cycles of debt." *Id.*

111.    In response, Think Finance funded and spearheaded litigation to challenge a cease
and desist issued to Great Plains. As part of this lawsuit, Great Plains sought declaratory relief and
a preliminary injunction that tribal businesses were inherently sovereign nations and not subject to
New York law. *See Otoe-Missouria Tribe of Indians v. New York State Dept. of Fin. Services*, 974
F. Supp. 2d 353, 361 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014).

112.    On September 30, 2013, the district court denied the tribal plaintiff's request for a
preliminary injunction, finding that the "undisputed facts demonstrate[d]" that the illegal activity
was "taking place in New York, off of the Tribes' lands," and thus, the loans were "subject to the
State's non-discriminatory anti-usury laws." 974 F. Supp. 2d at 361.

113.    The court reasoned, "There is simply no basis… that the Tribes are treated differently from any other individuals or entities that enter New York to lend to New York residents." *Id*.

114.    In addition to the loss in *Otoe-Missouria*, a growing number of lawsuits and government enforcement actions against the scheme's competitors brought increased scrutiny to the tribal lending business model, including the New York Attorney General's lawsuit filed in August 2013 against a tribal lending enterprise involving CashCall and Western Sky. *People of the State of New York v. Western Sky Financial, et al*, New York State Supreme Court, New York County, No. 451370/2013.

115.    In a matter of mere months following this devastating decision for Think Finance's rent-a-tribe business model, the company began "evaluating a rather draconian organizational change that we are referring to as 'Project Exclaim.' This would spin off several products (Rise, Sunny, Elastic) to separate the tribal and non-tribal businesses." Ex. 1

116.    The plan was to split the company into two pieces: Think Finance and Elevate. Think Finance would contain "all of the (extremely profitable but) tainted assets, including all tribal-related lending products," for which "[n]o effort [would] be put into growth." Ex. 11 at SEQ-CA0017287; *see also* Ex. 1 (Memorandum to the Board, explaining that Think Finance was "evaluating a rather draconian organizational change" that would "spin off several products" to "separate the tribal and non-tribal products."). *Id*.

117.    By contrast, all of the "good stuff," *i.e.*, the lending products and assets unconnected to the tribal products, would be moved to the "newco." *Id*. In other words, as reported by Ken Rees to the Think Finance Board of Directors, this spin-off scheme was optimal "from the standpoint of potential liquidity events." Ex. 1 at TF-VA0297706.

118.    In another powerpoint, Think Finance described the benefit to "spinning off non-tribal businesses" was to "[s]eparate potential financial downsides and upsides for each business model." Ex. 13 at TF-VA0297648.

**H.    Think Finance's spin-off of Elevate and later filing of bankruptcy was carefully orchestrated to protect the assets of its owners.**

119.    To evade its massive liability to consumer borrowers, Think Finance completed the spin off on or around May 1, 2014.

120.    As part of the Elevate spin-off, Think Finance distributed for zero consideration all of the outstanding equity interests of Elevate to Think Finance stakeholders in an equal amount of stock as they held in Think Finance. Yet, Think Finance's shareholders paid nothing for these Elevate shares.

121.    This transfer of assets was part of Think Finance's scheme to shield its assets from creditors and enrich its owners.

122.    Internal emails show that Think Finance knew the spin-off was subject to challenge and reflect that Think Finance even attempted to doctor its financials to lessen the obviously suspicious nature of the transaction. For example, a July 28, 2014 email from Think Finance's CFO to CBIZ, a company retained to provide a "Valuation Analysis" for Think Finance and Elevate, worried about "showing a big jump in [Elevate's] valuation so quickly after a spinoff" and stated he could "reduce future year volumes to make it consistent with the spinoff analysis." Ex. 14 at TF-VA 221074.

123.    Think Finance's owners and executives, who had orchestrated the fraudulent transfer of Think Finance's assets to Elevate through the spin-off, profited handsomely, both in the form of dividend payments, as well as in the form of Elevate public stock, all for zero consideration.

124.    In sum, Think Finance carefully conceived of and carried out a plan to divest Think Finance of its assets in order to protect the wealth of the company's owners from anticipated collection efforts by spinning off certain products under the Elevate umbrella. The company's goal at all times was to siphon off its wealth and good assets to protect it from claims from consumer borrower creditors.

**I.    Elevate and Think Finance used their shared employees, shared services, and shared data to facilitate Think Finance's operations**

125.    The Elevate spin-off agreement, titled the "Separation and Distribution Agreement," between Think Finance and Elevate—which was signed by Ken Rees as President of both companies and conceived of to protect Think Finance's non-troubled assets from collection— included a series of agreements, pursuant to which Elevate aided, abetted, assisted, and facilitated Think Finance's Tribal Lending Enterprise. Ex. 15 at SEQ-VT0000326.

126.    At the time Think Finance transferred its most valuable assets to Elevate for $0.00, there was no change in ownership. All equity holders of Think Finance received the same number of shares in Elevate, while retaining their same shares in Think Finance. Accordingly, the controlling owners of Think Finance were also the controlling owners of Elevate.

127.    In addition, Elevate/Think Finance's controlling stakeholders had representation on both Boards. Ex. 16 at SEQ-CA0017672. For example, Rees served both as Elevate's CEO and Board Chairman, as well as Think Finance's Board Chairman. For the Harvison family, Jason Harvison became the COO of Elevate and his father, Johnny Harvison, stepped onto the board of Think Finance.

128.    The two companies also operated out of the same office building, with Elevate subleasing its office space from Think Finance.

129.    And, although Elevate took on substantially more employees than nominally remained at Think Finance, pursuant to the "Employee Matters Agreement," entered into by Think Finance and Elevate (and also signed for both parties by Rees), the companies shared a significant number of employees, who performed services for both and were thus designated "Shared Service Employees." *See* Ex. 17. No separate consideration was exchanged for this agreement.

