**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| DARLENE GIBBS, STEPHANIE EDWARDS, LULA WILLIAMS, PATRICK INSCHO, SHARON BURNEY, CHASTITY MCNEIL, ALICIA PATTERSON, JERI BRENNAN, EARL BROWNE, KIMETRA BRICE, JILL NOVOROT *on behalf of themselves and all individuals similarly situated* | Civil Action No. 3:20-cv-632 (MHL) |
| Plaintiffs, | |
| v. | |
| ELEVATE CREDIT, INC., | |
| Defendant. | |

## FIRST AMENDED CLASS ACTION COMPLAINT

COME NOW Plaintiffs Darlene Gibbs, Stephanie Edwards, Lula Williams, Patrick Inscho, Sharon Burney, Chastity McNeil, Alicia Patterson, Jeri Brennan, Earl Browne, Kimetra Brice, Jill Novorot (collectively, the "Plaintiffs"), *on behalf of themselves and all individuals similarly situated*, by counsel, and for their First Amended Class Action Complaint against Defendant Elevate Credit, Inc. ("Elevate"),[1] they allege as follows:

## INTRODUCTION

1.      As this Court is aware, Plaintiffs filed various cases related to Think Finance's billion-dollar illegal lending scheme designed to ostensibly evade state usury laws by originating high interest loans in the name of entities formed by Native American tribes. *See, e.g.*, *Gibbs v.*

---

[1] Pursuant to Rule 15(a), Plaintiffs file this amended complaint as a matter of right. On August 25, 2020, Plaintiffs sent a waiver of service to counsel for the Defendant. Accordingly, the deadline to amend the complaint as a matter of right is September 15, 2020.

*Rees*, Case No. 3:17-cv-00386 (E.D. Va. 2017); *Gibbs v. Plain Green, LLC*, Case No. 3:17-cv-00495 (E.D. Va. 2017); *Gibbs v. Haynes Investments, LLC*, Case No. 3:18-cv-00048 (E.D. Va. 2018); *Gibbs v. Curry*, Case No. 3:18-cv-00654 (E.D. Va. 2018); *Gibbs v. TCV V, L.P.*, Case No. 3:19-cv-789 (E.D. Va. 2019). Those cases focused on the role and liability of Think Finance and its chief executive officer, shareholders, investors, and business partners in what is referred to throughout this Complaint as the "Tribal Loan Enterprise" or "Enterprise."

2.      This case is the final chapter of this litigation, which has already resulted in over $400 million in relief to consumers victimized by Think Finance's predatory lending scheme that profited from the collection of unlawful interest. After regulatory efforts uncovered Think Finance's illegal lending practices in 2013, Think Finance began developing and ultimately completed a corporate spin-off in May 2014 in an effort to protect itself from legal liability by shielding its assets from collection. As a result of the spin-off, Think Finance was separated into two companies, including a newly created company named Elevate.

3.      As detailed in a memorandum to Think Finance's Board of Directors dated December 11, 2013, the purpose of the spin-off was "to separate the tribal and non-tribal businesses" because of Think Finance's anticipated massive liability relating to its tribal products. Ex. 1, Dec. 11, 2013 Memorandum at 3. This self-described "draconian organizational change" was designed to insulate and protect the hundreds of millions of dollars generated by Think Finance's non-tribal lending products, which could have been used to pay Think Finance's $1.13 billion in liability to consumers. *Id*.

4.      Seeking to avoid facing the consequences for its widespread misconduct, Think Finance completed the spin-off in May 2014, roughly seven months after a federal court issued an opinion rebuking the legality of its business model. *See Otoe-Missouria Tribe of Indians v. New*

2

*York State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 355 (S.D.N.Y. Sept. 30, 2013). Although concealed by the pleadings, this litigation was spearheaded and funded by Think Finance even though the Otoe-Missouria Tribe and Great Plains Lending, LLC were the named plaintiffs.

5.      Despite the spin off, Elevate is directly liable under the Racketeer Influenced and Corrupt Organizations Act ("RICO") because it continued to aid, abet, assist, and facilitate Think Finance's unlawful collection of the usurious and illegal debts from consumers. For example, Think Finance and Elevate entered into a series of agreements by which Elevate continued to aid, abet, assist, and facilitate Think Finance's misconduct, including a "Data Sharing and Support Agreement," financing agreements, a Shared Employees agreement, and "Shared Services Agreement."

6.      Through these agreements, as well as its continued assistance to Think Finance, Elevate violated § 1962(d) of RICO, which prohibits any person from conspiring with another to violate RICO's prohibited activities. This section "does not require that a defendant have a role in directing an enterprise." *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012). Rather, in the Fourth Circuit, "simply agreeing to advance a RICO undertaking is sufficient." *Id*. "Once it has been shown that a conspiracy exists, the evidence need only establish a slight connection between the defendant and the conspiracy" to support a violation of § 1962(d). *See United States v. Brooks*, 957 F.2d 1138, 1147 (4th Cir. 1992). A "slight connection" is satisfied by showing "knowledge of the essential nature of the plan." *United States v. Morrow*, 914 F.2d 608, 612 (4th Cir. 1990). Here, Elevate had far more than a slight connection to the conspiracy.

## JURISDICTION

7.      This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as a majority of Plaintiffs are residents of this District and Division and a substantial part of Plaintiffs' claims occurred in Virginia.

