IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| DARLENE GIBBS, STEPHANIE EDWARDS, LULA WILLIAMS, PATRICK INSCHO, SHARON BURNEY, CHASTITY MCNEIL, ALICIA PATTERSON, JERI BRENNAN, EARL BROWNE, KIMETRA BRICE, JILL NOVOROT, on behalf of themselves and all individuals similarly situated, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| | § | Civil Action No. 3:20-cv-632 (MHL) |
| Plaintiffs, | §<br>§ | |
| vs. | §<br>§ | |
| ELEVATE CREDIT, INC., | §<br>§<br>§ | |
| Defendant. | § | |

**DEFENDANT ELEVATE CREDIT, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO
DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

## TABLE OF CONTENTS

**Page**

I.  SUMMARY ...................................................................................................1

II.  FACTS .......................................................................................................3

   A.  Plaintiffs have filed a series of class actions related to Think Finance ..................3

   B.  Plaintiffs allege claims based on alter-ego, successor, fraudulent
       transfer theories, and then abandon them. ..............................................5

   C.  Plaintiffs' amended lawsuit is based entirely on the four
       Transitory Agreements..........................................................................6

       (1)  Employee Matters Agreement ..................................................7

       (2)  Data Sharing Agreement.........................................................8

       (3)  Shared Services Agreement ....................................................9

       (4)  Credit Facility Agreement.....................................................10

   D.  Plaintiffs obtained loans from Plain Green and Great Plains in 2015 and 2016....10

III.  APPLICABLE LEGAL STANDARD ............................................................11

IV.  ARGUMENTS AND AUTHORITIES...........................................................12

   A.  Plaintiffs have failed to state a claim under 18 U.S.C. § 1962(c)........................12

       (1)  Plaintiffs' allegations do not support the conclusion that Elevate
            participated in the operation or management of the Tribal Loan
            Enterprise. ....................................................................12

       (2)  Plaintiffs have not alleged facts showing that Elevate's alleged
            violation of 18 U.S.C. § 1962(c) was the "but for" and proximate
            cause of Plaintiffs' injuries. .....................................................17

   B.  Plaintiffs have failed to state a claim under 18 U.S.C. § 1962(d)........................18

       (1)  Failure to state a claim under section 1962(c) requires dismissal of
            the section 1962(d) claim........................................................18

       (2)  Plaintiffs have alleged no facts that support the conclusion that Elevate
            agreed to participate in the collection of alleged unlawful debts..............20

V.  CONCLUSION.......................................................................................22

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### CASE LAW

*Allstate Ins. Co. v. Benhamou,*
    190 F.Supp.3d 631 (S.D. Tex. 2016) ...............................................................20

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)........................................................................................12

*Banks v. Rees,*
    No. 8:17-CV-02201 (M.D. Fla. Mar. 2, 2018) ........................................4, 5, 11

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)........................................................................................11

*Bodtker v. Forest City Trading Group,*
    No. CV-99-533, 1999 WL 778583, at *6 (D. Ore. Oct. 1, 1999) ....................14

*Brannon v. Boatmen's First Nat. Bank of Oklahoma,*
    153 F.3d 1144 (10th Cir. 1998) .....................................................................14

*Brice v. Rees,*
    3-18-CV-01200-WHO (Feb. 23, 2018) ..................................................4, 5, 11

*Chisolm v. TranSouth Fin. Corp.,*
    95 F.3d 331 (4th Cir. 1996) ...........................................................................18

*Domanus v. Locke Lord LLP,*
    847 F.3d 469 (7th Cir. 2017) .........................................................................22

*Fayetteville Investors v. Commercial Builders, Inc.,*
    936 F.2d 1462 (4th Cir. 1991) .......................................................................13

*Francis v. Giacomelli,*
    588 F.3d 186 (4th Cir. 2009) ....................................................................11, 12

*Gibbs v. Curry,*
    3:18-CV-00654-MHL (E.D. Va. June 26, 2019) ..............................................5

*Gibbs v. Curry,*
    3:18-CV-00654-MHL (E.D. Va. Sept. 25, 2019) ..............................................4

*Gibbs v. Haynes Investments, LLC,*
    3:18-CV-0048 (E.D. Va. Jan. 22, 2018) ......................................................4, 5

*Gibbs v. Haynes Investments, LLC,*
    368 F.Supp.3d 901 (E.D. Va. Mar. 22, 2019)…......................................10, 19

*Gibbs v. Plain Green, LLC,*
  3:17-CV-495-MHL, (E.D. Va. July 11, 2017)...............................................4, 5

*Gibbs v. Plain Green, LLC*,
  No. 3:17-cv-495 (E.D. Va. Dec. 13, 2019) ...................................................5

*Gibbs v. Stinson*,
  3:18-CV-00676-MHL (E.D. Va. Feb. 1, 2019) ...............................................5

*Gibbs v. Stinson*,
  3:18-CV-00676-MHL (E.D. Va. Oct. 4, 2018)................................................4

*Gibbs v. Stinson*,
  421 F.Supp.3d 267 (E.D. Va. 2019) .............................................................12

*Gibbs v. TCV V, L.P.*,
  No. 3:19-CV-00789-MHL (E.D. Va.) ..........................................................5

*Gibbs v. Rees*,
  3:17-CV-00386 (E.D. Va. May 19, 2017) .....................................................4

*Goren v. New Vision Int'l, Inc.*,
  156 F.3d 721 (7th Cir. 1998) ...................................................................20, 21

*Hemi Group, LLC v. City of New York*,
  559 U.S. 1 (2010)......................................................................................18

*Hengle v. Ansner*,
  433 F.Supp.3d 825 (E.D. Va. 2020) .............................................10, 12, 16, 19, 22

*Holmes v. Sec. Inv'r Prot. Corp.*,
  503 U.S. 258 (1992)...................................................................................18

*In re Think Finance, LLC*,
  No. 17-33964 (N.D. Tex. Dec. 6, 2019) .......................................................5

*In re Think Finance, LLC*,
  No. 17-33964-hdh11 (Bankr. N.D. Tex. Oct. 23, 2017)...................................4

*Noble Sec., Inc. v. MIZ Engineering, Ltd.*,
  611 F.Supp.3d 513 (E.D. Va. 2009) .............................................................18

*Republican Party of N.C. v. Martin*,
  980 F.2d 943, 952 (4th Cir. 1992) ...............................................................11

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993)...................................................................................12

*Rojas v. Delta Airlines, Inc.*,
    425 F.Supp.3d 524 (D. Md. 2019) ................................................................19