130.    In fact, the bulk—77%—of Think Finance employees were Shared Service Employees with Elevate, including such high-level employees as the Chief Financial Officer, Chief Operating Officer, and Human Resources Director.

131.    As reflected in another agreement, titled the "Shared Services Agreement," Think Finance/Elevate's Shared Service Employees worked on the core operations of both companies. No consideration was exchanged for this agreement. *See* Ex. 18.

132.    Specifically, Shared Service Employees provided services relating to nearly, if not all aspects of operating the businesses, including human resources (payroll and benefits administration, recruiting, time management, reporting and performance management, 401(k) administration); finance (accounting, treasury services, financial analysis and reporting); facilities management (mail distribution, janitorial services, receptionist duties, management of catering services, office furniture, equipment, and personnel); operations (customer service, technical writing support, assistance with operating procedures and infrastructure resources); and information technology ("IT") (staffing, data management services, technical support, access to Think Finance systems, data center, and platforms). The parties jointly oversaw and split the cost of any such shared services.

133.    Think Finance and Elevate also entered into a Data Sharing and Support Agreement, under which the companies agreed to share data and information relating to their

respective products "to ensure a continuity of services to their respective customers." *See* Ex. 19. This agreement had four parts and was signed by Rees on behalf of both Elevate and Think Finance. No separate consideration was exchanged for this agreement or any of its respective sub-agreements.

134.    The first part, a "Data Sharing for Model Development and Validation Purposes" agreement specifically provided for the sharing of information between Think Finance and Elevate relating to their respective products "for the purpose of developing and validating underwriting, verifications, response, line assignment and fraud models, processes and rules and performing related analysis," including borrower data furnished when applying for a loan, borrower data obtained for the purpose of processing a loan application, borrower account repayment history, and analysis of the foregoing.

135.    The second part, a "Fraud Mitigation and Prevention Services" agreement, provided for the exchange of fraud data for purposes of identifying problematic loan applications, including through the development of fraud strategies and modeling.

136.    Pursuant to the third part, a "Data Hosting Services" agreement, Think Finance agreed to host Elevate's data, information, documents, and files.

137.    Finally, through the "Data Connectivity Services" agreement, Elevate was given the ability to access and connect to data bases and third-party data providers through Think Finance.

138.    Furthermore, Think Finance provided Elevate a $75 million intercompany line of credit at the time of the spin-off in order to provide needed working capital to Elevate. *See* Ex. 20. In other words, Elevate was not financially independent at the time of the spin-off. Instead, it depended on Think Finance's ill-gotten gains to operate.

139.     That this $75 million line of credit was not an arms-length transaction is evidenced by the fact that the only security pledged to Think Finance as collateral was Think Finance's own assets that were being spun off. In addition, "[a]ny notices, consents, waivers or other communications required or permitted" under the agreement were to be sent to the same individual at the same office building with the same fax number for both companies—Ken Rees—as CEO of Elevate and Think Finance. *Id*. at TCV-VT0000597-98.

140.     What these agreements meant in practice was that there was no real or meaningful separation between Think Finance and Elevate. Separate companies in name only, they operated as one and the same. As such, Elevate employees assisted with Think Finance products and continuation to facilitate the unlawful origination and collection of usurious debt.

141.     In sum, because many Think Finance employees with institutional knowledge of and involvement in the company's rent-a-tribe lending business were quickly transferred to Elevate, Think Finance required and depended on continued involvement by Elevate and its employees in operating its rent-a-tribe lending business, which involvement was freely and often provided.

142.     Elevate thereby directly or indirectly aided, abetted, and/or counseled Think Finance and the other participants in Think Finance's rent-a-tribe Enterprise, including aiding and abetting the "collection of unlawful debt" in violation of 18 U.S.C. § 1962(c).

143.     RICO defines "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

144.     Think Finance charged an interest rate far in excess of the enforceable rate established by Virginia, Florida, and California law, and thus, Think Finance and Elevate violated RICO's prohibition against the collection of unlawful debt.

145.     As a result of Elevate's participation in the Enterprise and violations of RICO, Elevate is jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### COUNT ONE: VIOLATIONS OF RICO, 18 U.S.C. § 1962(c) (CLASS CLAIM)

146.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

147.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a class initially defined as:

> All individuals: (1) located in any state other than Nevada and Utah, (2) who took out a consumer loan product with Plain Green or Great Plains; and (3) made a payment on the loan.

Plaintiffs are members of this class.

148.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. In fact, through prior litigation and settlements involving the Enterprise, it was revealed to plaintiffs that there are over 1 million consumers nationwide who took out a Plain Green or Great Plains loan. Additionally, as borne out in the prior settlements, the names and addresses of the class members are readily identifiable through the internal business records maintained by the Enterprise, and the class members may be notified of the pendency of this action by published and/or mailed notice.

149.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no

factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether Defendant may be held liable for the unlawful conduct of Think Finance under successor and/or alter ego theories of liability; (2) whether Think Finance (and thus Defendant as Think Finance's successor and alter ego) formed an association-in-fact enterprise with its investors and tribal lending partners; (3) whether Think Finance (and thus Defendant) participated in the affairs of the enterprise through the collection of unlawful debt; and (4) what is the proper recovery for Plaintiffs and the class members against Defendant for its role in the enterprise.

150.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

151.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

152.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The

damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

153.    Defendant violated § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs.

154.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate."  18 U.S.C. § 1961(6).

155.    All of the loans made to RICO Class members included interest rates far in excess of twice the enforceable rate in their states.

156.    Plaintiffs and the RICO Class members were injured as a direct result of the violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

157.    Because it participated in the affairs and operation of the Enterprise, Defendant is jointly and severally liable to Plaintiffs and the RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

158.    Plaintiffs and the class members were injured as a result of Defendant's violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the Enterprise (for which Defendant is derivatively liable as Think Finance's successor and alter ego).