## PARTIES

9.      Plaintiff Lula Williams ("Williams") is a natural person and resident of this Division and District.

10.     Plaintiff Stephanie Edwards ("Edwards") is a natural person and resident of the Commonwealth of Virginia.

11.     Plaintiff Darlene Gibbs ("Gibbs") is a natural person and resident of the Commonwealth of Virginia.

12.     Plaintiff Patrick Inscho ("Inscho") is a natural person and resident of the Commonwealth of Virginia.

13.     Plaintiff Alicia Patterson ("Patterson") is a natural person and resident of the State of Florida.

14.     Plaintiff Sharon Burney ("Burney") is a natural person and resident of the State of Florida.

15.     Plaintiff Chastity McNeil ("McNeil") is a natural person and resident of the State of Florida.

16.     Plaintiff Jeri Brennan ("Brennan") is a natural person and resident of the State of Florida.

17.     Plaintiff Kimetra Brice ("Brice") is a natural person and resident of the State of California.

18.     Plaintiff Earl Browne ("Browne") is a natural person and resident of the State of California.

19.     Plaintiff Jill Darlene Novorot ("Novorot") is a natural person and resident of the State of California.

20.     Defendant Elevate Credit Service, LLC ("Elevate") is a Delaware limited liability company with its principal office at 4150 International Plaza, Suite 300, Fort Worth, Texas 76109. Through a corporate spinoff, Think Finance created Elevate in May 2014 as part of a scheme to generate windfall profits for its owners—the same owners of Elevate—by protecting Think Finance's assets from collection by consumer borrower creditors. Think Finance did so by transferring its non-troubled assets for zero consideration to the newly formed Elevate. After the spinoff, Elevate's employees and executives continued to assist Think Finance in its predatory rent-a-tribe lending scheme through shared employees and services.

## **BACKGROUND**

A.     **Virginia, Florida, and California law prohibit usury and provide for strict licensing requirements to protect consumers from predatory and abusive lending practices.**

21.     More than forty years before the signing of the Declaration of Independence, Virginia enacted its first usury law, which capped interest rates at 6 percent. John W. Edmonds III, *Virginia Law of Interest and Usury*, 10 U. Rich. L.R. 77, 77 (1975), *available at* https://scholarship.richmond.edu/cgi/viewcontent.cgi?article=1313&context=lawreview.

22.     Virginia's "usury laws serve a beneficial public purpose and are to be liberally construed with a view to advance the remedy and suppress the mischief." *Radford v. Cmty. Mortg. & Inv. Corp.*, 312 S.E.2d 282, 285 (Va. 1984).

23.     The Supreme Court of Virginia has repeatedly acknowledged that Virginia's "usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated, and the court should therefore be chary in permitting this policy to be thwarted." *Id*. (quoting *Heubusch & Reynolds v. Boone*, 192 S.E.2d 783, 789 (Va. 1972)).

24.     In accordance with this longstanding public policy, a person may not charge an annual percentage rate ("APR") exceeding 12% without first obtaining a consumer finance license from the Commonwealth. Va. Code §§ 6.2-1501(A), 6.2-303(A).

25.     If a person violates the interest rate cap, Virginia's Consumer Finance Act imposes severe consequences, including criminal liability and forfeiture of all principal, interest, and any charges related to the loan. Va. Code § 6.2-1540 (making it a class 2 misdemeanor for any person who violates or participates in the violation of Virginia's interest rate cap); Va. Code § 6.2-1541(A) (declaring such loans "void" and the principal uncollectible).

26.     Virginia's Consumer Finance Act is a remedial statute that "originated to protect needy consumers from unjust terms and exploitation surrounding lending practices." *Com. v. Car Pawn of Virginia, Inc.*, 1995 WL 17044380, at *4 (Va. Cir. 1995); *see also Greenberg v. Com. ex rel. Atty. Gen.*, 499 S.E.2d 266, 269 (Va. 1998). Thus, it was designed to protect Virginia consumers from the very type of abusive lending practice Defendant participated in, which sought to evade state lending laws, including Virginia's, by entering into ventures with Native American tribes "so they can use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders & Tribes: Are Both Tribal Sovereignty & Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 758-59 (2012)).

27.     Like Virginia, Florida and California have enacted usury laws that prohibit lenders from making high interest loans.

28.     Prior to even becoming a member of the Union in 1845, the Florida legislature passed laws prohibiting usury as early as 1822.[2] As the Florida Supreme Court noted, "The very purpose of statutes prohibiting usury is to bind the power of creditors over necessitous debtors and prevent them from extorting harsh and undue terms in the making of loans." *Chandler v. Kendrick*, 146 So. 551, 552 (Fla. 1933).

29.     Pursuant to Florida Statute § 687.03, interest rates greater than 18% per annum on loans in the amount of $500,000 or less are usurious. Those who violate the usury provisions must forfeit "the entire interest so charged, or contracted to be charged" and double the amount of usurious interest paid. Fla. Stat. § 687.04.

30.     Additionally, in Florida, lenders must be licensed by the Office of Financial Regulation, and loans of $25,000 or less with interest exceeding 18% per annum are void and unenforceable. Fla. Stat. § 516.02(1-2). Even with a license, a lender may not charge interest exceeding 30% on the first $3,000 of the principal amount, 24% on the part of the principal amount exceeding $3,000 and up to $4,000, and 18% on that part of the principal amount exceeding $4,000 and up to $25,000. Fla. Stat. § 516.031(1).

31.     If a lender (licensed or unlicensed) charges interest greater than legally permitted, the loan is void and unenforceable. Fla. Stat. § 516.02(2)(c).

32.     Further, under Florida law, it is a criminal offense to make usurious loans at rates of 25% of higher. Fla. Stat. § 687.071. Loan contracts in excess of the 25% threshold triggering

---

[2] *See* Jeremiah W. Blydenburgh, *A Treatise On The Law Of Usury; To Which Are Added, The Statutes Of Several States Relating To Interest Now In Force*, 172 (1844), *available at* https://books.google.com/books?id=6Fk9AAAAIAAJ&printsec=frontcover&source=gbs_ge_su mmary_r&cad=0#v=onepage&q&f=false.

criminal liability for usury are similarly "void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

33.     The Florida Attorney General has made clear that payday loans and similar loans are subject to Florida's usury laws. Fla. AGO 2000-26 (Fla. A.G.), 2000 WL 543211.

34.     Similarly, California has regulated maximum interest rates since 1872. *See* Robert R. Rickett, *California's Model Approach to Usury*, 18 Stan. L. Rev. 1381, 1385 (1966). Currently, the law of usury in California is based upon California Constitution article XV, section 1, which limits the interest payable "[f]or any loan or forbearance of any money." *Sw. Concrete Products v. Gosh Constr. Corp.*, 798 P.2d 1247, 1249 (Cal. 1990) (quoting Cal. Const. Art. XV § 1).