*Slay's Restoration, LLC v. Wright Nat. Flood Ins. Co.*,
    884 F.3d 489 (4th Cir. 2018) ........................................................................18

*Space Tech. Dev. Corp. v. Boeing Co.*,
    209 F. App'x 236 (4th Cir.2006) ..................................................................13

*United Food and Com. Workers Unions and Emp. Midwest Health*
    *Benefits Fund v. Walgreen Co.*,
    719 F.3d 849 (7th Cir. 2013) ........................................................................20

*United States v. Mouzone*,
    687 F.3d 207 (4th Cir. 2012) ..................................................................20, 21

*United States v. Posada-Rios*,
    158 F.3d 832 (5th Cir. 1998) ........................................................................20

*Walters v. McMahen*,
    684 F.3d 435 (4th Cir. 2012) ........................................................................19

## STATUTES

18 U.S.C. § 1962(c) ........................................................................................12

18 U.S.C. § 1962(c) ........................................................................................12

18 U.S.C. § 1964(c) ..................................................................................12, 16

18 U.S.C. § 1962(d) ........................................................................................19

## RULES

Fed. R. Civ. P. 8(a)(2)....................................................................................11

## TREATISES

5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990).......11

Defendant Elevate Credit, Inc. ("Elevate") files this Brief in Support of its Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I. SUMMARY

For more than three years, Plaintiffs have filed various class actions, against a myriad of defendants, based on the identical allegation that they were "victimized by Think Finance's predatory lending scheme." (Am. Compl. ¶ 2). In the prior lawsuits, Plaintiffs have sued Think Finance, its former chief executive officer, shareholders, investors, and business partners in connection with a purported "Tribal Loan Enterprise" that operated an "illegal lending scheme designed to ostensibly evade state usury laws by originating high interest loans in the name of entities formed by Native American tribes." (Am. Compl. ¶ 1). Now, in what Plaintiffs describe as the "final chapter in this litigation," Plaintiffs seek to expand the Think Finance litigation to an entity that was formed in 2014 that had zero connection to Plaintiffs, their loans, or any Native American tribe.

Plaintiffs' initial attempt at a lawsuit against Elevate centered around the allegations that Elevate was the alter-ego of, or the successor to, Think Finance and that the May 1, 2014 spin-off of Elevate from Think Finance was a fraudulent transfer of assets to avoid creditors. (Compl. ¶¶ 7, 149, 158, 169, 173, 178, 182, 192, 196, 201, 206, 210, 215, 220, 229, 234-37). After Elevate sought an injunction to prohibit the Plaintiffs from asserting claims that had been assigned to the Think Finance Litigation Trust,[1] Plaintiffs dropped their fraudulent transfer claims, their state law usury claims, and all allegations that Elevate was the alter-ego of or successor to Think Finance.[2]

---

[1] See *Elevate Credit, Inc. v. Gibbs*, No. 20-03109-hdh (Complaint, filed on Sept. 2, 2020, Dkt. No. 1).

[2] *Compare* Original Complaint [Dkt. No. 1] with Amended Complaint [Dkt. No. 5]. Despite dropping the fraudulent transfer claims, the Amended Complaint still included numerous, now irrelevant, allegations that the spin-off was a wrongful attempt to shield assets from creditors. (Am.

Plaintiffs' renewed attempt at a lawsuit against Elevate has narrowed the case to two claims: (a) that Elevate allegedly violated section 1962(d) of Racketeer Influenced and Corrupt Organizations Act ("RICO") "by agreeing to aid, abet, assist, and facilitate Think Finance's RICO violations"; and (b) that Elevate allegedly violated section 1962(c) by "participating, directly or indirectly, in the conduct of the Enterprise's affairs." But there are no factual allegations to support these claims. Elevate has never had any connection to the tribal loans that are the subject of the Plaintiff's other RICO claims.

As Plaintiffs have acknowledged, Elevate was formed in January 2014 with no employees, data, or IT infrastructure, and no financing. Consequently, when Elevate was spun out of Think Finance on May 1, 2014, it needed a brief window of time to establish its own IT and data infrastructure for its non-tribal lending programs. To accomplish this goal, Elevate and/or its affiliated companies signed four short-term agreements (the "Transitory Agreements") with Think Finance affiliates that allowed Elevate's affiliates to use Think Finance's employees, data, and IT infrastructure *for Elevate's business*, which was wholly unconnected to the Native American lenders from which Plaintiffs obtained loans. Nothing in these agreements required, allowed, or even permitted Elevate or its affiliates to participate in, or benefit from, the Native American lenders, or Think Finance's provision of services to those lenders.

Plaintiffs' Amended Complaint has two primary parts. The first part, which includes paragraphs 21 to 120, contains the same allegations that are the subject of the other class action complaints. None of the allegations in the first part of the Amended Complaint reference conduct

---

Compl. ¶¶ 2, 3, 4, 20, 113, 114, 115, 116, 117, 118, 119 and 120). Plaintiffs' counsel sits on the Think Finance Litigation Trust Oversight Board that was created through the confirmation of the Think Finance Chapter 11 bankruptcy plan. The Think Finance Litigation Trust is currently pursuing fraudulent transfer claims against Elevate in an adversary proceeding in the United States Bankruptcy Court for the Northern District of Texas.

by Elevate. Most of the allegations concern conduct that occurred before Elevate existed. The part of the Amended Complaint that discusses Elevate is contained in the 19 paragraphs from paragraph 121 to paragraph 139. The facts in these paragraphs focus solely on the Transitory Agreements attached to the Amended Complaint. However, nothing in the Transitory Agreements allows Elevate to participate in Think Finance's tribal loan programs, or connects Elevate to Plaintiffs and their loans.

This motion boils down to a straightforward legal question: Do the four Transitory Agreements under which Elevate affiliates obtained employees, data, IT infrastructure, and financing to operate *Elevate's business* support a plausible basis for Elevate to be liable for "participating" in an alleged RICO enterprise that was collecting alleged unlawful debts related to Think Finance's business [18 U.S.C. § 1962(c)] or for agreeing to participate in an endeavor which, if complete, would have collected unlawful debts [18 U.S.C. § 1962(d)]? The inescapable answer is no. The four Transitory Agreements—two of which are not even with Elevate—do not support the reasonable inference that Elevate participated in or agreed to participate in the alleged Tribal Loan Enterprise, let alone that Elevate did so through the collection of unlawful debts. Perhaps even more egregious is that there is no connection between Elevate and Plaintiffs, their loans, or the purported harm they suffered. For these reasons, the Amended Complaint should be dismissed.