## COUNT TWO:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
## (CLASS CLAIM)

159.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

160.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a class initially defined as:

> All individuals: (1) located in any state other than Nevada and Utah; (2) who took out a consumer loan product with Plain Green, Great Plains; and (3) made a payment on the loan.

Plaintiffs are members of this class.

161.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. In fact, through prior litigation and settlements involving the Enterprise, it was revealed to plaintiffs that there are over 1 million consumers nationwide who took out a Plain Green or Great Plains loan. Additionally, as borne out in the prior settlements, the names and addresses of the class members are readily identifiable through the internal business records maintained by the Enterprise, and the class members may be notified of the pendency of this action by published and/or mailed notice.

162.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions

predominate over the questions affecting only individual class members. The common questions include: (1) whether Defendant conspired to violate RICO § 1962(c) through the collection of unlawful debts; and (2) what is the proper recovery for Plaintiffs and the class members against Defendant for its role in the conspiracy.

163.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

164.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

165.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised

by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

166.    Defendant violated § 1962(d) of RICO by agreeing to to aid, abet, assist, and facilitate Think Finance's RICO violations after it was spun off. Defendant's agreement is evidenced by *inter alia*, the "Data Sharing and Support Agreement," financing agreements, a Shared Employees agreement, and the "Shared Services Agreement."

167.    Defendant knowingly agreed to participate in the scheme alleged herein that aided, abetted, assisted and facilitated the making and collection of unlawful debt at more than twice the lawful rate of interest under state usury laws.

168.    Plaintiffs and the class members were injured as a result of the Defendant's violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

169.    Plaintiffs and the class members were injured as a result of Defendant's violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the Enterprise (for which Defendant is derivatively liable as Think Finance's successor and alter ego).

## COUNT THREE:
## VIOLATIONS OF VA CODE § 6.2-305
## (CLASS CLAIM AGAINST DEFENDANT AS SUCCESSOR AND ALTER EGO OF THINK FINANCE)

170.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

171.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

**Usury Class**: All individuals: (1) located in Virginia; (2) who took out a consumer loan product with Plain Green or Great Plains; and (3) made a payment on the loan.

Plaintiffs Gibbs, Edwards, Williams, Inscho and Mwethuku are members of this class.

172.   **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. In fact, through prior litigation and settlements involving the Enterprise, it was revealed to Plaintiffs that there are over 1 million consumers nationwide who took out a Plain Green or Great Plains loan. Additionally, as borne out in the prior settlements, the names and addresses of the class members are readily identifiable through the internal business records maintained by the Enterprise, and the class members may be notified of the pendency of this action by published and/or mailed notice.

173.   **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made to consumers charged interest in excess of that permitted by Virginia's usury laws; (2) whether Plaintiffs may recover from Defendant (as Think Finance's successor and/or alter ego) the amounts paid on the loans; and (3) what is the proper recovery for Plaintiffs and the class members against Defendant.

174.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

175.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

176.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

177.   As demonstrated by the facts alleged above, the transfer of assets from Think Finance to Elevate through the May 2014 spin-off was fraudulent. Elevate provided inadequate consideration for the spin-off; the transfer differed from the usual method of conducting a spin-off; the transfer was made in anticipation of litigation and to escape anticipated liabilities regarding

Think Finance's tribal lending products; the same shareholders owned both entities; management and employees were shared between entities; and Think Finance became effectively insolvent following the transfer after it paid out its remaining assets in dividends to its shareholders. These badges of fraud establish a fraudulent transfer, and Elevate is liable under the doctrine of successor liability for all unlawful conduct committed by Think Finance prior to the spin-off in May 2014.

178.     After the May 2014 spin-off, Think Finance and Elevate were separate in name only, operating seamlessly as one and the same—as alter egos of each other—through shared services and employees, who worked on different product lines just as they had always done. Accordingly, Elevate is liable as the alter ego of Think Finance for all unlawful conduct committed by Think Finance following the spin-off in May 2014.

179.     All of the loans made to Virginia consumers in the name of Plain Green and Great Plains contained interest rates exceeding the amounts permitted by state usury laws, including Virginia's 12% interest rate cap.

180.     As explained above, Think Finance received revenues collected on the loans.

181.     Plaintiffs paid interest in excess of that permitted by Virginia law.

182.     Through this conduct, Think Finance violated § 6.2-305. Defendant is liable as Think Finance's successor for Think Finance's violations of § 6.2-305 to the extent such violations occurred prior to May 2014. As the alter ego of Think Finance, Defendant is liable for having so violated § 6.2-305 to the extent such violations occurred after the spin-off in May 2014.

183.     Accordingly, Plaintiffs and the class members are entitled to recover all amounts repaid on the void loans and twice the amount of such usurious interest that was paid in the two years preceding the filing of this action and their attorney's fees and costs. Va. Code § 6.2-305.

**COUNT FOUR:**
**VIOLATIONS OF FLORIDA CONSUMER FINANCE LAWS**
**(CLASS CLAIM AGAINST DEFENDANT AS SUCCESSOR AND ALTER EGO OF THINK FINANCE)**

184.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

185.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

> **Florida Usury Class**: All Florida consumers who made a payment on any loan with Plain Green or Great Plains.
>
> Plaintiffs Burney, McNeil, Patterson, and Brennan are members of this class.

186.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. In fact, through prior litigation and settlements involving the Enterprise, it was revealed that there are over 1 million consumers nationwide who took out a Plain Green or Great Plains loan. Additionally, as borne out in the prior settlements, the names and addresses of the class members are readily identifiable through the internal business records maintained by the Enterprise, and the class members may be notified of the pendency of this action by published and/or mailed notice.