35.     Thus, "unless a lender falls into one of the exemptions approved by the state legislature, it may not charge more than 10% interest per annum on a loan." *Dev. Acquisition Group, LLC v. ea Consulting, Inc.*, 776 F. Supp. 2d 1161, 1164 (E.D. Cal. 2011) (citing CAL. CONST. ART. XV § 1). "An interest rate in excess of 10% is usurious, and if a lender negotiates a loan at a usurious rate absent a qualified exemption, the agreement shall be void and the lender will have no action at law to recover any interest." *Id.* (citing Cal. Civ. Code § 1916–2).

36.     California's usury laws "are primarily designed to penalize those who take advantage of 'unwary and necessitous borrowers.'" *See id.* at 1166 (quoting *Fox v. Peck Iron and Metal Co., Inc.*, 25 B.R. 674, 692-93 (Bankr. S.D. Cal. 1982)).

37.     Thus, California law allows consumers to recover all interest paid on usurious loans in excess of 10% within the past two years, plus treble damages for any interest paid within the year preceding the filing of this action, as well as Plaintiffs' attorney's fees and costs. Cal. Civ. Code § 1916-3; *Dev. Acquisition Group*, 776 F. Supp. 2d at 1165; Rickett, *supra*, at 1391.

**B.     The rent-a-tribe model was developed to evade state usury laws, such as those of Virginia, Florida, and California.**

38.     Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a repayment system that involves the lender withdrawing funds directly from the borrower's bank account."[3] These types of debt traps "are heavily marketed to financially vulnerable consumers."[4]

39.     Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005, "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra* ¶ 28, at 759 (quoting Karen E. Francis, Note, *Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611-12 (2010)).

40.     It is no secret that "internet payday lenders have a weak history of complying with state laws." *Id*. at 764. Prior to the rent-a-tribe business model, some payday lenders, including Think Finance, entered into partnerships with national banks to avoid compliance with state laws.[5]

41.     Beginning in 2005, federal regulators began cracking down on rent-a-bank arrangements, and they were nearly eliminated by 2010—largely by the assessment of penalties

---

[3] *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

[4] *See CFPB Finalizes Rule To Stop Payday Debt Traps*, CFPB (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. "A debt trap results when a borrower is repeatedly unable to repay a loan and must reborrow, paying additional fees each time." *See Payday, Vehicle Title, and Certain High-Cost Installment Loans*, *supra* note 3, at 1853.

[5] *See, e.g.*, Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp.*, *Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* at 17-22 (2001), *available at* http://www.consumerfed.org/pdfs/paydayreport.pdf.

and fines against participating banks. *See, e.g.*, Creola Johnson, *America's First Consumer Financial Watchdog Is on A Leash: Can the CFPB Use Its Authority to Declare Payday-Loan Practices Unfair, Abusive, and Deceptive?*, 61 Cath. U. L. Rev. 381, 399 n.16 (2012).

42.    In response to the crackdown on rent-a-bank arrangements, several payday lenders reincarnated the lending model through associations with Native American tribes to avoid state laws. *Id.*; *see also* Martin & Schwartz, *supra* at ¶ 28.

43.    "In these partnerships, online payday lenders register businesses on Native American lands and claim to be exempt from lawsuits and state usury caps under tribal sovereign immunity. Using this doctrine, lenders argue that because their businesses are located on or headquartered within the borders of a Native American reservation, they are bound by the laws of that reservation only, not the laws of the state in which the reservation is located or the state in which the borrower resides." Johnson, *supra* ¶ 43, at 399 (footnotes omitted).

44.    A central feature of the rent-a-tribe business model is the choice-of-law provision used in the scheme's lending agreements. Non-tribal participants assert they have no liability for their violations of state and federal laws because only tribal law applies to the loans. But such claims have been uniformly denied by courts from a variety of jurisdictions across the country, including by the Fourth Circuit Court of Appeals and this Court with respect to the very loan agreements at issue here, thus demonstrating the illegality of the instant rent-a-tribe lending scheme.[6] Indeed, the Supreme Court most recently denied a petition for certiorari by another

---

[6] *See Gibbs v. Haynes Investments, LLC*, No. 19-1434, 2020 WL 4118239, at *6 (4th Cir. July 21, 2020); *Gibbs v. Stinson,* No. 3:18CV676, 2019 WL 4752792, at *14-18 (E.D. Va. Sept. 30, 2019); *see also Gingras v. Think Finance*, 922 F.3d. 112 (2d Cir. 2019); *Brice v. 7HBF No. 2, Ltd.*, No. 19-CV-01481-WHO, 2019 WL 5684529 (N.D. Cal. Nov. 1, 2019); *Brice v. Plain Green*, 372 F. Supp. 3d 955 (N.D. Cal. 2019); *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016); *W. Sky Fin., LLC v. State ex rel. Olens*, 300 Ga. 340, 348 (2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, No. 13-60066-CIV, 2015 WL

participant in the rent-a-tribe lending scheme alleged here, who sought review of the Second Circuit's decision striking down the choice-of-law provisions in the same form loan agreements at issue here, which the Second Circuit described as "transparent attempts to deploy tribal sovereign immunity to skirt state and federal consumer protection laws." *See Gingras v. Think Finance*, 922 F.3d. 112, 126 (2d Cir. 2019), *cert. denied*, 2020 WL 129562 (U.S. Jan. 13, 2010) (No. 19-331).

**C.      Think Finance adopted the tribal lending model to evade state usury laws, such as those of Virginia, Florida, and California.**

45.     Think Finance and its subsidiaries (collectively "Think Finance") operated a usurious lending scheme, which sought to evade the usury laws of certain states by using the Chippewa Cree, Otoe-Missouria, and Tunica-Biloxi Tribe (collectively, the "Tribes") as the conduit for their loans. Under the tribal lending model, loans were made in the name of Plain Green, LLC ("Plain Green"), Great Plains Lending, LLC ("Great Plains"), and Mobiloans, LLC ("Mobiloans")—three entities formed under tribal law to serve as the fronts to disguise Think Finance's role and to ostensibly shield the scheme by exploiting tribal sovereign immunity. In return for the use of their name, the tribal companies received a nominal flat fee of the revenue from the loans, but they otherwise had no control over the income, expenses, or day-to-day operations of the businesses.