## II.  FACTS

**A.      Plaintiffs filed a series of class actions related to Think Finance.**

As noted in the Amended Complaint, Plaintiffs have filed "various actions" related to Think Finance's alleged "Tribal Loan Enterprise." (Am. Compl. ¶ 1). These "various actions" include at least seven other class actions against at least 27 persons or entities affiliated with Think Finance.

Plaintiffs first initiated their class actions in 2017 with a complaint filed in this Court. Specifically, on May 19, 2017, Virginia Plaintiffs Darlene Gibbs, Stephanie Edwards, Lulu Williams, and Patrick Inscho sued Think Finance, its former CEO, and several affiliates, alleging violations of RICO and Virginia's usury statute.[3]  These same Virginia Plaintiffs subsequently filed additional class actions against the Native American tribal lenders that Plaintiffs acknowledge actually made *and collected* the loans from Plaintiffs,[4] the lenders to the tribal lenders,[5] Think Finance's consultants,[6] and its founders, shareholders and various board members,[7] alleging the same violations of RICO and Virginia's usury laws.  On February 23, 2018, California Plaintiffs Kimetra Brice, Earl Browne, and Jill Novorot sued Think Finance's former CEO, the tribal lenders, and investors and/or lenders to the tribal lenders, alleging violations of RICO and California's usury statute.[8]  On March 2, 2018, Florida Plaintiffs Jeri Brennan and Alicia Patterson joined a pending Florida class action against Think Finance, its former CEO, its affiliates and its lender, alleging violations of RICO and Florida's usury statute.[9]

Many of the class actions have settled. In their Amended Complaint, Plaintiffs note that these class actions have resulted in "over $400 million in relief to consumers." (Am. Compl. ¶ 2). Think Finance and its affiliates filed a Chapter 11 bankruptcy petition on October 23, 2017.[10]  In

---

[3] *See Gibbs, et al v. Rees, et al*, 3:17-CV-00386 (E.D. Va. May 19, 2017) (Dkt. No. 1).  On March 23, 2018, this case was transferred to the United States District Court for the Northern District of Texas. *See id.* (Dkt. No. 132).

[4] *See Gibbs v. Plain Green, LLC,* 3:17-CV-495-MHL, (E.D. Va. July 11, 2017) (Dkt. No. 1).

[5] *See Gibbs v. Haynes Investments, LLC,* 3:18-CV-0048 (E.D. Va. Jan. 22, 2018) (Dkt. No. 1).

[6] *See Gibbs v. Curry*, 3:18-CV-00654-MHL (E.D. Va. Sept. 25, 2019) (Dkt. No. 1).

[7] *See Gibbs v. Stinson*, 3:18-CV-00676-MHL (E.D. Va. Oct. 4, 2018) (Dkt. No. 1).

[8] *See Brice v. Rees*, 3:18-CV-01200-WHO (N.D. Cal. Feb. 23, 2018) (Dkt. No. 1).

[9] *See Banks v. Rees*, No. 8:17-CV-02201 (M.D. Fla. Mar. 2, 2018) (Dkt. No. 59).

[10] *See In re Think Finance, LLC*, No. 17-33964-hdh11 (Bankr. N.D. Tex. Oct. 23, 2017) (Dkt. No.

the Think Finance bankruptcy, Plaintiffs sought and obtained approval of a global class action settlement with Think Finance, the tribal lenders, and various related and affiliated persons and entities.  In addition to other relief, the class action settlement canceled $380,711,145.15 in loans,[11] paid the class members $53 million, paid each of the Plaintiffs a Service Award of $7,500,[12] paid $8,500,000 in attorneys' fees,[13] and paid $12,800,007.00 in expenses related to the Think Finance litigation.[14]  Plaintiffs also recently announced a settlement with Think Finance's shareholders and debt collectors that will create a $50,050,000 settlement fund and cancel an additional $383,000,000 in loans.[15]

## B. Plaintiffs allege claims based on alter-ego, successor, fraudulent transfer theories, and then abandon them.

Most of the allegations against Elevate are recycled pleadings from the now-settled cases. Ninety-two of the 163 paragraphs in the Amended Complaint are identical or virtually identical to paragraphs in prior class action complaints.[16]  Using these recycled pleadings against Elevate is

---

1).

[11] *See generally Gibbs v. Plain Green, LLC*, Case No. 3:17-cv-495 (E.D. Va.), Dec. 13, 2019 Order at Dkt. 141 (granting final approval of the class settlement);  *In re Think Finance, LLC*, Case No. 17-33964 (N.D. Tex. Dec. 6, 2019) (Dkt. 1673).

[12] *See id.*

[13] *See id.*

[14] *In re Think Finance, Inc.*, No. 17-33964-hdh11 (Bankr. N.D. Tex. Sept. 26, 2019) (Dkt. No. 1523-1, pg. 37 of 73).

[15] *See Gibbs v. TCV V, L.P.*, No. 3:19-CV-00789-MHL (E.D. Va.) (Dkt. No. 783, Memorandum in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement).

[16] For example, Paragraphs 7–12, 14–19, 21–30, 33, 38–44, 46–53, 55–76, 89–93, 95, 98–100, 137–46, 149–60, 163 of the Amended Complaint appear in one or more of the following prior class actions complaints in the same or virtually identical form: (a) *Gibbs v. Stinson*, 3:18-CV-00676-MHL (E.D. Va. Feb. 1, 2019), First Amended Class Action Complaint [Dkt. 43] at ¶¶ 8–13, 32–50, 52–53, 63–76, 78–85, 117–25, 127, 160–61, 163–66, 168–70, 172–78; (b) *Gibbs v. Plain Green, LLC,* 3:17-CV-495-MHL, (E.D. Va. July 11, 2017), Class Action Complaint [Dkt. 1] at ¶¶ 8–9, 11, 17–20, 22, 25, 65, 73–75, 86, 89–92, 94–96, 98–99, 102–4, 107; (c) *Gibbs v. Curry*, 3:18-CV-00654-MHL (E.D. Va. June 26, 2019), First Amended Class Action Complaint

inherently flawed. Elevate did not exist until January 2014, long after the alleged Tribal Loan Enterprise started, and Elevate has never had any connection to the Tribal Loan Enterprise. From its first day of operations, Elevate operated only completely separate non-tribal lending programs.