187.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made to Florida consumers charged interest in excess of that permitted by Florida law; (2) whether Plaintiffs may recover from Defendant (as Think Finance's successor

and/or alter ego) the amounts paid on the loans; and (3) what is the proper recovery for Plaintiffs and the class members against Defendant.

188.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

189.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

190.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the

litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

191.    As demonstrated by the facts alleged above, the transfer of assets from Think Finance to Elevate through the May 2014 spin-off was fraudulent. Elevate provided inadequate consideration for the spin-off; the transfer differed from the usual method of conducting a spin-off; the transfer was made in anticipation of litigation and to escape anticipated liabilities regarding Think Finance's rent-a-tribe lending products; the same shareholders owned both entities; management and employees were shared between entities; and Think Finance became effectively insolvent following the transfer after it paid out its remaining assets in dividends to its shareholders. These badges of fraud establish a fraudulent transfer, and Elevate is liable under the doctrine of successor liability for all unlawful conduct committed by Think Finance prior to the spin-off in May 2014.

192.    After the May 2014 spin-off, Think Finance and Elevate were separate in name only, operating seamlessly as one and the same—as alter egos of each other—through shared services and employees, who worked on different product lines just as they had always done. Accordingly, Elevate is liable as the alter ego of Think Finance for all unlawful conduct committed by Think Finance following the spin-off in May 2014.

193.    All of the loans made to Florida consumers in the name of Great Plains and Plain Green had interest rates greater than 18%.

194.    As explained above, Think Finance received revenues collected on the loans.

195.    Plaintiffs paid interest in excess of that permitted by Florida law.

196.    Through this conduct, Think Finance violated Florida's consumer finance laws. Defendant is liable as Think Finance's successor for Think Finance's violations of Florida's

consumer finance laws to the extent such violations occurred prior to May 2014. As the alter ego

of Think Finance, Defendant is liable for having so violated these laws to the extent such violations

occurred after the spin-off in May 2014.

197.   Accordingly, Plaintiffs and the class members are entitled to recover all amounts

repaid on the void loans, plus twice the amount of usurious interest that was paid, as well as

attorneys' fees and costs. Fla. Stat. §§ 516.02, 687.04.

## COUNT FIVE:
## VIOLATIONS OF CALIFORNIA USURY LAWS
## (CLASS CLAIM AGAINST DEFENDANT AS SUCCESSOR AND ALTER EGO OF THINK FINANCE)

198.   Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth

at length herein.

199.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this

action for themselves and on behalf of a class initially defined as follows:

**California Usury Class**: All individuals: (1) located in California; (2) who took
out a consumer loan product with Plain Green or Great Plains; and (3) made a
payment on the loan.

Plaintiffs Browne, Brice, and Novorot are members of this class.

200.   **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from

California consumers, numerosity is easily satisfied. In fact, through prior litigation and

settlements involving the Enterprise, it was revealed that there are over 1 million consumers

nationwide who took out a loan from the tribal lending entities. Additionally, as borne out in the

prior settlements, the names and addresses of the class members are readily identifiable through

the internal business records maintained by the Enterprise, and the class members may be notified

of the pendency of this action by published and/or mailed notice.

201.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).**

Common questions of law and fact exist as to all members of the putative class, and there are no

factual or legal issues that differ between the putative class members. These questions predominate

over the questions affecting only individual class members. The principal issues include: (1)

whether the loans made to California consumers violated California law because their interest rates

were too high; (2) whether Plaintiffs may recover from Defendant (as Think Finance's successor

and/or alter ego) the amounts paid on the loans; and (3) what is the proper recovery for Plaintiffs

and the class members against Defendant.

202.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of

each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of

action as the other members of the putative class. All claims are based on the same facts and legal

theories.

203.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate

representatives of the putative class because their interests coincide with, and are not antagonistic

to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel

competent and experienced in such litigation, and they intend to continue to prosecute the action

vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the

members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them

to not vigorously pursue this action.

204.     **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the

class members predominate over questions affecting only individual members, and a class action

is superior to other available methods for fair and efficient adjudication of the controversy. The

damages sought by each member are such that individual prosecution would prove burdensome

and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

205. As demonstrated by the facts alleged above, the transfer of assets from Think Finance to Elevate through the May 2014 spin-off was fraudulent. Elevate provided inadequate consideration for the spin-off; the transfer differed from the usual method of conducting a spin-off; the transfer was made in anticipation of litigation and to escape anticipated liabilities regarding Think Finance's rent-a-tribe lending products; the same shareholders owned both entities; management and employees were shared between entities; and Think Finance became effectively insolvent following the transfer after it paid out its remaining assets in dividends to its shareholders. These badges of fraud establish a fraudulent transfer, and Elevate is liable under the doctrine of successor liability for all unlawful conduct committed by Think Finance prior to the spin-off in May 2014.

206. After the May 2014 spin-off, Think Finance and Elevate were separate in name only, operating seamlessly as one and the same—as alter egos of each other—through shared services and employees, who worked on different product lines just as they had always done. Accordingly, Elevate is liable as the alter ego of Think Finance for all unlawful conduct committed by Think Finance following the spin-off in May 2014.

207.     All of the loans made to California consumers in the name of Plain Green and Great Plains used an interest rate greater than 10%.

208.     As explained above, Think Finance received revenues collected on the loans.

209.     Plaintiffs each paid interest in excess of that permitted by California law.

210.     Through this conduct, Think Finance violated California usury laws. Defendant is liable as Think Finance's successor for Think Finance's violations of California usury laws to the extent such violations occurred prior to May 2014. As the alter ego of Think Finance, Defendant is liable for having so violated these laws to the extent such violations occurred after the spin-off in May 2014.

211.     Accordingly, Plaintiffs and the class members are entitled to recover all interest paid on the loans in excess of 10% within the two years prior to the filing of this action, plus treble damages for any interest paid within the year preceding the filing of this action, as well as their attorney's fees and costs. Cal. Civ. Code § 1916-3.