46.     Prior to the creation of the lending scheme at issue, Think Finance used a rent-a-bank lending model. *See* Ex. 2 (First Bank of Delaware and ThinkCash PowerPoint entitled "Universal Fund Investor Overview").

---

11438192, at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin.*, LLC, No. 13 CVS 16487, 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes*, 811 F.3d at 675; *Rideout v. CashCall, Inc.*, No.  2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

47.     Under this arrangement, loans were originated in the name of First Bank of Delaware, but the bank served as nothing more than a nominal lender on behalf of Think Cash, Inc. ("Think Cash"), Think Finance's predecessor. *Id*. at TF-PA-504641.

48.     In return for the use of its name, First Bank of Delaware received 10% of the revenue from the loans. *Id*. at TF-PA-504640.

49.     By contrast, through its wholly owned subsidiary TC Administrative, Think Cash received the "excess" of the cash flow after accounting for losses, management fees, and fixed rate interest payments to investors, *i.e.*, the third parties who invested money to allow Think Cash to grow the scheme. *Id*. at TF-PA-504640.

50.     In August 2010, the Federal Deposit Insurance Corporation ("FDIC") took steps to shut down ThinkCash's arrangement with First Bank of Delaware through a cease and desist order directing it to terminate its relationship with "all third-party lending programs." *See, e.g., In the Matter of First National Bank,* Case No. FDIC-07-256b, Order to Cease and Desist, Order for Restitution, and Order to Pay (Oct. 9, 2008) (requiring First Bank of Delaware to terminate "all relationships with third-party providers and the termination of all third-party lending programs or any agreements or arrangements with third-party providers that exhibit the characteristics of a 'Rent-a-BIN' or 'Rent-a-ICA' arrangement"). In response, First Bank of Delaware notified Think Finance that that they were going to terminate the program. Ex. 3, Rees Dep. at 157:2-3.

51.     Not to be deterred, the owners and executives of Think Finance identified what they believed would be a solution—they decided to adapt their business model to use a tribal entity as a conduit for the loan. The purpose of adopting the rent-a-tribe model was to avoid banking regulatory issues and leverage Think Finance's existing sourcing, underwriting, and servicing platforms from the discredited rent-a-bank model.

52.     Think Finance modeled its rent-a-tribe scheme after CashCall, Inc., which they identified as their main competitor, and Think Finance retained the same legal counsel used by CashCall to construct its tribal lending model, Claudia Callaway.[7]

53.     Instead of using a national bank as a nominal lender, Think Finance would use a business entity organized under the laws of a Native American tribe as the nominal lender. The entity organized under tribal law would originate installment loans that were substantially similar to the loans originated under the rent-a-bank arrangement.

54.     According to the CEO of Think Finance, Kenneth Rees, the company "had a business model" that "worked well" with First Bank of Delaware, and it wanted its tribal lending arrangement "to replicate that as much as possible." Ex. 3, Rees Dep. at 183:17-22.

**D.     Think Finance solicited the Otoe-Missouria Tribe to form Great Plains in furtherance of the usurious lending scheme.**

55.     On or around January 12, 2011, for example, representatives of Think Finance met with members of the Otoe-Missouria Tribe. *See generally* Ex. 4 (Think Finance PowerPoint entitled "Great Plains Lending Meeting").

---

[7] Callaway's advice to her clients is well-documented in the CashCall litigation. *See Consumer Fin. Prot. Bureau v. CashCall, Inc.,* 2016 WL 4820635, at *2 (C.D. Cal. 2016). As detailed in the court's findings of fact, Callaway was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." *Id*. Callaway presented herself to her clients as someone who could "'facilitate relationships' and provide opportunities" for payday lenders "to diversify and structure a lending model within requirements of law to 'avoid enforcement actions by state and federal regulators." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2018 WL 485963, at *2 (C.D. Cal. 2018) (finding of fact and conclusion of law after bench trial). Callaway advised her clients that "because the loans made pursuant to the Tribal Lending Model were originated by a tribe or tribal member, the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id*. at 3.

56.     Prior to this meeting, employees of Think Finance created a PowerPoint presentation entitled "Great Plains Lending Meeting," which contained an agenda of key points to present to the Otoe-Missouria Tribe. *Id*. at 1.

57.     The agenda of key points included a company overview of Think Finance, an overview of the loan program, the structure of the arrangement, contractual arrangements, operational responsibilities, and next steps. *Id*. at 2, 9-10.

58.     Great Plains had not been formed as of the date of this meeting, and, the presentation identified one of the "next steps" as "[c]reate tribal entity—Great Plains Lending, LLC." *Id*. at 13.

59.     The other steps included setting up a "tribal bank account at FBD," "[r]eview/approve consumer legal documents," and "[r]eview/sign contractual agreements." *Id*.

60.     Although Great Plains had not been incorporated as of the meeting, Think Finance had already registered the domain name for the Great Plains website and developed the text and graphics for the website—samples of which were included in the PowerPoints. *Id*. at 5.

61.     In February 2011, Think Finance held another meeting with the Otoe-Missouria Tribe to promote the potential venture. *See generally* Ex. 5.

62.     As part of this process, Think Finance created a PowerPoint entitled "Emergency Cash Lending—A New Source of Tribal Revenue." *Id*. at 1.

63.     The PowerPoint claimed that "[o]nline emergency cash lending" represented "a significant opportunity for increased tribal revenue" and that Think Finance had "a unique turnkey solution for helping tribes enter this lucrative market." *Id*. at 2.

64.     The "[t]urn-key solution include[d] technology, marketing, risk management, compliance support, and access to capital funding," which could be "[u]p and running 90 days from signed contracts." *Id*. at 3.

65.     More specifically, Think Finance touted that it had: (1) a "proven technology platform," that had "millions of transactions processed to date," (2) a "marketing machine" that had "100,000 applications monthly," (3) "best in class underwriting," (4) "access to third party capital," including "up to $150" million for funding the loans, and (5) "extensive compliance experience," including multiple "successful FDIC and state exams." *Id*. at 6.