To connect Elevate to Think Finance's tribal loan program, Plaintiffs originally alleged that Elevate was the "alter ego" or "successor" to Think Finance, and, therefore, liable for its alleged collection of unlawful debts, regardless of what business Elevate actually conducted. (Compl. ¶¶ 7, 149, 158, 169, 173, 178, 182, 192, 196, 201, 206, 210, 215, 220, 229, 234-37). Plaintiffs also alleged that the May 1, 2014 spin-off of Elevate to the Think Finance shareholders was a fraudulent transfer intended to defraud creditors. *See id.* On September 2, 2020, Elevate filed an action for injunctive relief in the Northern District of Texas, seeking an injunction to prohibit the Plaintiffs from pursuing the claims that had been assigned to the Think Finance Litigation Trust.[17] On September 15, 2020, Plaintiffs voluntarily abandoned the alter-ego, successor, and fraudulent transfer claims—the former core of their claims against Elevate—and instead decided to focus on direct claims against Elevate under RICO Sections 1962(c) and (d). (Am. Compl. ¶¶ 151-163).

---

[Dkt. 70] at ¶¶ 6–10, 12–13, 16–25, 27–40, 42–43, 50, 52–64, 86–87, 89, 91–94, 98, 101–2, 108–9, 111–13, 126, 130–32, 134–36, 138–39, 142–45, 149; (d) *Gibbs v. Haynes Investments, LLC*, 3:18-CV-0048 (E.D. Va. Jan. 22, 2018), Class Action Complaint [Dkt. 1] at ¶¶ 6–11, 22–26, 28–30, 34–35, 121, 123, 125–27, 129, 134–35, 138, 165, 168–72, 174, 177–78, 181–84; (e) *Brice v. Rees*, 3:18-CV-01200-WHO (N.D. Cal. Feb. 23, 2018), Class Action Complaint [Dkt. 1] at ¶¶ 9–13, 26–31, 33–35, 37–44, 58–61, 145–47, 174, 178–81, 183, 186–87, 191–93; and (f) *Banks v. Rees*, No. 8:17-CV-02201 (M.D. Fla. Mar. 2, 2018), First Amended Class Action Complaint [Dkt. 59] at ¶¶ 8–9, 11–12, 22–25, 27–29, 31–33, 40–44, 52–55, 112–14, 134, 137–40, 143–47, 150–52, 155.

[17] *See Elevate Credit, Inc. v. Gibbs*, No. 20-03109-hdh (Complaint, filed on Sept. 2, 2020, Dkt. No. 1).

**C.     Plaintiffs' amended lawsuit is based entirely on four Transitory Agreements.**

Plaintiffs' amended RICO class action centers around the allegation that, after the May 1, 2014 spin-off from Think Finance, Elevate "continued to aid, abet, assist, and facilitate Think Finance's unlawful collection of the usurious and illegal debts" through four agreements under which Think Finance shared its employees and data with, and provided services to, Elevate. (Am. Compl. ¶¶ 121-39).   Plaintiffs do not allege that Elevate's business is a RICO Enterprise, that Elevate was part of the Tribal Loan Enterprise, or that Elevate is an alter ego of or successor to Think Finance. (Am. Compl. ¶¶ 1, 100, 113-14, 121-39). Plaintiffs also do not allege that Elevate issued  any loans or collected any usurious interest.  Instead, Plaintiffs allege that the following four Transitory Agreements support the inference that Elevate facilitated the collection of unlawful debts and that Elevate agreed to participate in the collection of unlawful debts:

- Employee Matters Agreement between Think Finance and Elevate;[18]

- Data Sharing and Support Agreement ("Data Sharing Agreement") between TC Decision Sciences, LLC and Elevate Decision Sciences, LLC;[19]

- Shared Services Agreement between TC Loan Service, LLC and Elevate Credit Service, LLC;[20] and

- Credit Facility Agreement between Elevate Credit Service, LLC, as Borrower, Elevate Credit, as guarantor, and Think Finance, as lender.[21]

---

[18] The Employee Matters Agreement is attached to the Amended Complaint as Exhibit 15 and starts at PageID# 837.

[19] The Data Sharing Agreement is attached to the Amended Complaint as Exhibit 16 and starts at PageID# 847.

[20] The Shared Services Agreement is attached to the Amended Complaint as Exhibit 17 and starts at PageID# 863.

[21] The Credit Facility Agreement is attached to the Amended Complaint as Exhibit 18 and starts at PageID# 877.

As noted below, while Plaintiffs include a couple of passing references to the Employee Matters Agreement and the Credit Facility Agreement, the focus of almost all Elevate-related allegations are the Data Sharing Agreement and the Shared Services Agreement—two agreements to which Elevate is not even a party.

### (1)    Employee Matters Agreement.

On May 1, 2014, Elevate was spun out of Think Finance. (Am. Compl. Ex. 14). Through the Employee Matters Agreement, Elevate and Think Finance designated which employees would work for Elevate Credit Service, LLC, which employees would remain with TC Loan Service, LLC, and which employees would be shared between the two companies for the seven months that Elevate needed in order to completely separate from Think Finance. (Am. Compl. Ex. 15, PageID# 837-38). The Employee Matters Agreement does not permit Elevate to manage or supervise Think Finance's employees while they are working at Think Finance. *Id.* Rather, the only allegation in the Amended Complaint concerning the Employee Matters Agreement is in paragraph 123. Plaintiffs only specific allegation regarding the Employee Matters Agreement is that it permitted "a significant number of employees" to provide services for both Elevate and Think Finance. There is no allegation, and the Employee Matters Agreement does not state, that Elevate had any ability to affect, influence, or control employees while performing tasks for Think Finance.

### (2)    Data Sharing Agreement.

A majority of the allegations directed at Elevate concern the Data Sharing Agreement. (Am. Compl. ¶¶ 5, 127-31, and 147). However, Elevate is not a party to the Data Sharing Agreement. (Am. Compl. at Ex. 16 PageID# 848). The Data Sharing Agreement is between TC

Decision Sciences, LLC ("TCDS") and Elevate Decision Services, LLC ("EDS")—a non-party to this case.

Even ignoring that Elevate was not a party to this agreement, Plaintiffs contend that, under the Data Sharing Agreement, Elevate and Think Finance "agreed to share data and information relating to their respective products 'to ensure a continuity of services **to their respective customers.**'" (Am. Compl. ¶ 127) (Emphasis added). Plaintiffs also allege that the Data Sharing including the sharing of information "relating **to their respective products** 'for the purpose of developing and validating underwriting, verifications, response, line assignment and fraud models, processes and rule and performing related analysis,' including borrower data furnished when applying for a loan, borrower data obtained for the purpose of processing a loan application, and borrower account repayment history, and analysis of the foregoing." (Am. Compl. ¶ 128) (Emphasis added). Plaintiffs further contend Elevate and Think Finance shared "fraud data for purposes of identifying problematic loan applications, including the development of fraud strategies and modeling." (Am. Compl. ¶ 128). Plaintiffs also allege that, under the Data Sharing Agreement, Think Finance agreed to host Elevate's data and agreed to give Elevate access to data and third-party data providers. (Am. Compl. ¶¶ 130-31).