## COUNT SIX:
## VIOLATIONS OF UNFAIR COMPETITION LAW (CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200)
## (CLASS CLAIM)

212.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

213.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Restitution Class"—initially defined as follows:

> **Restitution Class**: All individuals: (1) located in California; (2) who took out a consumer loan product with Plain Green or Great Plains; and (3) made a payment on the loan.

> Plaintiffs Browne, Brice, and Novorot are members of this class.

44

214.   **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from California consumers, numerosity is easily satisfied. In fact, through prior litigation and settlements involving the Enterprise, it was revealed that there are over 1 million consumers nationwide who took out a loan from the tribal lending entities. Additionally, as borne out in the prior settlements, the names and addresses of the class members are readily identifiable through the internal business records maintained by the Enterprise, and the class members may be notified of the pendency of this action by published and/or mailed notice.

215.   **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made to California consumers violated California law because their interest rates were too high; (2) whether the rent-a-tribe venture was unlawful, unfair, or deceptive under California's unfair competition law; (3) whether Plaintiffs may recover from Defendant (as Think Finance's successor and/or alter ego) the amounts paid on the loans; and (3) what is the proper recovery for Plaintiffs and the class members against Defendant.

216.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

217.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel

competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

218.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

219.    As demonstrated by the facts alleged above, the transfer of assets from Think Finance to Elevate through the May 2014 spin-off was fraudulent. Elevate provided inadequate consideration for the spin-off; the transfer differed from the usual method of conducting a spin-off; the transfer was made in anticipation of litigation and to escape anticipated liabilities regarding Think Finance's rent-a-tribe lending products; the same shareholders owned both entities; management and employees were shared between entities; and Think Finance became effectively insolvent following the transfer after it paid out its remaining assets in dividends to its

shareholders. These badges of fraud establish a fraudulent transfer, and Elevate is liable under the doctrine of successor liability for all unlawful conduct committed by Think Finance prior to the spin-off in May 2014.

220.    After the May 2014 spin-off, Think Finance and Elevate were separate in name only, operating seamlessly as one and the same—as alter egos of each other—through shared services and employees, who worked on different product lines just as they had always done. Accordingly, Elevate is liable as the alter ego of Think Finance for all unlawful conduct committed by Think Finance following the spin-off in May 2014.

221.    Think Finance has engaged in business acts and practices that constitute unfair competition in violation of Business and Professions Code section 17200. Specifically, Think Finance engaged in unlawful, unfair, and deceptive business practices likely to deceive the general public through their relationship with the Tribes and purporting to make the loans in the name of the Tribe in order to make high-interest loans to consumers throughout the country, including California, in violation of, *inter alia*, 18 U.S.C. § 1962(a)-(d) and California usury laws.

222.    Think Finance engaged in these unfair practices to increase the profits of Think Finance and its owners. Accordingly, Think Finance engaged in unlawful trade practices, as defined and prohibited by section 17200, *et. seq.* of the California Business and Professions Code.

223.    The aforementioned acts and practices, which Think Finance (and thus Defendant as Think Finance's successor and alter ego) has used to significant financial gain of Think Finance and its owners, also constitute unlawful competition and provided an unlawful advantage over Think Finance's competitors as well as injury to the general public.

224.    Defendant is liable as Think Finance's successor for Think Finance's violations of California's Unfair Competition Law to the extent such violations occurred prior to May 2014. As

the alter ego of Think Finance, Defendant is liable for having so violated the Unfair Competition Law to the extent such violations occurred after the spin-off in May 2014.

225.    As a result of Defendant' unfair, fraudulent, and unlawful business practices alleged herein, Plaintiffs and putative class members have been injured in amounts not less than any interest, fees, or other sums that the Enterprise has collected, which exceed millions of dollars in the aggregate. These amounts have been paid to the Enterprise by Plaintiffs and members of the putative class and should be restored to them. Plaintiffs thus seek, on behalf of those similarly situated, full restitution of such sums acquired by the Enterprise from Plaintiffs, the general public, or those similarly situated by means of the unfair and/or deceptive trade practices complained of herein, plus interest thereon.

**COUNT SEVEN:**
**UNJUST ENRICHMENT**
**(CLASS CLAIM)**

226.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

227.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Unjust Enrichment Class"—initially defined as follows:

> **Unjust Enrichment Class**: All individuals: (1) located in any state other than Nevada and Utah; (2) who took out a consumer loan product with Plain Green or Great Plains; and (3) made a payment on the loan.

> Plaintiffs are members of the unjust enrichment class.

228.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from Virginia, Florida, and California consumers, numerosity is easily satisfied. In fact, through prior litigation and settlements involving the Enterprise, it was revealed that there are over 1 million

consumers nationwide who took out a Plain Green or Great Plains loan. Additionally, as borne out in the prior settlements, the names and addresses of the class members are readily identifiable through the internal business records maintained by the Enterprise, and the class members may be notified of the pendency of this action by published and/or mailed notice.

229.     **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Plaintiffs and the class members conferred a benefit on Think Finance (and thus Defendant as Think Finance's successor and/or alter ego); (2) whether Think Finance (and thus Defendant as Think Finance's successor and/or alter ego) knew or should have known of the benefit; (3) whether Think Finance (and thus Defendant as Think Finance's successor and/or alter ego) retained an unjust benefit by accepting the proceeds from the void loans; and (4) what is the proper recovery for Plaintiffs and the class members against Defendant.

230.     **Typicality**. **Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

231.     **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the

members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

232. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

233. As demonstrated by the facts alleged above, the transfer of assets from Think Finance to Elevate through the May 2014 spin-off was fraudulent. Elevate provided inadequate consideration for the spin-off; the transfer differed from the usual method of conducting a spin-off; the transfer was made in anticipation of litigation and to escape anticipated liabilities regarding Think Finance's rent-a-tribe lending products; the same shareholders owned both entities; management and employees were shared between entities; and Think Finance became effectively insolvent following the transfer after it paid out its remaining assets in dividends to its shareholders. These badges of fraud establish a fraudulent transfer, and Elevate is liable under the

doctrine of successor liability for all unlawful conduct committed by Think Finance prior to the spin-off in May 2014.