66.     Think Finance further explained that "[u]sing Think Finance technology and services," would allow tribes to "generate millions of dollars in cash flow with no investment in technology, lending capital, or marketing costs, and with no risk of loss." *Id*. at 2.

67.     The primary sources of this revenue were "[e]mergency cash users—mainstream Americans," who were "65% female," with household income of "$25K-50K" who primarily needed the emergency loans for unexpected bills, medical costs, car repairs, or to avoid overdrafts. *Id*. at 4.

68.     The PowerPoint further claimed that "Recent Rulings Have Confirmed that Tribes Can Provide These Services without State Regulatory Jurisdiction." *Id*. at 4.

69.     On February 24, 2011, the Otoe-Missouria accepted Think Finance's proposal and Ken Rees signed a "Trademark and URL Assignment Agreement," transferring the web address, www.greatplainslending.com, to Great Plains for $100.00. *See* Ex. 6.

70.     That same day, Rees sent an e-mail attaching the URL Agreement to Think Finance's key executives and instructing them to "start your engines!!" *See* Ex. 7.

15

E.       **Think Finance solicited the Chippewa Cree Tribe to form Plain Green in furtherance of the rent-a-tribe scheme.**

71.      On March 11, 2011, Think Finance entered into an initial term sheet with the Chippewa Cree Tribe, Victory Park (through its ownership of GPLS),[8] and Haynes Investments, LLC ("Haynes Investments") for another rent-a-tribe venture.

72.      Consistent with the rent-a-bank arrangement, Think Finance agreed to provide the infrastructure to run the lending operations, including the software, "risk management, application processing, underwriting assistance, payment processing, and ongoing service support" for consumer loans in the name of the Chippewa Cree Tribe. Ex. 8 at 1 (Term Sheet for Think Finance-Chippewa Cree Transaction).

73.      In return, the Chippewa Cree Tribe agreed to commit "its best efforts" to complete certain "critical path items" within 14 days, including forming Plain Green, revising the Tribal Transaction Code to allow for the arrangement's lending products, setting up bank accounts and ACH processing for Plain Green, and obtaining separate originating and servicing addresses for Plain Green. *Id*. at 3.

74.      In return for the use of its name, Plain Green received "4.5% of cash revenue received" on the loans, as well as reimbursement for expenses. *Id*. at 3.

75.      The Chippewa Cree Tribe was not required to contribute any of its own money to fund the loans or operations. *Id*. at 1.

76.      Rather, Haynes Investments agreed to "provide funding to the Tribe to enable it to make each of the Loans," and to fund Plain Green's bank account with "sufficient monies to fund one business day of Loans[.]" *Id*. at 1.

---

[8] Victory Park Capital Advisors, LLC ("Victory Park") is a private equity firm headquartered in Chicago, which invested and participated in Think Finance's rent-a-tribe predatory lending enterprise.

77.     Because of Think Finance's control and role, Plain Green's former CEO and COO, Billi Anne Raining Bird, recently testified that she agreed with the characterization that Plain Green was a "rent-a-tribe," including that the tribes served purely as figureheads with no involvement or control over any aspect of the lending business. Ex. 9, Raining Bird Dep. at 52:13-55:4, 69:2-75:10, 85:18-86:10, 139:8-141:1.

78.     She further testified that Plain Green didn't have any meaningful control over the lending business; rather Think Finance offered a small percentage to the Tribe on a take it or leave it basis. *Id*. at 52:13-55:4, 69:2-75:10. Plain Green didn't even review the loan applications, which were automatically processed regardless of whether Plain Green provided the pro forma approval it was supposed to provide. *Id*. at 58:13-59:21, 168:16-22. And, Think Finance intentionally tried to conceal information from Plain Green so that it was dependent on Think Finance, who could then continue to demand the vast majority of the profits from the lending business. *Id*. at 85:8-22; 102:3-18, 139:8-141:15.

**F.     Think Finance received unlawful interest and principal on the void loans.**

79.     Although, as Ms. Raining Bird testified, the Tribal Fronts received a miniscule portion of Think Finance's profits, the Enterprise generated billions of dollars of revenue, with Think Finance and its owners profiting handsomely.

80.     In ten years of Think Finance's operation, the company went from a $17 million-dollar company to a $700 million dollar company—building its profitability off the backs of consumers who were charged unlawful interest on loans far in excess of that allowed by relevant state laws.

81.     For example, between October 23, 2013 and June 1, 2016, Think Finance collected through Plain Green $80,327,521 from California consumers, representing $37,332,248 in repaid principal, $42,638,916 in interest and $356,357 in fees.

82.     Between May 19, 2013 and October 20, 2017, Think Finance collected through Plain Green $50,942,975.88 from Virginia consumers, which includes $22,155,557.32 in repaid principal and $28,787,418.56 in interest and fees.

83.     Between September 22, 2013 and June 1, 2016, Think Finance collected through Plain Green $76,039,347 from Florida consumers, which includes $32,196,529 in repaid principal, $43,529,675 in interest, and $313,143 in fees.

84.     As for Great Plains, between October 23, 2013 and April 1, 2018, Think Finance collected $48,266,421 from California consumers, representing $19,396,445 in principal, $28,360,221 in interest and $509,755 in fees.

85.     Between May 19, 2013 and October 20, 2017, Think Finance collected through Great Plains $18,498,414.81 from Virginia consumers, which includes $7,096,354.96 in repaid principal and $11,402,059.85 in interest and fees.

86.     Between September 22, 2013 and April 1, 2018, Think Finance collected through Great Plains $51,027,783 from Florida consumers, which includes $18,927,899 in principal, $31,661,055 in interest and $438,829 in fees.

87.     This is collectively nearly over $325 million just from Virginia, Florida, and California consumers for the time periods identified and for only Great Plains and Plain Green, of which over half (approximately $187.64 million) constituted usurious interest in plain violation of Virginia, Florida, and California law.

88.     In its bankruptcy proceedings, Think Finance agreed to an allowed claim by consumer borrowers nationwide of $1.13 billion asserted as having been unlawfully charged and collected, reflecting the magnitude of Think Finance's predatory lending scheme.