**(3)    Shared Services Agreement.**

Most of the remaining allegations directed at Elevate concern the Shared Services Agreement. (Am. Compl. ¶¶ 5, 123-26, and 147). Like the Data Sharing Agreement, Elevate is not a party to the Shared Services Agreement. (Am. Compl. at PageID# 863). The Shared Services Agreement is between TC Loan Service, LLC ("TCLS") and Elevate Credit Services, LLC ("ECS"), not Elevate. (Am. Compl. at Ex. 17, PageID# 864).

Plaintiffs contend that, through the Shared Services Agreement, the shared employees worked on the core operations of both companies. (Am. Compl. ¶125). Plaintiffs allege:

> Shared Service Employees provided services relating to nearly, if not all aspects of operating the businesses, including human resources (payroll and benefits administration, recruiting, time management, reporting and performance management, 401(k) administration); finance (accounting, treasury services, financial analysis and reporting); facilities management (mail distribution, janitorial services, receptionist duties, management of catering services, office furniture, equipment, and personnel); operations (customer service, technical writing support, assistance with operating procedures and infrastructure resources); and information technology ('IT') (staffing, data management services, technical support, access to Think Finance systems, data center, and platforms).

(Am. Compl. ¶ 126). Aside from ignoring the fact that the agreement is with ECS, not Elevate, Plaintiffs have misread the Shared Services Agreement. The listed services are services that TCLS *provided to* ECS (the Elevate subsidiary), not services that ECS provided to TCLS. (Am. Compl. at Ex. 17, PageID# 874).

### (4)    Credit Facility Agreement.

Finally, Plaintiffs' point to a Credit Facility Agreement, which they summarize in paragraph 132, stating: "Think Finance provided Elevate a $75 million intercompany line of credit at time of the spin-off in order to provide working capital to Elevate." (Am. Compl. ¶ 132). Plaintiffs also complain that the Credit Facility Agreement was not an arms-length transaction. Noticeably absent, however, is any allegation connecting the money provided *to Elevate* to the Tribal Lenders, Plaintiffs' loans, or the harm suffered by Plaintiffs. Moreover, Plaintiffs do not explain how the lack of an arms-length transaction is relevant to the Tribal Lenders, Plaintiffs' loans, or their purported harm. (Am. Compl. ¶¶ 132-33).

### D.    Plaintiffs obtained loans from Plain Green and Great Plains in 2015 and 2016.

Plaintiffs contend that they suffered damages by paying usurious interest to the Native American lending entities Plain Green and Great Plains and seek to certify a class of individuals

who obtained loans *from those lenders* after May 1, 2014. (Am. Compl. ¶ 141 and 152). Plaintiffs do not allege the dates on which they allegedly obtained the usurious loans. (Am. Compl. ¶ 100). However, at least some of these loans have been the subject of prior cases, and this Court has analyzed these loan agreements in detail.[22]

The attached Loan Agreements show that the Virginia Plaintiffs (Gibbs, Williams, Edwards, and Inscho) entered their loans with Plain Green and Great Plains in 2015 and 2016, long after Elevate spun out of Think Finance and after the Transitory Agreements had expired.[23] Attached as Exhibit B is the Amended Complaint filed in *Banks v. Rees*, No. 8:17-CV-02201 (M.D. Fla. March 2, 2018), which shows that Florida Plaintiff Jeri Brennan received her loans from Great Plains in December 2016 and February 2018 and Florida Plaintiff Alicia Patterson obtained her loans from Plain Green in late 2014, 2016, 2017, and 2018. *See* Ex. B, ¶¶ 93-104. Attached as Exhibits C, D, and E are the loan agreements that California Plaintiffs Jill Novorot, Earl Browne, and Kimetra Brice attached to their class action complaint in *Brice v. Rees*, 3-18-CV-01200-WHO (Feb. 23, 2018), which show they obtained their loans in 2015 and 2016. *See* Ex. C, D and E.

### III.  APPLICABLE LEGAL STANDARD

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of

---

[22] *See, e.g., Gibbs v. Haynes Investments, LLC*, 368 F.Supp.3d 901, 911-12 (E.D. Va. Mar. 22, 2019) (describing the loans); *Hengle v. Asner*, 433 F.Supp.3d 825, 892 (E.D. Va. 2020) (noting that the court may rely on the loan agreements as long as there is not a dispute over their authenticity); *see also See* Ex. A (Declaration of Stephen Smith, previously filed as Document 35-1 on July 18, 2018 in *Haynes v. Gibbs*, No. 3:18-CV-00048-MHL and as Document 17-1 August 7, 2017 in *Gibbs v. Rees*, No. 3:17-CV-00386-MHL). Attached to Mr. Smith's declaration are the loan agreements for Plaintiffs Gibbs, Williams, Edwards, and Inscho.

[23] *See* Ex. A (Declaration of Stephen Smith, previously filed as Document 35-1 on July 18, 2018 in *Haynes v. Gibbs*, No. 3:18-CV-00048-MHL and as Document 17-1 August 7, 2017 in *Gibbs v. Rees*, No. 3:17-CV-00386-MHL).

defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).   To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief.").   Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193.   A district court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 676–79. However, this principle applies only to factual allegations.   "[A] court considering a motion to dismiss can choose to begin by identifying the pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

## IV.  ARGUMENTS AND AUTHORITIES

### A.     Plaintiffs have failed to state a claim under 18 U.S.C. § 1962(c).

#### (1)     Plaintiffs' allegations do not support the conclusion that Elevate participated in the operation or management of the Tribal Loan Enterprise.

To establish a violation of section 1962(c), Plaintiffs must allege that Defendants: (1) conducted the affairs of an enterprise (2) through the collection of unlawful debt (3) while employed by or associated with (4) the enterprise engaged in, or the activities of which affect, interstate or foreign commerce. *See Gibbs v. Stinson*, 421 F.Supp.3d 267, 312 (E.D. Va. 2019) (citing 18 U.S.C. § 1962(c)).  Additionally, as discussed below, private causes of action under Section 1964(c) require that Plaintiffs demonstrate that their harm was proximately caused by a defendant's violation of the statute. 18 U.S.C. § 1964(c).  "RICO liability depends upon a showing that a defendant acted or participated in the enterprise's affairs, and not just his or her own affairs." *Hengle v. Asner*, 433 F.Supp.3d 825, 897 (E.D. Va. 2020) (citing *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)).  Further, as the Supreme Court has repeatedly affirmed, a "[defendant] is not liable under [§ 1962(c)] unless [the defendant] has participated in the operation or management of the enterprise itself." *Id.* at 182.  "Congress did not intend to extend RICO liability under § 1962(c) beyond those who participate in the operation or management of an enterprise through a pattern of racketeering activity." *Id.* at 184.  "Of course, the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required." *Id.* at 179.