234.    After the May 2014 spin-off, Think Finance and Elevate were separate in name only, operating seamlessly as one and the same—as alter egos of each other—through shared services and employees, who worked on different product lines just as they had always done. Accordingly, Elevate is liable as the alter ego of Think Finance for all unlawful conduct committed by Think Finance following the spin-off in May 2014.

235.    All of the loans made in the name of Plain Green and Great Plains to consumers in Virginia, Florida, California, and other states with similar laws were void and unenforceable.

236.    Plaintiffs conferred a benefit on Think Finance (and thus Defendant as Think Finance's successor and alter ego) when they repaid the void loans; Think Finance (and thus Defendant) knew or should have known of the benefit; and Think Finance (and thus Defendant) has been unjustly enriched through its receipt of any amounts in connection with the unlawful loans.

237.    Defendant is liable as Think Finance's successor for Think Finance's unjust enrichment to the extent such unjust enrichment occurred prior to May 2014. As the alter ego of Think Finance, Defendant is liable for such unjust enrichment to the extent it occurred after the spin-off in May 2014.

238.    Accordingly, on behalf of themselves and all other similarly situated, Plaintiffs seek to recover from Defendant, jointly and severally, all amounts repaid on any loans with Plain Green or Great Plains.

## COUNT EIGHT:

## INTENTIONAL FRAUDULENT TRANSFERS UNDER VA. CODE § 55.1-400
### (CLASS CLAIM)

239.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

240.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a class initially defined as:

> All individuals: (1) located in Virginia (2) who took out a consumer loan product with Plain Green or Great Plains; and (3) made a payment on the loan.

> Plaintiffs Edwards, Inscho and Mwethuku are members of this class.

241.   **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. In fact, through prior litigation and settlements involving the Enterprise, it was revealed that there are over 1 million consumers nationwide who took out a loan from the tribal lending entities. Additionally, as borne out in the prior settlements, the names and addresses of the class members are readily identifiable through the internal business records maintained by the Enterprise, and the class members may be notified of the pendency of this action by published and/or mailed notice.

242.   **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether transfers occurred; and (2) whether such transfers were made with the intent to delay, hinder, or defraud creditors of Think Finance.

243.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the

other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

244. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

245. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

246.    As detailed above, Elevate's spin-off was part of a scheme to shield the assets of Think Finance and its owners from potential liability stemming from litigation challenging Think Finance's violations of state and federal law.

247.    Indeed, leading up to the spin-off, Think Finance geared up for legal battle in the face of significant regulatory pressure and enforcement actions. When these efforts started to unravel, Think Finance abruptly changed course and began implementing its scheme to transfer its assets, which occurred just months before the first lawsuit on behalf of consumer borrowers was filed against Think Finance.

248.    As part of this scheme, Think Finance and its owners transferred the company's non-troubled assets that were not subject to regulatory and litigation actions to Elevate for $0.00, with Think Finance's owners obtaining the same shares in Elevate that they had in Think Finance, also for $0.00 in consideration.

249.    The transfer of Think Finance's assets through the spin-off of Elevate was made with actual intent to delay, hinder, or defraud consumer borrower creditors like Plaintiffs to which Think Finance has since acknowledged it was indebted in an amount no less than $1.3 billion, and which liability Think Finance, Elevate, and their core group of stakeholders anticipated would result from regulatory and litigation efforts brought on behalf of consumer borrowers like Plaintiffs.

250.    As a result of the transfer of Think Finance's assets to Elevate, Plaintiffs, who are creditors of Think Finance, have been harmed.

251.    Plaintiffs are entitled to void the transfer and recover with interest the property or value of the property transferred by Think Finance to Elevate, as well as any appreciation of the value of those assets.

**COUNT NINE:**

**CONSTRUCTIVE FRAUDULENT TRANSFERS UNDER VA. CODE § 55.1-401
(CLASS CLAIM AGAINST ELEVATE)**

252.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

253.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a class initially defined as:

> All individuals: (1) located in Virginia (2) who took out a consumer loan product with Plain Green or Great Plains prior to the Elevate spin-off; and (3) made a payment on the loan.

> Plaintiffs Gibbs, Edwards, Williams, Inscho and Mwethuku are members of this class.

254.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. In fact, through prior litigation and settlements involving the Enterprise, it was revealed that there are over 1 million consumers nationwide who took out a loan from the tribal lending entities. Additionally, as borne out in the prior settlements, the names and addresses of the class members are readily identifiable through the internal business records maintained by the Enterprise, and the class members may be notified of the pendency of this action by published and/or mailed notice.

255.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether transfers occurred; and (2) if so, whether such transfers were made not upon consideration deemed valuable in law.

256.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

257.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

258.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

259.    As detailed above, Elevate's spin-off was part of a scheme to shield the assets of Think Finance and its owners from potential liability stemming from litigation challenging Think Finance's violations of state and federal law.

260.    As part of this scheme, Think Finance and its owners transferred the company's non-troubled assets that were not subject to regulatory and litigation actions to Elevate for $0.00, with Think Finance's owners obtaining the same shares in Elevate that they had in Think Finance, also for $0.00 in consideration. In other words, Think Finance did not receive valuable consideration for the transfer of its assets to Elevate.

261.    The transfer of Think Finance's assets to Elevate was not an arms-length transaction and was taken covertly in bad faith to protect the ill-gotten gains of Think Finance from consumers for the benefit of Think Finance/Elevate's owners. Plaintiffs were furthermore unaware of the Elevate spin-off at the time it occurred, which spin-off was not publicly available or otherwise recorded in a manner that Plaintiffs and putative class members, exercising due diligence, could have discovered.