89.     Think Finance's enormous revenue and corresponding profits resulted from the illegal collection of usurious loans in Virginia, Florida, California, and other states.

90.     Under the terms of Think Finance's standard Loan Agreements, the interest rates charged were significantly greater than that allowed under Virginia, Florida, and California law (12%, 18%, and 10% APR respectively)—often between 118% and 448%, if not higher.

91.     For example, Plaintiff Inscho was charged with an APR of 448%—over 37 times the 12% interest cap in Virginia. Va. Code § 6.2-303(A).

92.     Similarly, Plaintiff Gibbs was charged with an APR of 277.92%, and Plaintiff Williams was charged with an APR of 247.88%.

93.     Likewise, Plaintiff McNeil's loan carried an interest rate of 349.05%—over 19 times the 18% interest cap in Florida for unlicensed loan companies. *See* Fla. Stat. § 516.01(2), 516.02(2)(a).

94.     Similarly, Plaintiff Patterson's loans with Plain Green carried interest rates of 200%, 248.54%, and 258.09%.

95.     Burney's loans with Great Plains carried interest rates of, *inter alia*, 154.59%, 249.30%, and 348.52%. Her loans with Plain Green likewise carried interest rates ranging from 139% to 236%.

96.     Plaintiff Brennan's loan with Great Plains carried an interest rate of 176.5%.

97.     Plaintiff Brice was charged with an APR of 287.86%—over 37 times the 10% interest cap permitted under California's Constitution. Cal. Const. Art. XV § 1.

98.     Neither Think Finance nor any of the other participants in the lending scheme had a consumer finance license permitting them to make loans charging interest in excess of 12% APR in Virginia or 18% in Florida, nor did they ever attempt to obtain such a license. *See* Va. Code § 6.2-1501; Fla. Stat. § 516.01(2), 516.02(2)(a).

99.     Accordingly, the loans were null and void in Virginia and Florida and exceeded the lawful usury rate in California, such that it was unlawful for Think Finance or any of its affiliated entities to collect or receive interest or charges on the loans in excess of the applicable state usury rates or even any principal in Virginia or Florida, including the amounts paid by Plaintiffs. Va. Code § 6.2-1541(A); Fla. Stat. § 516.02(2)(c); Fla. Stat. § 687.147; CAL. CONST. Art. XV § 1.

100.    As a result of the illegal loans, Think Finance and other members of the Enterprise received at least: (i) $711.02 from Ms. Gibbs; (ii) $15,369.15 from Ms. Edwards; (iii) $1,858.67 from Ms. Williams; (iv) $16,210.84 from Mr. Inscho; (v) $40,000 from Ms. Burney; (vi) $2,867 from Ms. McNeil; (vii) $14,500 from Ms. Patterson; (vii) $4,444.72 from Ms. Brennan; (ix) $2,634.40 from Ms. Brice; (x) $10,250.20 from Mr. Browne; and (xi) $6,244 from Ms. Novorot. The majority of these amounts were credited to interest and fees.

**G.     Events leading to the spinoff and creation of Elevate.**

101.    In or about early 2012, Think Finance became concerned that its lucrative cash stream associated with its rent-a-tribe model was at risk due to attacks by federal and state regulators, causing it to seek out a "legal 'dream team' in preparation for potential litigation from consumer groups, state AGs, FTC/CFPB." Ex. 10 at SEQ-CA0007269; *see also* Ex. 11 at SEQ-CA0007398 (powerpoint presentation detailing potential alternatives to tribal lending, including migrating to offshore lending or finding a bank partner to use as the conduit for the loans).

102.    Shortly thereafter, on June 12, 2012, the Consumer Financial Protection Bureau ("CFPB") issued Civil Investigative Demands ("CIDs") to Great Plains, Plain Green, and

Mobiloans, which Think Finance unsuccessfully sought to set aside. *Consumer Fin. Prot. Bureau v. Great Plains Lending, LLC*, 2014 WL 12685941, at *1 (C.D. Cal. May 27, 2014) (providing background on CID issued to Great Plains in 2012), *aff'd*, 846 F.3d 1049 (9th Cir. 2017).

103.    Later that year, the Department of Justice ("DOJ") initiated what was referred to as "Operation Chokepoint," pursuant to which the DOJ and FDIC sought to prevent Automated Clearing House ("ACH") processors from engaging in electronic fund transfers for online payday lenders engaged in consumer fraud, such as Think Finance's rent-a-tribe lending business.

104.    Several internal documents produced by Think Finance show that it considered Operation Chokepoint as a major threat to its business model, especially its tribal lending products.

105.    On August 6, 2013, the biggest threat to the tribal lending model came when the New York Department of Financial Services ("DFS") issued a cease and desist letter to 35 online lending companies, including Great Plains. The Official Website of New York State, *Press Room*, *Cuomo Administration Demands 35 Companies Cease and Desist Offering Illegal Online Payday Loans That Harm New York Consumers* (Aug. 6, 2013), *available at* https://www.governor.ny.gov/news/cuomo-administration-demands-35-companies-cease-and-desist-offering-illegal-online-payday-loans.

106.    The cease and desist was issued after an "extensive" investigation "uncovered that those companies were offering payday loans to consumers over the Internet in violation of New York law, including some loans with annual interest rates as high as 1,095 percent." *Id*.

107.    In addition to the cease and desist sent to the payday lenders, the Superintendent of Financial Services, Benjamin Lawsky, also sent letters to 117 banks and the National Automated Clearinghouse Association, requesting that "they work with DFS to cut off access to New York customer accounts for illegal payday lenders." *Id*.

108.    In his public comments on the letters, Mr. Lawsky explained: "Companies that abuse New York consumers should know that they can't simply hide from the law in cyberspace. We[ a]re going to use every tool in our tool-belt to eradicate these illegal payday loans that trap families in destructive cycles of debt." *Id.*

109.    In response, Think Finance funded and spearheaded litigation to challenge a cease and desist issued to Great Plains. As part of this lawsuit, Great Plains sought declaratory relief and a preliminary injunction that tribal businesses were inherently sovereign nations and not subject to New York law. *See Otoe-Missouria Tribe of Indians v. New York State Dept. of Fin. Services*, 974 F. Supp. 2d 353, 361 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014).