The Amended Complaint contains no substantive factual allegations that support a plausible claim that Elevate participated in the operation or management of the purported Enterprise's affairs.  Plaintiffs include no allegations that Elevate offered or collected any alleged unlawful debts.  According to the Amended Complaint, the "newly created" Elevate was spun off to operate a non-tribal, state licensed, lending business. (*See* Am. Compl. ¶¶ 2 and 115).  Plaintiffs

do not provide a single instance where Elevate participated in the collection of any of the allegedly usurious loans made by the Native American lenders.  Plaintiffs contend that the Transitory Agreements show that Elevate participated in Think Finance's collection of an alleged unlawful debt, but the agreements themselves—which are all attached to the Complaint—are entirely to the contrary.  This Court cannot accept allegations that are flatly contradicted by documentary evidence attached to the complaint. *See Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991) (recognizing that, if the allegations in the complaint conflict with an exhibit attached to the complaint, the exhibit prevails); *Space Tech. Dev. Corp. v. Boeing Co.*, 209 F. App'x 236, 238 (4th Cir.2006) (noting "the Court need not accept as true conclusions or inferences from the complaint that are contradicted by the attached exhibits.").

First, Elevate is not a party to the Data Sharing Agreement or the Shared Services Agreement, the two agreements that account for 95 percent of the allegations against Elevate. Consequently, these two agreements cannot support the inference that *Elevate* participated in the collection of any alleged illegal loans. *See Brannon v. Boatmen's First Nat. Bank of Oklahoma*, 153 F.3d 1144, 1150 (10th Cir. 1998) (holding that trial court correctly granted 12(b)(6) motion and dismissed claim for violation of section 1962(c) against a parent corporation because the allegations were based solely on actions of the subsidiary); *see also Bodtker v. Forest City Trading Group*, No. CV-99-533, 1999 WL 778583, at *6 (D. Ore. Oct. 1, 1999) ("Despite a subsidiary's close affiliation with its parent corporation, it also is a separate and distinct legal entity. RICO does not dictate that a court disregard corporate law concepts.").

Second, even if the Court ignores the fact that Elevate is not a party to the Data Sharing Agreement or the Shared Services Agreement, the facts alleged regarding the agreements do not support a plausible claim for relief.  Both agreements were short-term transitory agreements that

were intended to assist Elevate in *separating* from Think Finance. (Am. Compl. Ex. 14). The Shared Services Agreement terminated on November 1, 2014, six months after its execution. (Am. Compl. Ex. 17, PageID# 866). The Data Services Agreement terminated on December 31, 2014, eight months after its execution. (Am. Compl. Ex. 16, PageID# 851). In addition, the laundry list of services identified by the Plaintiffs—the alleged services that show that Elevate participated in the collection of the tribal loans—were services provided by TCLS *to ECS* for the operation of *Elevate's business*, not loans related to the alleged Tribal Loan Enterprise. (Compare Am. Compl. ¶ 26 to Am. Compl. Ex.17, PageID# 874). In other words, the alleged "aiding and abetting" by Elevate relates to services that ECS was *receiving from*, rather than *providing to*, TCLS. Similarly, the Employee Matters Agreement also makes clear that the shared employees are *employees already employed by Think Finance*:

> WHEREAS, pursuant to the Reorganization (a) certain employees of TC Loan Service, LLC, a wholly-owned subsidiary of TF ("TCLS"), will be transitioned to and will become employed by Elevate Credit Service, LLC, a wholly-owned subsidiary of EC ("ECS"), and perform services exclusively on behalf of ECS and its Affiliates ("ECS Employees"), (b) other employees of TCLS will remain employed by TCLS and perform services exclusively on behalf of TCLS and its Affiliates ("TCLS Employees") and (c) other employees of TCLS will remain employed by TCLS and perform services for both TCLS and its Affiliates and ECS and its Affiliates ("Shared Services Employees") in accordance with that certain Shared Services Agreement, dated on or about the date hereof, by and between TCLS and ECS ("Shared Services Agreement").

(Compl. Ex. 15, PageId# 837). This fact is fatal to Plaintiffs' theory that Elevate "aided and abetted" Think Finance by sharing certain Elevate's employees with Think Finance since (1) the agreements show that *all* of the employees were already employed by Think Finance or its affiliates; and (2) it was Think Finance or its affiliates who were sharing their employees with Elevate's affiliates.

This "reverse aiding and abetting" theory is persistent throughout the Amended Complaint. For example, Plaintiffs allege that Elevate participated in the Enterprise because:

- "Think Finance agreed to host Elevate's data, information, documents, and files;"[24]

- "Elevate was given the ability to access and connect to data bases and third-party data providers through Think Finance;"[25] and

- "Think Finance provided Elevate a $75 million intercompany line of credit at the time of the spin-off in order to provide needed working capital to Elevate."[26]

These allegations, even if accepted as true, are insufficient to state a RICO claim against Elevate. Plaintiffs cannot plausibly assert that Elevate "aided and abetted" Think Finance based on the fact that Elevate *received* services from Think Finance. Plaintiffs must show that Elevate conducted the affairs of the alleged Tribal Loan Enterprise, not that employees, data, financing, or services were provided to Elevate for its business. *See, e.g., Reves*, 507 U.S. at 185 (1993).

Finally, this Court's opinions in other related cases demonstrate that the facts alleged in this case are not sufficient to support a RICO claim. For example, in *Hengle v. Asner*, 433 F.Supp.3d 825, 897 (E.D. Va. 2020), this court found that the plaintiffs had stated a plausible claim against the defendants under section 1962(c) by alleging (a) defendants received nearly all of the revenues from the alleged unlawful debts; (b) non-tribal entities owned and operated by the defendants performed nearly all of the operations of the tribal lending entities; (c) defendants took actions to shield the enterprise from liability; and (d) defendants helped to devise and structure an associated group of individuals and businesses that issued and collected unlawful debts under "the auspices of the Tribe while in fact funneling most of the revenues to nontribal entities and individuals, including" the defendants. *Id.*

---

[24] Am. Compl. ¶ 130.

[25] Am. Compl. ¶ 131.