262.    Think Finance's assets that were transferred to Elevate were thereby put out of reach of consumer borrower creditors like Plaintiffs to which Think Finance has since acknowledged it was indebted in an amount no less than $1.3 billion, and which liability Think Finance, Elevate, and their core group of stakeholders anticipated would result from regulatory and litigation efforts brought on behalf of consumer borrowers like Plaintiffs.

263.    Think Finance (i) was insolvent on the date that the transfers of Think Finance's assets were made or shortly thereafter or (ii) was left so under-capitalized with such overwhelming liability that insolvency was rendered certain as a result.

264.     As a result of the transfer of Think Finance's assets to Elevate, Plaintiffs, who had taken out loans from Plain Green or Great Plains prior to the Elevate spin-off and are creditors of Think Finance, have been harmed.

265.     Plaintiffs are entitled to void the transfer and recover with interest the property or value of the property transferred by Think Finance to Elevate, its affiliates, or third parties.

**COUNT TEN:**
**INTENTIONAL FRAUDULENT TRANSFERS UNDER FLA. STAT. ANN. §§ 726.105(1)(a), 726.108(1)(a)**
**(CLASS CLAIM AGAINST ELEVATE)**

266.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

267.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a class initially defined as:

> All individuals: (1) located in Florida (2) who took out a consumer loan product with Plain Green or Great Plains; and (3) made a payment on the loan.

Plaintiffs Burney, McNeil, and Patterson are members of this class.

268.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. In fact, through prior litigation and settlements involving the Enterprise, it was revealed that there are over 1 million consumers nationwide who took out a loan from the tribal lending entities. Additionally, as borne out in the prior settlements, the names and addresses of the class members are readily identifiable through the internal business records maintained by the Enterprise, and the class members may be notified of the pendency of this action by published and/or mailed notice.

269.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no

factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether transfers occurred; and (2) whether such transfers were made with the intent to delay, hinder, or defraud creditors of Think Finance.

270.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

271.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

272.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay

and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

273.  **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendant has acted on grounds generally applicable to the class, making appropriate injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendant to divest themselves of any interest in the enterprise, including the receipt of any proceeds arising from the unlawful collection of debt; prohibiting Defendant from continuing to engage in the enterprise or selling the outstanding balances on the loans to any third parties.

274.  As detailed above, Elevate's spin-off was part of a scheme to shield the assets of Think Finance and its owners from potential liability stemming from litigation challenging Think Finance's violations of state and federal law.

275.  Indeed, leading up to the transfer, Think Finance geared up for legal battle in the face of significant regulatory pressure and enforcement actions. When these efforts started to go south, Think Finance abruptly changed course and began implementing its scheme to transfer its assets, which occurred just months before the first lawsuit on behalf of consumer borrowers was filed against Think Finance.

276.  As part of this scheme, Think Finance and its owners transferred the company's non-troubled assets that were not subject to regulatory and litigation actions to Elevate for $0.00, with Think Finance's owners obtaining the same shares in Elevate that they had in Think Finance, also for $0.00 in consideration.

277.     The transfer of Think Finance's assets through the spin-off of Elevate was done covertly and made with actual intent to delay, hinder, or defraud consumer borrower creditors like Plaintiffs to which Think Finance has since acknowledged it was indebted in an amount no less than $1.3 billion, and which liability Think Finance, Elevate, and their core group of stakeholders anticipated would result from regulatory and litigation efforts brought on behalf of consumer borrowers like Plaintiffs.

278.     As a result of the transfer of Think Finance's assets to Elevate, Plaintiffs, who are creditors of Think Finance, have been harmed.

279.     Plaintiffs and putative class members were unaware of the Elevate spin-off at the time it occurred and could not have reasonably discovered it exercising due diligence.

280.     Plaintiffs are entitled to void the transfer and recover with interest the property or value of the property transferred by Think Finance to Elevate, its affiliates, or third parties.

## COUNT ELEVEN:
## INTENTIONAL FRAUDULENT TRANSFERS UNDER CAL. CIV. CODE §3439.04(a)(1) (CLASS CLAIM)

281.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

282.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a class initially defined as:

> All individuals: (1) located in California (2) who took out a consumer loan product with Plain Green or Great Plains; and (3) made a payment on the loan.

> Plaintiffs Browne, Brice, and Novorot are members of this class.

283.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. In fact, through prior litigation and settlements involving the Enterprise, it was revealed that there are over 1 million consumers nationwide who took out a

loan from the tribal lending entities. Additionally, as borne out in the prior settlements, the names and addresses of the class members are readily identifiable through the internal business records maintained by the Enterprise, and the class members may be notified of the pendency of this action by published and/or mailed notice.

284.    **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether transfers occurred; (2) if so, whether such transfers were made with the intent to delay, hinder, or defraud creditors of Think Finance; (3) whether Elevate was an insider; (4) whether before the transfers were made, Think Finance had been sued or threatened with suit; (5) whether Think Finance received consideration that was reasonably equivalent to the value of the assets transferred; and (6) whether Think Finance was insolvent or became insolvent shortly after the transfers were made.

285.    **Typicality**. **Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

286.    **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the

members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

287.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

288.   As detailed above, the Elevate spin-off was part of a scheme to shield the assets of Think Finance and its owners—the same owners of Elevate, who was thus an insider—from collection efforts that were anticipated to result from consumer borrower litigation targeting violations of state and federal law by Think Finance's rent-a tribe predatory lending Enterprise.

289.   Indeed, leading up to the transfer, Think Finance geared up for legal battle in the face of significant regulatory pressure and enforcement actions. When these efforts started to unravel, Think Finance abruptly changed course and began implementing its scheme to transfer its assets, which occurred just months before the first lawsuit on behalf of consumer borrowers was filed against Think Finance.