110.    On September 30, 2013, the district court denied the tribal plaintiff's request for a preliminary injunction, finding that the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands," and thus, the loans were "subject to the State's non-discriminatory anti-usury laws." 974 F. Supp. 2d at 361.

111.    The court reasoned, "There is simply no basis… that the Tribes are treated differently from any other individuals or entities that enter New York to lend to New York residents." *Id.*

112.    In addition to the loss in *Otoe-Missouria*, a growing number of lawsuits and government enforcement actions against the scheme's competitors brought increased scrutiny to the tribal lending business model, including the New York Attorney General's lawsuit filed in August 2013 against a tribal lending enterprise involving CashCall and Western Sky. *People of the State of New York v. Western Sky Financial, et al*, New York State Supreme Court, New York County, No. 451370/2013.

113.    In a matter of mere months following this devastating decision for Think Finance's rent-a-tribe business model, the company began "evaluating a rather draconian organizational change that we are referring to as 'Project Exclaim.' This would spin off several products (Rise, Sunny, Elastic) to separate the tribal and non-tribal businesses." Ex. 1

114.    The plan was to split the company into two pieces: Think Finance and Elevate. Think Finance would contain "all of the (extremely profitable but) tainted assets, including all tribal-related lending products," for which "[n]o effort [would] be put into growth." Ex. 12 at SEQ-CA0017287; *see also* Ex. 1 (Memorandum to the Board, explaining that Think Finance was "evaluating a rather draconian organizational change" that would "spin off several products" to "separate the tribal and non-tribal products."). *Id*.

115.    By contrast, all of the "good stuff," *i.e.*, the lending products and assets unconnected to the tribal products, would be moved to the "newco." *Id*. In other words, as reported by Ken Rees to the Think Finance Board of Directors, this spin-off scheme was optimal "from the standpoint of potential liquidity events." Ex. 1 at TF-VA0297706.

116.    In another powerpoint, Think Finance described the benefit to "spinning off non-tribal businesses" was to "[s]eparate potential financial downsides and upsides for each business model." Ex. 13 at TF-VA0297648.

117.    To evade its massive liability to consumer borrowers, Think Finance completed the spin off on or around May 1, 2014.

118.    As part of the Elevate spin-off, Think Finance distributed for zero consideration all of the outstanding equity interests of Elevate to Think Finance stakeholders in an equal amount of stock as they held in Think Finance. Yet, Think Finance's shareholders paid nothing for these Elevate shares.

119.    This transfer of assets was part of Think Finance's scheme to shield its assets from creditors and enrich its owners.

120.    In sum, Think Finance carefully conceived of and carried out a plan to divest Think Finance of its assets in order to protect the wealth of the company's owners from anticipated collection efforts by spinning off certain products under the Elevate umbrella. The company's goal at all times was to siphon off its wealth and good assets to protect it from claims from consumer borrower creditors.

## H.    Elevate and Think Finance used their shared employees, shared services, and shared data to facilitate Think Finance's operations

121.    Despite the spin off, Elevate continued to aid, abet, assist, and facilitate Think Finance's unlawful collection of the usurious and illegal debts from consumers and, in doing so, it directly violated the prohibitions established by RICO.

122.    For example, the Elevate spin-off agreement, titled the "Separation and Distribution Agreement," between Think Finance and Elevate—which was signed by Ken Rees as President of both companies and conceived of to protect Think Finance's non-troubled assets from collection—included a series of agreements, pursuant to which Elevate aided, abetted, assisted, and facilitated Think Finance's Tribal Lending Enterprise. Ex. 14 at SEQ-VT0000326.

123.    And, although Elevate took on substantially more employees than nominally remained at Think Finance, pursuant to the "Employee Matters Agreement," entered into by Think Finance and Elevate (and also signed for both parties by Rees), the companies shared a significant number of employees, who performed services for both and were thus designated "Shared Service Employees." *See* Ex. 14. This shared employees agreement allowed Think Finance to continue to facilitate the unlawful lending scheme.

24

124.    In fact, the bulk—77%—of Think Finance employees were Shared Service Employees with Elevate, including such high-level employees as the Chief Financial Officer, Chief Operating Officer, and Human Resources Director.

125.    As reflected in another agreement, titled the "Shared Services Agreement," Think Finance/Elevate's Shared Service Employees worked on the core operations of both companies. *See* Ex. 15.

126.    Specifically, Shared Service Employees provided services relating to nearly, if not all aspects of operating the businesses, including human resources (payroll and benefits administration, recruiting, time management, reporting and performance management, 401(k) administration); finance (accounting, treasury services, financial analysis and reporting); facilities management (mail distribution, janitorial services, receptionist duties, management of catering services, office furniture, equipment, and personnel); operations (customer service, technical writing support, assistance with operating procedures and infrastructure resources); and information technology ("IT") (staffing, data management services, technical support, access to Think Finance systems, data center, and platforms). The parties jointly oversaw and split the cost of any such shared services.

127.    Think Finance and Elevate also entered into a Data Sharing and Support Agreement, under which the companies agreed to share data and information relating to their respective products "to ensure a continuity of services to their respective customers." *See* Ex. 16. This agreement had four parts and was signed by Rees on behalf of both Elevate and Think Finance. No separate consideration was exchanged for this agreement or any of its respective sub-agreements.

128.    The first part, a "Data Sharing for Model Development and Validation Purposes" agreement specifically provided for the sharing of information between Think Finance and Elevate relating to their respective products "for the purpose of developing and validating underwriting, verifications, response, line assignment and fraud models, processes and rules and performing related analysis," including borrower data furnished when applying for a loan, borrower data obtained for the purpose of processing a loan application, borrower account repayment history, and analysis of the foregoing.

129.    The second part, a "Fraud Mitigation and Prevention Services" agreement, provided for the exchange of fraud data for purposes of identifying problematic loan applications, including through the development of fraud strategies and modeling.