[26] Am. Compl. ¶ 132.

Plaintiffs' have alleged none of these facts against Elevate.  Plaintiffs have not alleged that Elevate shared in the revenue from the collection of the tribal loans, performed operations for the tribal lending entities, or took any action to shield the enterprise from liability. (Am. Compl. ¶¶ 121-139).  Plaintiffs have also not alleged that Elevate had any role in devising the structure for the collection of the alleged unlawful loans.  Elevate did not exist when the alleged Tribal Lending Enterprise was formed.  According to the Amended Complaint, the Tribal Loan Enterprise started in 2011 and produced significant revenue in 2013 but, Elevate's alleged participation started "after it was spun off" on May 1, 2014. (Am. Compl. ¶¶ 55-71, 81-86 and 147).

This Court's opinion in *Gibbs v. Stinson*,[27] is also instructive.  In *Gibbs*, the plaintiffs alleged that Defendants "helped design and implement the Tribal lending business," and "dominated and controlled its business and operations." *Id.*  Plaintiffs also alleged that the defendants altered Think Finance's business model in response to growing legal pressures and that they "directed, reviewed, and approved key business decisions of Think Finance, including decisions related to the origination, marketing, underwriting, servicing, and collection of the loans." *Id.*  Based on these facts, the Court found that the plaintiffs had alleged sufficient facts to allege RICO claims. *Id.* at 313.  However, none of these types of facts are alleged against Elevate. There are no allegations that Elevate "helped design and implement" the Tribal lending business or that Elevate "directed, reviewed, or approved" key business decision of Think Finance.  Elevate had zero role in Think Finance's business.  The facts alleged only show that Elevate affiliates received assistance from Think Finance so Elevate affiliates could operate Elevate's completely separate lending business.

---

[27] 421 F.Supp.3d 267, 312-13 (E.D. Va. 2019).

Because Plaintiffs have failed to plausibly allege that Elevate participated in the operation or management of the Tribal Loan Enterprise itself, Plaintiffs' section 1962(c) RICO claim must be dismissed.

> **(2)    Plaintiffs have not alleged facts showing that Elevate's alleged violation of 18 U.S.C. § 1962(c) was the "but for" and proximate cause of Plaintiffs' injuries.**

Section 1964(c) provides in relevant part:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c). "While this language could be construed as simply requiring 'but for' causation of a plaintiff's injury and thereby allowing 'all factually injured plaintiffs to recover,' it is clear from context that Congress did not intend 'such an expansive reading.'" *Slay's Restoration, LLC v. Wright Nat. Flood Ins. Co.*, 884 F.3d 489, 493 (4th Cir. 2018) (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 265–66 (1992)).  Section 1964(c) requires a showing of "proximate caus[ation]," meaning "some *direct* relation between the injury asserted and the injurious conduct alleged." *Id.*  "Thus, a court facing a RICO claim should not focus on whether the harm to the RICO plaintiff was a foreseeable result of the defendant's conduct or even whether it was "the *intended* consequence[ ] of [that] behavior," but rather on "the *directness of the relationship* between the conduct and the harm." *Id.* (emphasis in original) (quoting *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 12 (2010)).  In the RICO context, the "pertinent inquiry in determining the existence of proximate, or 'legal' cause, is 'whether the conduct has been so significant and important a cause that the defendant should be held responsible.'" *Noble Sec., Inc. v. MIZ Engineering, Ltd.*, 611 F.Supp.3d 513, 550 (E.D. Va. 2009) (quoting *Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 336 (4th Cir. 1996)).

While Plaintiffs state that "Plaintiffs and the RICO Class members were injured as a direct result of the violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise," this allegation shows causation only as to Think Finance and the Enterprise, not Elevate. (Am. Compl. ¶ 161). Plaintiffs do not plausibly allege how Elevate—a company formed in 2014—could be directly responsible for injuries allegedly caused by others. Plaintiffs do not allege that Elevate had any dealings with the tribal lending entities or the consumer plaintiffs. None of the alleged conduct by Elevate *directly* led to Plaintiffs paying "unlawful and usurious rates of interest."

As this Court has done in other related cases, it can take judicial notice of the fact that the Plaintiffs' loans with the tribal lending entities originated in 2015 and 2016.[28] This fact demonstrates that the alleged conduct by Elevate did not directly cause the Plaintiffs' injuries. Indeed, Plaintiffs have no answers for basic questions regarding their claim against Elevate and the harm allegedly caused by Elevate. How did services provided under the four Transitory Agreements—which all terminated in 2014—directly cause injuries from allegedly usurious loans in 2015 and 2016? Plaintiffs have alleged no facts supporting the inference that the employees, data, services, and financing provided to Elevate in 2014 directly caused injuries to Plaintiffs in 2015 and 2016.

---

[28] *See, e.g., Gibbs v. Haynes Investments, LLC*, 368 F.Supp.3d 901, 911-12 (E.D. Va. Mar. 22, 2019) (describing the loans); *Hengle v. Ansner*, 433 F.Supp.3d 825, 892 (E.D. Va. 2020) (noting that the court may rely on the loan agreements as long as there is not a dispute over their authenticity); *see also See* Ex. A (Declaration of Stephen Smith, previously filed as Document 35-1 on July 18, 2018 in *Haynes v. Gibbs*, No. 3:18-CV-00048-MHL and as Document 17-1 August 7, 2017 in *Gibbs v. Rees*, No. 3:17-CV-00386-MHL). Attached to Mr. Smith's declaration are the loan agreements for Plaintiffs Gibbs, Williams, Edwards, and Inscho.

Based on the foregoing, Plaintiffs have failed to sufficiently allege that Elevate was the "but for" and proximate cause of Plaintiffs' injuries and the injuries to the class. Consequently, Plaintiffs' section 1962(c) RICO claim must be dismissed.

**B.    Plaintiffs have failed to state a claim under 18 U.S.C. § 1962(d).**

> **(1)    Failure to state a claim under section 1962(c) requires dismissal of the section 1962(d) claim.**

Section 1962(d) makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). When a plaintiff fails to state a claim under § 1962(a), (b) or (c), a conspiracy to violate RICO pursuant to § 1962(d) is also without merit, and must be dismissed. *See Walters v. McMahen*, 684 F.3d 435, 440 (4th Cir. 2012); *Rojas v. Delta Airlines, Inc.*, 425 F.Supp.3d 524, 537 n.5 (D. Md. 2019) ("Additionally, because Plaintiffs have failed to state a claim under § 1962(c), '[their] charge of conspiracy to violate RICO pursuant to § 1962(d) is also without merit,' and must be dismissed.") (citation omitted); *see also United Food and Com. Workers Unions and Emp. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 856-57 (7th Cir. 2013) ("Having failed to plead facts that would establish a violation of Section 1962(c), the [plaintiff] cannot state a claim for conspiracy under Section 1962(d) based on those same facts."); *Allstate Ins. Co. v. Benhamou*, 190 F.Supp.3d 631, 663 (S.D. Tex. 2016) (collecting cases holding the same). Because Plaintiffs have failed to sufficiently state a claim under section 1962(c), Plaintiffs' section 1962(d) claim must also be dismissed.