290.    As part of this scheme, Think Finance and its owners transferred the company's non-troubled and highly valuable assets that were not subject to regulatory and litigation actions to Elevate for $0.00, with Think Finance's owners obtaining the same shares in Elevate that they had in Think Finance, also for $0.00. As such, Think Finance did not receive any consideration for the transfer of its highly valuable assets to Elevate, much less reasonably equivalent consideration.

291.    The transfer of Think Finance's assets through the spin-off of Elevate was done covertly and made with actual intent to delay, hinder, or defraud consumer borrower creditors like Plaintiffs to which Think Finance has since acknowledged it was indebted in an amount no less than $1.3 billion, and which liability Think Finance, Elevate, and their core group of stakeholders anticipated would result from regulatory and litigation efforts brought on behalf of consumer borrowers like Plaintiffs.

292.    Think Finance (i) was insolvent on the date that the transfers of Think Finance's assets were made or shortly thereafter or (ii) was left so under-capitalized with such overwhelming liability that insolvency was rendered certain as a result.

293.    As creditors of Think Finance, Plaintiffs were harmed by the transfer of Think Finance's assets to Elevate.

294.    Plaintiffs and putative class members were unaware of the Elevate spin-off at the time it occurred and could not have reasonably discovered it by exercising due diligence.

295.    Plaintiffs are entitled to void the transfer and recover with interest the property or value of the property transferred by Think Finance to Elevate, its affiliates, or third parties.

## COUNT TWELVE:
### FRAUDULENT TRANSFERS UNDER CALIFORNIA COMMON LAW
### (CLASS CLAIM)

296.    Plaintiffs incorporate by reference the allegations set forth in the preceding

paragraphs as though fully set forth herein.

297.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a class initially defined as:

> All individuals: (1) located in California (2) who took out a consumer loan product with Plain Green or Great Plains; and (3) made a payment on the loan.

Plaintiffs Browne, Brice, and Novorot are members of this class.

298.   **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. In fact, through prior litigation and settlements involving the Enterprise, it was revealed that there are over 1 million consumers nationwide who took out a loan from the tribal lending entities. Additionally, as borne out in the prior settlements, the names and addresses of the class members are readily identifiable through the internal business records maintained by the Enterprise, and the class members may be notified of the pendency of this action by published and/or mailed notice.

299.   **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether transfers occurred; (2) if so, whether such transfers were made with the intent to delay, hinder, or defraud creditors of Think Finance; (3) whether Elevate was an insider; (4) whether before the transfers were made, Think Finance had been sued or threatened with suit; (5) whether Think Finance received consideration that was reasonably equivalent to the value of the assets transferred; and (6) whether Think Finance was insolvent or became insolvent shortly after the transfers were made.

300.   **Typicality**. **Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

301.   **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

302.   **Superiority**. **Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

303.    As detailed above, the Elevate spin-off was part of a scheme to shield the assets of Think Finance and its owners—the same owners of Elevate, who was thus an insider—from collection efforts that were anticipated to result from consumer borrower litigation targeting violations of state and federal law by Think Finance's rent-a tribe predatory lending Enterprise.

304.    Indeed, leading up to the transfer, Think Finance had geared up for legal battle in the face of significant regulatory pressure and enforcement actions. When these efforts started to go south, Think Finance abruptly changed course and began implementing its scheme to transfer its assets, which occurred just months before the first lawsuit on behalf of consumer borrowers was filed against Think Finance.

305.    As part of this scheme, Think Finance and its owners transferred the company's non-troubled and highly valuable assets that were not subject to regulatory and litigation actions to Elevate for $0.00, with Think Finance's owners obtaining the same shares in Elevate that they had in Think Finance, also for $0.00. As such, Think Finance did not receive any consideration for the transfer of its highly valuable assets to Elevate, much less reasonably equivalent consideration.

306.    The transfer of Think Finance's assets to Elevate was made with actual intent to delay, hinder, or defraud consumer borrower creditors like Plaintiffs to which Think Finance has since acknowledged it was indebted in an amount no less than $1.3 billion, and which liability Think Finance, Elevate, and their core group of stakeholders anticipated would result from regulatory and litigation efforts brought on behalf of consumer borrowers like Plaintiffs.

307.    Think Finance (i) was insolvent on the date that the transfers of Think Finance's assets were made or shortly thereafter or (ii) was left so under-capitalized with such overwhelming liability that insolvency was rendered certain as a result.

308. As a result of the transfer of Think Finance's assets through the spin-off of Elevate, Plaintiffs, who are creditors of Think Finance, have been harmed.

309. Plaintiffs are entitled to void the transfer and recover with interest the property or value of the property transferred by Think Finance to Elevate, its affiliates, or third parties.

310. Elevate's conduct set forth herein was fraudulent, wanton, malicious or willful in complete disregard of Plaintiffs' rights. Accordingly, Plaintiffs seek relief in the form of exemplary or punitive damages in an amount to be determined at trial.

**WHEREFORE,** Plaintiffs request that the Court enter judgment on behalf of themselves and the class they seek to represent against Defendant for:

A.     Certification for this matter to proceed as a class action;

B.     Actual and treble damages relief as pled herein;

C.     Sanctions and exemplary damages against Elevate for its participation in the fraudulent conveyances;

D.     Attorney's fees, litigation expenses, and costs of suit; and

E.     Such other or further relief as the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,
**PLAINTIFFS**

By: _____*/s/ Kristi C. Kelly*_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

Leonard A. Bennett, Esq., VSB #37523
Craig C. Marchiando, Esq., VSB #89736

CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA  23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email:  lenbennett@clalegal.com
Email: craig@clalegal.com

Anna Haac (*pro hac vice* to be filed)
TYCKO & ZAVAREEI, LLP
1828 L Street, N.W., Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
Email: ahaac@tzlegal.com

*Counsel for Plaintiffs*