130.    Pursuant to the third part, a "Data Hosting Services" agreement, Think Finance agreed to host Elevate's data, information, documents, and files.

131.    Finally, through the "Data Connectivity Services" agreement, Elevate was given the ability to access and connect to data bases and third-party data providers through Think Finance.

132.    Furthermore, Think Finance provided Elevate a $75 million intercompany line of credit at the time of the spin-off in order to provide needed working capital to Elevate. *See* Ex. 19. In other words, Elevate was not financially independent at the time of the spin-off. Instead, it depended on Think Finance's ill-gotten gains to operate.

133.    That this $75 million line of credit was not an arms-length transaction is evidenced by the fact that the only security pledged to Think Finance as collateral was Think Finance's own assets that were being spun off. In addition, "[a]ny notices, consents, waivers or other communications required or permitted" under the agreement were to be sent to the same individual

at the same office building with the same fax number for both companies—Ken Rees—as CEO of Elevate and Think Finance. *Id*. at TCV-VT0000597-98.

134.    In sum, because many Think Finance employees with institutional knowledge of and involvement in the company's rent-a-tribe lending business were quickly transferred to Elevate, Think Finance required and depended on continued involvement by Elevate and its employees in operating its rent-a-tribe lending business, which involvement was freely and often provided.

135.    Elevate's involvement with Think Finance included the continued participation of Ken Rees and other executives—while technically receiving a paycheck and working for Elevate—controlling, aiding, and abetting the operation of Think Finance.

136.    Elevate thereby directly or indirectly aided, abetted, and/or counseled Think Finance and the other participants in Think Finance's rent-a-tribe Enterprise, including aiding and abetting the "collection of unlawful debt" in violation of 18 U.S.C. § 1962(c).

137.    RICO defines "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

138.    Think Finance charged an interest rate far in excess of the enforceable rate established by Virginia, Florida, and California law, and thus, Think Finance and Elevate violated RICO's prohibition against the collection of unlawful debt.

139.    As a result of Elevate's participation in the Enterprise and violations of RICO, Elevate is jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT ONE:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)**
**(CLASS CLAIM)**

140.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

141.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a class initially defined as:

> All individuals: (1) located in any state other than Nevada and Utah, (2) who took out a consumer loan product with Plain Green prior to June 1, 2016, or Great Plains; and (3) made a payment on the loan after May 1, 2014.

Plaintiffs are members of this class.

142.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. In fact, through prior litigation and settlements involving the Enterprise, it was revealed to plaintiffs that there are over 1 million consumers nationwide who took out a Plain Green or Great Plains loan. Additionally, as borne out in the prior settlements, the names and addresses of the class members are readily identifiable through the internal business records maintained by the Enterprise, and the class members may be notified of the pendency of this action by published and/or mailed notice.

143.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether Defendant conspired with Think Finance and others to violate RICO; and (2) what is the proper recovery for Plaintiffs and the class members against Defendant for its role in the conspiracy.

144. __Typicality__. **Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

145. __Adequacy of Representation__. **Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

146. __Superiority__. **Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

147.    Defendant violated § 1962(d) of RICO by agreeing to aid, abet, assist, and facilitate Think Finance's RICO violations after it was spun off. Defendant's agreement is evidenced by *inter alia*, the "Data Sharing and Support Agreement," financing agreements, a Shared Employees agreement, and the "Shared Services Agreement."

148.    Defendant knowingly agreed to participate in the scheme alleged herein that aided, abetted, assisted and facilitated the making and collection of unlawful debt at more than twice the lawful rate of interest under state usury laws.

149.    Plaintiffs and the class members were injured as a result of the Defendant's violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the enterprise.

150.    Plaintiffs and the class members were injured as a result of Defendant's violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the Enterprise.

**COUNT TWO:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**
**(CLASS CLAIM)**

151.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

152.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of a class initially defined as:

> All individuals: (1) located in any state other than Nevada and Utah, (2) who took out a consumer loan product with Plain Green prior to June 1, 2016, or Great Plains; and (3) made a payment on the loan after May 1, 2014.

Plaintiffs are members of this class.

153.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Based on the revenue collected from consumers, numerosity is easily satisfied. In fact, through prior litigation and settlements involving

the Enterprise, it was revealed to plaintiffs that there are over 1 million consumers nationwide who took out a Plain Green or Great Plains loan. Additionally, as borne out in the prior settlements, the names and addresses of the class members are readily identifiable through the internal business records maintained by the Enterprise, and the class members may be notified of the pendency of this action by published and/or mailed notice.

154.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether Elevate participated in the operation or management of the affairs of the Enterprise; (2) what is the proper recovery for Plaintiffs and the class members against Defendant for its role in the enterprise.

155.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

156.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

157.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

158.   Defendant violated § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs.

159.   RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate."  18 U.S.C. § 1961(6).

160.   All of the loans made to RICO Class members included interest rates far in excess of twice the enforceable rate in their states.

161.   Plaintiffs and the RICO Class members were injured as a direct result of the violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

162.   Because it participated in the affairs and operation of the Enterprise, Defendant is

jointly and severally liable to Plaintiffs and the RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

163. Plaintiffs and the class members were injured as a result of Defendant's violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the Enterprise.

**WHEREFORE,** Plaintiffs request that the Court enter judgment on behalf of themselves and the class they seek to represent against Defendant for:

A. Certification for this matter to proceed as a class action;

B. Actual and treble damages relief as pled herein;

C. Attorney's fees, litigation expenses, and costs of suit; and

D. Such other or further relief as the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,
**PLAINTIFFS**

By: _____/s/ Kristi C. Kelly_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

Leonard A. Bennett, Esq., VSB #37523
Craig C. Marchiando, Esq., VSB #89736
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com

Email: craig@clalegal.com

Anna Haac (*pro hac vice* to be filed)
TYCKO & ZAVAREEI, LLP
1828 L Street, N.W., Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
Email: ahaac@tzlegal.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of September, 2020, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

_____/s/_____ _____
Kristi C. Kelly, Esq. VSB # 72791
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7570
Facsimile:  (703) 591-0167
E-mail:  kkelly@kellyguzzo.com
*Counsel for Plaintiffs*