> **(2)    Plaintiffs have alleged no facts that support the conclusion that Elevate agreed to participate in the collection of alleged unlawful debts.**

Plaintiffs have also failed to allege facts that would plausibly establish a claim for a violation of section 1962(d) by Elevate. A RICO conspiracy claim under section 1962(d) requires

allegations that (1) two or more people agreed to commit a substantive RICO offense (in this case, to participate in an enterprise that collects unlawful debts); and (2) the defendant knew of and agreed to the overall objective of the RICO offense. *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012) (quoting *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998).  The Fourth Circuit has cautioned that the RICO conspiracy statute does not "criminalize mere association with an enterprise." *Id.*  Rather, the touchstone of liability under section 1962(d) is an "agreement to participate in an endeavor which, if completed would constitute a violation of the substantive statute." *Id.* (quoting from *Goren v. New Vision Int'l, Inc.,* 156 F.3d 721, 732 (7th Cir. 1998)).  For purposes of a factual plausibility analysis, the issue is whether the Plaintiffs have alleged any facts, if accepted as true, that prove there was an agreement by Elevate to participate in Think Finance's collection of an alleged unlawful debt.

Plaintiffs allege that Elevate "violated § 1962(d) of RICO by agreeing to aid, abet, assist, and facilitate Think Finance's RICO violations after it was spun off," which Plaintiffs allege is evidenced by the Data Sharing Agreement, the Credit Facility Agreement, and the Shared Services Agreement. (Compl. ¶ 147.).  None of the Transitory Agreements support the inference that Elevate agreed to participate in *Think Finance's* business, or the collection of alleged unlawful debts "after [Elevate] was spun off."  Even the most cursory examination of the Transitory Agreements demonstrate they have nothing to do with Native American lending, Plaintiff's loans, or anything else having to do with the purported Tribal Loan Enterprise.

Rather, Plaintiffs' RICO conspiracy is predicated upon the same "reverse aiding and abetting" theory as its substantive RICO claim, and the Court should reject it for the same reasons. As seen above, the business agreements that allegedly evidence Elevate's conspiracy to engage in racketeering are in reality mundane, every-day business documents of the type necessary to

effectuate the orderly separation of two businesses. Moreover, the terms of the Transitory Agreements make clear that the bulk of the services and obligations under the agreements flow from Think Finance to Elevate's affiliates, not the other way around. The law requires much more than the mere receipt of lawful services under a separation agreement between two businesses to state a claim for racketeering under section 1962(d). The agreement itself must evidence an "agreement to participate in an endeavor which, if completed would constitute a violation of the substantive statute." *Mouzone*, 687 F.3d at 218 (quoting *Goren*, 156 F.3d at 732). Nothing about the services provided by the Transitory Agreements could possibly constitute, or lead to, a RICO violation. Instead, the Transitory Agreements establish nothing more than Elevate's association with Think Finance for a short period of time. But, as the Court is well aware, mere association with conspirators and racketeers is not enough to establish an unlawful agreement that violates the RICO statute. *See, e.g., Domanus v. Locke Lord LLP*, 847 F.3d 469, 482 (7th Cir. 2017).

From its inception, Elevate operated only a non-tribal lending business. (Am. Compl. ¶¶ 113-20). Plaintiffs' allegations and the documents Plaintiffs attached to the Amended Complaint show the Elevate did not agree to participate in the tribal loan business. For example, the May 1, 2014 Separation and Distribution Agreement attached to the Amended Complaint provides:

> Elevate was incorporated for the express purpose of operating the Elevate Business and has not engaged in any business activities except in preparation for its corporate reorganization and the distribution of its stock by Think Finance.

(Am. Compl. Ex. 14, PageID# 643). Plaintiffs note that, from the beginning, the purpose of the spin-off was to "separate the tribal and non-tribal businesses." (Am. Compl. ¶¶ 113-14). Plaintiffs never allege that this purpose changed or that Elevate switched to a different business model and purpose that was connected to the alleged enterprise. There is no allegation against Elevate that it was connected, *at any time*, to the tribal lending business or the enterprise. This is fatal to

22

Plaintiffs' conspiracy claims. *Cf. Hengle*, 433 F.Supp.3d at 898 (denying 12(b)(6) motion to dismiss claims under section 1962(d) because there was evidence of multiple prior business arrangements that connected defendants to the tribal lending entities).

Accordingly, because Plaintiffs have failed to plead any facts that plausibly allege a violation of 18 U.S.C. §§1962(c) or (d), Plaintiffs' RICO claims must be dismissed for failure to state a claim under Rule 12(b)(6).

## V.  CONCLUSION & PRAYER

Elevate respectfully requests that the Court dismiss Plaintiffs' claims with prejudice for failure to state a claim under Rule 12(b)(6) and award Elevate all other relief that is appropriate at law or in equity.

Respectfully submitted,

By: /s/ *John M. Erbach*
M. F. Connell Mullins, Jr. (VSB No. 47213)
Email: cmullins@spottsfain.com
John Michael Erbach (VSB No. 76695)
Email: jerbach@spottsfain.com
SPOTTS FAIN PC
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Telephone: (804) 697-2000
Facsimile: (804) 697-2100

Joel W. Reese (*pro hac vice* forthcoming)
joel.reese@rm-firm.com
Pete Marketos (*pro hac vice* forthcoming)
pete.marketos@rm-firm.com
REESE MARKETOS LLP
750 N. Saint Paul St., Suite 600
Dallas, Texas 75201-3201
214.382.9810 telephone
214.501.0731 facsimile

**COUNSEL FOR DEFENDANT ELEVATE
CREDIT, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2020, I will electronically file the foregoing with the

Clerk of the Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to all counsel of record.

By: /s/ *John M. Erbach*
John Michael Erbach (VSB No. 76695)
Email: jerbach@spottsfain.com
SPOTTS FAIN PC
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Telephone: (804) 697-2000
Facsimile: (804) 697-2100

**COUNSEL FOR DEFENDANT ELEVATE CREDIT, INC.**