## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**DARLENE GIBBS,** *et al.,*
*on behalf of themselves and all*
*individuals similarly situated,*

      **Plaintiffs,**

v.                                **Civil Action No. 3:20cv632**

**ELEVATE CREDIT, INC.,**

      **Defendant.**

### <u>MEMORANDUM OPINION</u>

This matter comes before the Court on two motions:

(1) Defendant Elevate Credit, Inc.'s ("Elevate") Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(2) (the "Rule 12(b)(2) Motion"),[1] (ECF No. 9); and,

(2) Elevate's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Rule 12(b)(6) Motion"),[2] (ECF No. 11).

Plaintiffs Darlene Gibbs, Stephanie Edwards, Lula Williams, Patrick Inscho, Sharon Burney,

Chastity McNeil, Alicia Patterson, Earl Browne, Kimetra Brice, and Jill Novorot ("Plaintiffs")

responded to both motions, (ECF Nos. 21, 22), and Elevate replied, (ECF Nos. 23, 24).[3] This

matter is ripe for disposition. The Court dispenses with oral argument because the materials

---

[1] Rule 12(b)(2) allows dismissal for "lack of personal jurisdiction." Fed. R. Civ. P. 12(b)(2).

[2] Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

[3] The Court terminated former plaintiffs Lawrence Mwethuku and Jerri Brennan from this case upon the Plaintiffs' notice of voluntary dismissal as to each former plaintiff. (ECF Nos. 4, 6, 8.)

before it adequately present the facts and legal contentions, and argument would not aid the decisional process. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.[4] For the reasons that follow, the Court will deny the Rule 12(b)(2) Motion.

## I. Factual and Procedural Background

This controversy arises from Elevate's alleged involvement in an unlawful lending operation. At the heart of this case sits nonparty Think Finance, LLC, from which Defendant Elevate separated on May 1, 2014.[5] According to Plaintiffs, Elevate conspired with Think Finance to collect unlawful debts in violation of RICO.[6]

---

[4] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

[5] For ease of readability and due to the density of the record, the Court will provide long record citations throughout the opinion. Where an exhibit appears in multiple parts of the record, the Court will refer only to one of those places. Additionally, paragraph (¶) citations appear only for citations to the Complaint and certain agreements; otherwise, page numbers in citations refer to the page number of the Electronic Case File (ECF) document.

[6] That statute provides, in pertinent part:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c), or to conspire to do so, 18 U.S.C. § 1962(d).

A.      <u>Factual Allegations</u>[7]

    1.      <u>Overview of the Think Finance Tribal-Lending Operation</u>

The lending operation developed and perpetuated by Think Finance, which Plaintiffs describe as a "rent-a-tribe" scheme,[8] offered loans to Plaintiffs with unlawful interest rates ranging from 118% to 448%. (Am. Compl. ¶¶ 1, 38–78, 90–97.)

Under this improper tribal lending business model, actors establish entities to originate internet-based high interest loans to evade state and federal usury and lending laws. (*Id.* ¶¶ 38–44.) To effectuate the scheme, a non-tribal entity and a Native American tribe agree to establish a lending company in the tribe's name. (*Id.* ¶¶ 43–44.) According to Plaintiffs, the Native American tribe nominally establishes the lending company to extend its tribal sovereign immunity to the newly formed business entity. (*Id.*) The tribal lending company, however, receives capital from a different, non-tribal person or company who seeks to use the tribal lending companies to cloak the unlawful high-interest internet loans with sovereign immunity. (*See id.* ¶¶ 44–45, 53, 65.) The non-tribal entity retains almost all the profits and controls the tribal lending entity, from major business decisions to day-to-day operations. (*See id.* ¶¶ 45–49,

_____

[7] For the purpose of the Rule 12(b)(6) Motion to Dismiss, "a court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 440 (4th Cir. 2011)).

[8] Plaintiffs employ the rent-a-tribe moniker when describing these lending schemes. They do so in part because Billi Anne Raining Bird, the CEO and COO of Plain Green who is a member of the Chippewa Cree Tribe, testified in a deposition that she agreed with that characterization because the tribes solely served as figureheads in the scheme. (Am. Compl. ¶¶ 71, 77.) Despite that testimony, the Court will minimize the utilization of that moniker.

51–53.)  The Native American tribe receives only a small percentage of the revenue in exchange. (*See id.* ¶¶ 48, 52–53.)

In this case,[9] Plaintiffs bring class claims against Elevate, which was carved out of Think Finance on May 1, 2014.  (*Id.* ¶¶ 2, 117.)  Sometime near 2011, Think Finance spearheaded efforts to establish and control the three tribal owned lending companies at the center of the lending operation at issue:  Plain Green, LLC, Great Plains Lending, LLC, and Mobiloans, LLC.[10]  (*Id.* ¶¶ 45, 55–78.)  Think Finance proposed the formation of the lending operation, asking the Tribes to establish the lending companies in their respective names.  (*Id.* ¶¶ 55–61, 71–74.)  In exchange, Think Finance provided the infrastructure to run the lending operations, including:

> (1) a "proven technology platform," that had "millions of transactions processed to date," (2) a "marketing machine" that had "100,000 applications monthly," (3) "best in class underwriting," (4) "access to third party capital," including "up to $150" million for funding the loans, and (5) "extensive compliance experience," including multiple "successful FDIC and state exams."

(*Id.* ¶ 65 (quoting *id.* Ex. 5 "Emergency Cash Lending Presentation" 7, ECF No. 5-5).)  Think Finance retained the "vast majority of the profits" from the lending operation.  (*Id.* ¶ 78.)

---

[9] Plaintiffs present this case as "the final chapter" of litigation stemming from the Think Finance tribal lending enterprise.  (Am. Compl. ¶ 1–2 (referencing *Gibbs v. Rees*, No. 3:17cv386 (E.D. Va. 2017); *Gibbs v. Plain Green, LLC*, No. 3:17cv495 (E.D. Va. 2017); *Gibbs v. Haynes Invs., LLC*, No. 3:18cv48 (E.D. Va. 2018); *Gibbs v. Curry*, No. 3:18cv654 (E.D. Va. 2018); and *Gibbs v. TCV V, L.P.*, No. 3:19cv789 (E.D. Va. 2019)).)

[10] The Chippewa Cree Tribe owned Plain Green, LLC.  (Am. Compl. ¶¶ 71–78.)  The Otoe-Missouria Tribe owned Great Plains Lending, LLC ("Great Plains").  (*Id.* ¶¶ 55–70.)  The Tunica-Biloxi Tribe owned Mobiloans, LLC.  (*See id.* ¶ 45.)  Plaintiffs do not include Mobiloans consumers within the putative class, meaning that only lending products from Plain Green and Great Plains pertain to this action.  (*Id.* ¶¶ 141, 152.)  Accordingly, the Court refers to the Chippewa Cree Tribe and the Otoe-Missouria Tribe collectively as the "Tribes."

2.    **Plaintiffs' Loans**

Plaintiffs are consumers who executed online loans with Great Plains and Plain Green. (Am. Compl. ¶¶ 141, 152.)  According to Plaintiffs, the interest rates charged on Think Finance's "standard loan agreements" ranged between 118% and 448%, exceeding the statutory maximum allowable in Virginia (12% per annum),[11] Florida (18% per annum),[12] and California (10% per annum).[13]  (*Id.* ¶ 90.)  The named plaintiffs here took out loans whose interest rates ranged from 139% to 448%.  (*Id.* ¶¶ 91–97.)  Neither Think Finance nor any other participant in the tribal lending scheme obtained or attempted to obtain a consumer finance license permitting them to charge interest rates above the statutory maximum in Virginia and Florida.[14]  (*Id.* ¶ 98.)  As a

---

[11] Va. Code § 6.2-303(A).  That statute provides: "Except as otherwise permitted by law, no contract shall be made for the payment of interest on a loan at a rate that exceeds 12 percent per year."  Williams, Edwards, Gibbs, and Inscho reside in Virginia.  (Am. Compl. ¶¶ 9–12.)

[12] Fla. Stat. § 516.02(2)(a).  That statute provides:

> A person who is engaged in the business of making loans of money, except as authorized by this chapter or other statutes of this state, may not directly or indirectly charge, contract for, or receive any interest or consideration greater than 18 percent per annum upon the loan . . . .

Patterson, Burney, and McNeil reside in Florida.  (Am. Compl. ¶¶ 13–15.)

[13] Cal. Const. Art. XV § 1.  That constitutional provision provides:

> The rate of interest upon the loan or forbearance of any money, goods, or things in action, or on accounts after demand, shall be 7 percent per annum but it shall be competent for the parties to any loan or forbearance of any money, goods or things in action to contract in writing for a rate of interest:
>
> > (1) For any loan or forbearance of any money, goods, or things in action, if the money, goods, or things in action are for use primarily for personal, family, or household purposes, at a rate not exceeding 10 percent per annum . . . .

Brice, Browne, and Novorot reside in California.  (Am. Compl. ¶¶ 17–19.)

[14] Article XV, Section 1 describes entities exempted from California usury law.  *See* Cal. Const. Art. XV § 1.  Defendants do not allege that Think Finance qualified as an exempt entity in

result, Plaintiffs argue that their loans "were null and void in Virginia and Florida and exceeded the lawful usury rate in California, such that it was unlawful for Think Finance or any of its affiliated entities to collect or receive" any payment, principal or otherwise, in Virginia and Florida and certain interest payments in California. (*Id.* ¶ 99.)

### 3.   The Plan to Create Elevate

Plaintiffs state that Think Finance became worried about the legal risk associated with its tribal lending business starting in early 2012. (Am. Compl. ¶ 101.) As a result, Think Finance funded a lawsuit to establish sovereign immunity for tribal lenders, which could absolve the lenders of liability under state and federal law. (*Id.* ¶ 109.) In *Otoe-Missouria Tribe of Indians v. New York State Department of Financial Services*, the United States District Court for the Southern District of New York found in a September 30, 2013 opinion that the tribal lenders' activity took "place in New York, off of the Tribes' lands," subjecting the loans "to the State's non-discriminatory anti-usury laws." 974 F. Supp. 2d 353, 361 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014). *Otoe-Missouria* was one of many lawsuits and enforcement actions around this time questioning the legality of the tribal lending model. (Am. Compl. ¶ 112); *see, e.g.*, *New York v. W. Sky Fin.*, No. 451370/2013 (N.Y. Sup. Ct.); *FTC v. Payday Fin., Inc*, No. 11-3017 (D.S.D.); *Gingras v. Rosette*, No. 5:15cv101 (D. Vt.).

In the months following *Otoe-Missouria*, Think Finance began internal conversations discussing a potential spin-off "to separate the tribal and non-tribal businesses." (Am. Compl.

---

either their Rule 12(b)(2) Motion or their Rule 12(b)(6) Motion. (*Cf.* Mem. Supp. Rule 12(b)(2) Mot., ECF No. 10; Mem. Supp. Rule 12(b)(6) Mot., ECF No. 12.)

Ex. 1 "Rees November 2013 Memorandum" 4, ECF No. 5-1.)[15]  By December 2013, the Think

Finance Board of Directors approved the plan to bifurcate the company:

> ThinkFinance will continue to be the name for the company containing all of the
> (extremely profitable but) tainted assets, including all tribal-related lending
> products. . . . [For these products] no effort will be put into growth. The good stuff
> will be in the newco with a new name ([then] Exclaim[16]), and will contain only
> lending products with no grey area, eg Rise (which conforms strictly to state-by-
> state enabling legislation).

(*Id.* Ex. 12 "Sequoia December 18, 2013 Email" 2–3, ECF No. 5-12.)

### 4.    The May 1, 2014 Separation and Distribution Agreement and Attached Agreements

On May 1, 2014, Think Finance completed the spin-off and created Elevate.  (Am.

Compl. Ex. 14 "Separation and Distribution Agreement" 7, ECF No. 5-14.)  This was

accomplished via a Separation and Distribution Agreement incorporating several agreements,

exhibits, schedules, contracts, and other documents.  (*Id.* 6.)  Only Kenneth Rees signed the

Separation and Distribution Agreement.  He signed as both the President of Think Finance, and

as the President of Elevate.  (*Id.* 44.)

As part of the separation, Think Finance distributed on a pro rata basis all outstanding

equity of Elevate to Think Finance shareholders.  (*Id.* 7 ¶ D.)  Think Finance:

> transferred, or caused to be transferred, all of the issued and outstanding equity
> interests of certain of its direct and indirect Subsidiaries to Elevate (any such
> entities, the "Elevate Designees"), and for Elevate and the Elevate Designees to
> assume the Elevate Liabilities, in each case as more fully described in this
> Agreement and the Ancillary Agreements ("the Separation").

---

[15] A "spin-off" is defined as "the distribution by a business to its stockholders of
particular assets and especially of stock of another company . . . also : the new company created
by such a distribution."  https://www.merriam-webster.com/dictionary/spin-off.

[16] Elevate was the new name for the company after initially being called "Exclaim."
(*See, e.g.*, Am. Compl. Ex. 12 "December 18, 2013 Email" 3, ECF No. 5-12.)

(*Id.* 7 ¶ C.) "The Separation and Distribution together [were] intended to qualify as a tax-free spin-off pursuant to Sections 355 and 368(a)(1)(D) of the [Internal Revenue] Code." (*Id.* 7 ¶ E; 26 U.S.C. §§ 355, 368(a)(1)(D).)

The Think Finance operations transferred were those "primarily related to the Great Plains, Plain Green, and Mobiloans products" and their related terminated, divested, or discontinued businesses. (Separation and Distribution Agreement 14 ¶ 1.76, ECF No. 5-14.) Immediately after Elevate received a Certificate of Incorporation, Think Finance was to exchange the one issued share of Elevate Common Stock for 4,646,133 shares of Elevate Common Stock, 2,957,059 shares of Elevate Series A Preferred Stock, and 2,682,351 shares of Elevate Series B Preferred Stock. (*Id.* 26 ¶ 3.2(f).)

The Separation and Distribution Agreement contained a termination clause stating that once the distribution had occurred, the Agreement could only be terminated by a written agreement signed by both parties.[17] (*Id.* 39 ¶ 8.1.) The Separation and Distribution Agreement required that any notices regarding the agreement should be sent to the same building, one floor apart:

| If to Think Finance, to: | If to Elevate, to: |
|---|---|
| 4150 International Plaza, Ste. 400 | 4150 International Plaza, Ste. 300 |
| Fort Worth, Texas 76109 | Fort Worth, Texas 76109 |
| Attention: Martin Wong, CEO | Attention: Ken Rees, CEO |

---

[17] Specifically, the Separation and Distribution Agreement provided: "This Agreement and any Ancillary Agreement may be terminated and the terms and conditions of the Distribution may be amended, modified or abandoned at any time prior to the Distribution Date by and in the sole and absolute discretion of the [Think Finance] Board without the approval of any Person, including Elevate, in which case no party will have any liability of any kind to any other party by reason of this Agreement. After the Distribution, this Agreement may not be terminated except by an agreement in writing signed by both parties." (Separation and Distribution Agreement 39 ¶ 8.1, ECF No. 5-14.)

(*Id.* 41 ¶ 9.5 (with format modified).)

The Separation and Distribution Agreement's attached Investors' Rights Agreement and Right of First Refusal and Co-Sale Agreement detailed the interlocking roles of various investors in Think Finance and Elevate. (*Id.* 148–99.) The Investors' Rights Agreement provided that Elevate "shall at all times" permit a representative of TCV (an "Observer") to attend Elevate's board meetings and participate in all discussions. (*Id.* 165–66.) The Observer was also entitled to receive copies of all notices and reports in the same manner as an Elevate Director, but could be excluded from a meeting or access to materials if it would violate attorney-client privilege or a confidentiality agreement between Elevate and a third party. (*Id.*) The Observer section contained a termination clause, as did many other parts of the Investors' Rights Agreement. (*Id.* 166; *see, e.g., id.* 105, 171.) Ken Rees signed the Investors' Rights Agreement as Elevate's President and CEO. (*Id.* 172.)

In the Investors' Rights Agreement, the Series A Preferred Investors identified themselves by signature:

| | |
|---|---|
| Kenneth Rees | |
| TCV Member Fund, LP[18] | (Rees, General Partner) |
| | (Linda Stinson, General Partner) |
| Heartland Exploration Properties, LLC | (Rees, President) |
| Rees/Source Ventures, Inc. | (Rees, Vice President) |
| | |
| Linda Stinson | |
| | |
| Start Up Capital Ventures, LP | (John Dean, Managing Partner) |
| Authosis Capital, Inc. | (John Dean, Chair) |
| | |
| 7HBF No. 2, Ltd. | (John Havison, Manager) |

(*See id.* 172–79.)

---

[18] The TCV Member Fund, LP was also listed as a Series B Preferred Investor. (Separation and Distribution Agreement 181, ECF No. 5-14.)

A second core facet of the Separation and Distribution Agreement was the Right of First Refusal and Co-Sale Agreement. The Right of First Refusal and Co-Sale Agreement ran among the Series A Investors, Series B Investors, and the Key Holders. (*Id.* 182, 184.) Again, Ken Rees signed on behalf of Elevate as its President and CEO. (*Id.* 195.) Some of the Key Holders identified by signature were: (1) the Stinson Grantor Annuity Trust Dated December 3, 2009 (Linda Stinson, Trustee); (2) Steve Shaper; (3) 7HBF No. 2, Ltd. (John Havison, General Partner); and, (3) Startup Capital Ventures, L.P (John Dean, Managing Partner). (*Id.* 195–99.)

The Separation and Distribution Agreement contained a clause entitled "Relationship of the Parties" that disavowed any affiliate relationship between the companies. (*Id.* 42.) It stated:

> It is expressly agreed that, from and after the Distribution Date and for purposes of this Agreement and the Ancillary Agreements, (a) no member of the Elevate Group shall be deemed to be an Affiliate of any member of the TF Group and (b) no member of the TF Group shall be deemed to be an Affiliate of any member of the Elevate Group.

(*Id.*) Plaintiffs nonetheless allege that the Separation and Distribution Agreement enabled Elevate to "aid[,] abet[,] assist[,] and facilitate[] Think Finance's" unlawful lending scheme in order "to protect Think Finance's . . . assets from collection." (Am. Compl. ¶ 122.) Plaintiffs argue that the agreements attached to the Separation and Distribution Agreement accomplished this goal. (*Id.* ¶¶ 122–33.) Moreover, Plaintiffs repeat that the relationship between Elevate and Think Finance "included the continued participation of Ken Rees and other executives [who]— while technically receiving a paycheck and working for Elevate—controll[ed], aid[ed], and abett[ed] the operation of Think Finance" to protect Think Finance's assets. (*Id.* ¶ 135; *accord id.* ¶ 122.)

5.      **The Interrelation of Think Finance and Elevate**

Plaintiffs allege that "[d]espite the spin off, Elevate continued to aid, abet, assist, and facilitate Think Finance's unlawful collection of the usurious and illegal debts from consumers and, in doing so, . . . directly violated the prohibitions established by RICO." (Am. Compl. ¶ 121.) Plaintiffs focus on at least four ancillary agreements to support their contention that Elevate aided, abetted, and facilitated Think Finance's tribal lending scheme: the Employee Matters Agreement, the Shared Services Agreement, the Data Sharing and Support Agreement (including its subparts), and the Credit Facility Agreement. (*Id.* ¶¶ 122–33.)

a.      **The Employee Matters Agreement**

First, Plaintiffs point to the Employee Matters Agreement. (Separation and Distribution Agreement 122, ECF No. 5-14.)[19] The Employee Matters Agreement was only signed by Kenneth Rees, as both Think Finance's President and as Elevate's President. (*Id.* 128.) The Employee Matters Agreement transitioned certain employees of TC Loan Service, LLC ("TCLS"), a wholly-owned subsidiary of Think Finance, to Elevate Credit Service, LLC ("ECS"), a wholly-owned subsidiary of Elevate. (*Id.* 123.) TCLS employees transitioned to become either exclusive employees of ECS, exclusive employees of TCLS, or employees of TCLS performing shared services for both Elevate and TCLS. (*Id.*)

---

[19] Plaintiffs included the Employee Matters Agreement, Shared Services Agreement, Data Sharing and Support Agreement, and Credit Facility Agreement as attachments to the Separation and Distribution Agreement (Exhibit 14 to their Amended Complaint). (*See* Separation and Distribution Agreement, ECF No. 5-14.) Plaintiffs also included these agreements as separate exhibits to their Amended Complaint. (*See* Am. Compl. Ex. 15, ECF No. 5-15; Am. Compl. Ex. 16, ECF No. 5-16; Am. Compl. Ex. 17, ECF No. 5-17; Am. Compl. Ex. 18, ECF No. 5-18.) The Court cites only to the agreements as they were attached to Exhibit 14, the Separation and Distribution Agreement.

The stated purpose of the Employee Matters Agreement was to ensure "the orderly transition of employees to ECS, the maintenance of the strength of [Think Finance's] business operations, the maintenance of the strength of [Elevate's] business operations and the performance of the services pursuant to the Shared Services Agreement." (*Id.*) According to Plaintiffs, seventy-seven percent of Think Finance Employees were shared with Elevate, including Ken Rees, who served as Think Finance's President, Elevate's President, and the President of many of each company's subsidiaries. (Am. Compl. ¶ 24; Separation and Distribution Agreement 44, 53, 88–91, ECF No. 5-14.) The Employee Matters Agreement did not include a termination date.

The Employee Matters Agreement allowed now-ECS employees to collect unpaid bonuses from their TCLS Executive Bonus Plan. (Separation and Distribution Agreement 124, ECF No. 5-14.) The Employee Matters Agreement created a "Steering Committee." (*Id.* 123.) Two executive officers from Think Finance and Elevate were to meet monthly as a Steering Committee during the course of the Agreement to make decisions regarding the continuation or cancellation of the services created by the Employee Matters Agreement.[20] (*Id.*) The Employee Matters Agreement required any notices regarding the agreement be sent to the same building, one floor apart:

To TF:

Think Finance, Inc.
4150 International Plaza, Suite 400
Fort Worth, TX 76109
Attention: General Counsel
Fax: (817) 546-2784
Email: ccarbone@thinkfinance.com.

To EC:

Elevate Credit, Inc.
4150 International Plaza, Suite 300
Fort Worth, TX 76109
Attention: General Counsel
Fax: (817) 928-1500
Email: scutrona@elevate.com.

---

[20] The Steering Committee performed this duty under not only the Employee Matters Agreement, but also the Shared Services Agreement and the Data Sharing and Support Agreement. (Separation and Distribution Agreement 47, 136, ECF No. 5-14.)

(*Id.* 125 (with format modified).)

Plaintiffs argue that, despite the fact that the Employee Matters Agreement stated that the entities were legally distinct, the Employees Matters Agreement "allowed Think Finance to continue to facilitate the unlawful lending scheme." (Am. Compl. ¶ 123; Separation and Distribution Agreement 127, ECF No. 5-14.)  This was because "many Think Finance employees with institutional knowledge of and involvement in the company's rent-a-tribe lending business were quickly transferred to Elevate," meaning that "Think Finance required and depended on continued involvement by Elevate and its employees in operating its rent-a-tribe business." (Am. Compl. ¶ 134.)  In that way, former Think Finance executives such as Ken Rees allegedly continued "controlling, aiding, and abetting Think Finance" after the spin-off, even though these people had become Elevate employees. (*Id.* ¶ 135.)  Indeed, for a time, the companies shared seventy-seven percent of Think Finance's employees. (*Id.* ¶¶ 123–24, 126.)

### b.    The Shared Services Agreement

Second, Plaintiffs turn to the Shared Services Agreement.  (Separation and Distribution Agreement 133, ECF No. 5-14.)  Ken Rees signed the Shared Services Agreement as CEO of ECS, the Elevate subsidiary. (*Id.* 144.)  Martin Wong signed as CEO of TCLS, the Think Finance subsidiary. (*Id.* 143.)

The Shared Services Agreement specified the services to be rendered by the Shared Services Employees, which Plaintiffs characterize as the "core operations of both companies." (Am. Compl. ¶ 125.)  Under this agreement between TCLS and ECS, TCLS provided six services for Elevate:[21] (1) human resources services (*e.g.*, payroll and benefits administration,

---

[21] The Court recognizes that Elevate, the parent company, was not a party to the Shared Services Agreement or to the Data Sharing Agreement. (Mem. Supp. Rule 12(b)(6) Mot. 19, ECF No. 12.)  Even though ECS, not Elevate, entered into the Shared Services Agreement with

recruiting); (2) finance services (*e.g.*, accounting services, financial analysis and reporting); (3) facilities management services (*e.g.*, catering services, mail distribution); (4) operations services (*e.g.*, customer service, development of standard operating procedures); (5) information technology services (*e.g.*, data management, access to Think Finance systems); and, (6) fraud and decision services (*e.g.*, access to certain platforms, use of file transfer infrastructure). (Separation and Distribution Agreement 145, ECF No. 5-14.)  In return, Elevate provided a single service for TCLS:  operations services (*e.g.*, customer service, development of standard operating procedures).  (*Id.* 146.)

The Shared Services Agreement terminated no later than six months after its May 1, 2014 effective date.[22]  (*Id.* 137.)  Further, pursuant to the Shared Services Agreement, two executive officers from Think Finance and Elevate were to meet monthly as a Steering Committee during the course of the Agreement to make decisions regarding the continuation or cancellation of the services created by the Shared Services Agreement, as well as the pricing or reimbursement for those services.  (*Id.* 136.)  The Shared Services Agreement also required that any notices regarding the agreement should be sent to the same building, one floor apart:

| | |
|---|---|
| TC Loan Service, LLC | Elevate Credit Service, LLC |
| Attention: Legal Department | Attention: Legal Department |
| 4150 International Plaza, Ste. 400 | 4150 International Plaza, Ste. 300 |
| Ft. Worth, Texas 76109 | Ft. Worth, Texas 76109 |
| (817) 546-2786 | (817) 928-1500 |

---

TCLS, the agreement identified Elevate as the recipient and provider of the relevant services and showed that the Elevate corporate structure essentially duplicated that of Think Finance. (Separation and Distribution Agreement 145–46, ECF No. 5-14.)

[22] Specifically, the Shared Services Agreement provided:  "The term of this Agreement ('Term') shall commence on the Effective Date [May 1, 2014] and continue in full force and effect for a period of six (6) calendar months or until all Shared Services have been terminated, whichever occurs first."  (Separation and Distribution Agreement 137, ECF No. 5-14.)

(817) 546-2786 facsimile                    (817) 928-1500 facsimile
ccarbone@thinkfinance.com                   scrutona@elevate.com

(*Id.* 138–39.)

      Again, despite the fact that the Shared Services Agreement stated that the entities were

legally distinct, Plaintiffs allege that TCLS provided this essential operational structure to ECS to

allow Think Finance to continue to facilitate its unlawful lending scheme by enabling the

functional turnover of employees and institutional knowledge from Think Finance to Elevate.

(Am. Compl. ¶¶ 125–26, 134; Separation and Distribution Agreement 141, ECF No. 5-14.)

### c.    <u>The Data Sharing and Support Agreement</u>

      Third, Plaintiffs point to the Data Sharing and Support Agreement. (Separation and

Distribution Agreement 45, ECF No. 5-14.) The Data Sharing and Support Agreement was only

signed by Kenneth Rees, as the President of TC Decision Sciences, LLC ("TCDS"), a subsidiary

of Think Finance, and as the President of Elevate Decision Sciences, LLC ("EDS"), a subsidiary

of Elevate. (*Id.* 53.)

      The Data Sharing and Support Agreement allowed TCDS and EDS to ensure the

continuity of services to their respective customers. The data shared included a vast array of

information: underwriting information, fraud models, borrower data furnished when applying

for (and processing) a loan, repayment history, and internal analysis of this information. (Am.

Compl. ¶ 128.)

      The Data Sharing and Support Agreement permitted sharing across four areas. First,

TCDS and EDS shared data for model development and validation. Specifically, EDS received

all data and information related to Elevate products, and TCDS retained data and information on

certain Think Finance products. (Separation and Distribution Agreement 54, ECF No. 5-14.)

TCDS also "share[d] with EDS certain data and information about the Plain Green, Great Plains

and Mobiloans products." (*Id.*)  Second, TCDS and EDS shared data for fraud mitigation and prevention. (*Id.* 56.)  TCDS "share[d] with EDS fraud data about the Plain Green, Great Plains and Mobiloans products." (*Id.*)  Third, TCDS provided data hosting services for EDS. (*Id.* 58.) Lastly, TCDS provided data connectivity services for EDS. (*Id.* 59.)

The Data Sharing and Support Agreement contained a termination clause for no later than seven months after its May 1, 2014 effective date.[23] (*Id.* 49.)  In addition, pursuant to the Data Sharing and Support Agreement, two executive officers from Think Finance and Elevate were to meet monthly as a Steering Committee during the course of the Agreement to make decisions regarding the continuation or cancellation of the services created by the Data Sharing and Support Agreement. (*Id.* 47.)  The Data Sharing and Support Agreement required that any notices regarding the agreement should be sent to the same building, one floor apart:

| To TCDS: | To EDS: |
|---|---|
| TC Decision Sciences, LLC<br>4150 International Plaza, Suite 400<br>Fort Worth, Texas 76109<br>Attention: General Counsel<br>Fax: (817) 546-2786<br>Email: ccarbone@thinkfinance.com. | Elevate Decision Sciences, LLC<br>4150 International Plaza, Suite 300<br>Fort Worth, Texas 76109<br>Attention: General Counsel<br>Fax: (817) 928-1500<br>Email: scutrona@elevate.com. |

(*Id.* 49–50 (with format modified).)

Plaintiffs allege that, even though the Data Sharing Agreement also included language that the entities were legally distinct, TCDS provided this essential operational structure to EDS to allow Think Finance to continue to facilitate its unlawful lending scheme. (Am. Compl. ¶ 136; *see* Separation and Distribution Agreement 52, ECF No. 5-14.)  This was supposedly by

---

[23] Specifically, the Data Sharing and Support Agreement provided: "The term of this Agreement shall commence on the Effective Date [May 1, 2014] and shall end on the earlier to occur of (a) date for which the last Exhibit hereto remains in effect and (b) December 31, 2014." (Separation and Distribution Agreement 49, ECF No. 5-14.)

enabling the sharing and continuity of information between the companies to allow the scheme to continue operating at Think Finance while protecting both companies' profits and losses. (Am. Compl. ¶ 127.)

### d.     The Credit Facility Agreement

Finally, Plaintiffs point to the Credit Facility Agreement. (Separation and Distribution Agreement 65, ECF No. 5-14.) Kenneth Rees signed the Credit Facility Agreement as President of Elevate, ECS, and numerous other guarantors. (*Id.* 88–91.) Martin Wong signed as CEO of Think Finance. (*Id.* 92.)

The Credit Facility Agreement contained the terms of a $75 million promissory note between ECS and Think Finance. (*Id.* 61.) It also contained a Subordinated Pledge and Security Agreement. (*Id.* 96–117.) Think Finance lent the capital to ECS, and Elevate and Elevate subsidiaries served as guarantors of the note. (*Id.* 88–91.) ECS was to use the loan to fund fees and expenses associated with the transactions provided for in the agreements, as well as "to pay operating expenses and . . . for working capital and other general corporate purposes." (*Id.* 78.) The Credit Facility Agreement required that any notices regarding the agreement should be sent to the same building, one floor apart, with the same fax number:

| If to any Credit Party: | If to Lender: |
|---|---|
| c/o Elevate Credit, Inc.<br>4150 International Plaza, Suite 300<br>Fort Worth, Texas 76109<br>Attention:  Chief Executive Officer<br>Facsimile:  (817) 546-2700 | Think Finance, Inc.<br>4150 International Plaza, Suite 400<br>Fort Worth, Texas 76109<br>Attention:  Chief Executive Officer<br>Facsimile:  (817) 546-2700 |

(*Id.* 84–85 (with format modified).)

Plaintiffs contend that even though the line of credit created under the Credit Facility Agreement purportedly terminated after four years,[24] it existed "to provide needed working capital to Elevate." (Am. Compl. ¶ 132; Separation and Distribution Agreement 69, ECF No. 5-14.) According to Plaintiffs, the Credit Facility Agreement demonstrates that "Elevate was not financially independent at the time of the spin-off" and "depended on Think Finance's ill-gotten gains to operate." (Am. Compl. ¶ 132.) Plaintiffs maintain that "the fact that the only security pledged to Think Finance as collateral was Think Finance's own assets" further evinces "[t]hat this $75 million line of credit was not an arms-length transaction" and that it enabled Think Finance to continue to facilitate its unlawful lending scheme. (*Id.* ¶¶ 133, 136.)

### B.    **Procedural Background**

On September 15, 2020, Plaintiffs filed a putative class action Amended Complaint against Elevate.[25] Plaintiffs pursue this suit on behalf of consumers in every state (except for Nevada and Utah) who executed a loan with Plain Green before June 1, 2016, or Great Plains at any time and made a payment on the loan after May 1, 2014. (Am. Compl. ¶¶ 141, 152.) Plaintiffs bring two class counts:

**Count I:**    Plaintiffs allege Elevate violated 18 U.S.C. § 1962(d) "by agreeing to aid, abet, assist, and facilitate Think Finance's RICO violations after it was spun off," an agreement reflected in the Employee

---

[24] Specifically, the Credit Facility Agreement provided: "Borrower has authorized the issuance to Lender on the Closing Date of a subordinated secured promissory note in the principal amount up to [$75,000,000], to be dated the date of issue thereof, to mature on the Maturity Date . . . ." (Separation and Distribution Agreement 71, ECF No. 5-14.) The Credit Facility Agreement defines "Maturity Date" as "the earlier of (a) April 30, 2018; and (b) such earlier date as the unpaid principal balance of the Note becomes due and payable pursuant to the terms of this Agreement and the Note." (Separation and Distribution Agreement 69, ECF No. 5-14.)

[25] Plaintiffs originally filed this suit on August 14, 2020. (ECF No. 1.) On September 15, 2020, Plaintiffs filed this Amended Complaint as a matter of right.

Matters Agreement, the Shared Services Agreement, the Data Sharing and Support Agreement, and the Credit Facility Agreement, (*id.* ¶ 147); and,

**Count II:**      Plaintiffs allege Elevate violated 18 U.S.C. § 1962(c)[26] "by participating in the conduct of the [Think Finance tribal lending scheme]." (*Id.* ¶ 158).

Plaintiffs seek: (1) class certification; (2) damages; and, (3) attorney's fees and costs. (*Id.* 33.)

On October 26, 2020, Defendant Elevate filed the Rule 12(b)(2) Motion and the Rule 12(b)(6) Motion. (ECF Nos. 9, 11.) Plaintiffs filed timely responses to both motions. (ECF Nos. 21, 22.) Elevate filed timely replies. (ECF Nos. 23, 24.) The motions are ripe. For the reasons articulated below, the Court will deny the Rule 12(b)(2) and 12(b)(6) Motions.

## II.  Analysis

The Court first addresses the Rule 12(b)(2) Motion because it concerns jurisdiction. As Elevate acknowledges, the Court may exercise personal jurisdiction over the company under 18 U.S.C. § 1965(d)[27] and United States Court of Appeals for the Fourth Circuit precedent. *See ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626–27 (4th Cir. 1997) (holding that a district court may exercise personal jurisdiction under RICO when the defendant is properly served in accordance with 18 U.S.C. § 1965(d)). Because proper jurisdiction exists here, the Court will

---

[26] That statute provides, in pertinent part:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c), or to conspire to do so, 18 U.S.C. § 1962(d).

[27] That statute provides: "All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(d).

deny the Rule 12(b)(2) Motion. Turning next to the Rule 12(b)(6) Motion, the Court concludes

that Plaintiffs allege facts to state both an unlawful debt claim under 18 U.S.C. § 1962(c) and a

RICO conspiracy claim under 18 U.S.C. § 1962(d). Accordingly, the Court will deny the Rule

12(b)(6) motion.[28]

### A.      The Court Will Deny the Rule 12(b)(2) Motion Because It May Exercise Personal Jurisdiction Over Elevate Under RICO

The Court will deny the Rule 12(b)(2) Motion because it may exercise personal

jurisdiction over Elevate under 18 U.S.C. § 1965, in accordance with binding precedent from the

United States Court of Appeals for the Fourth Circuit. *ESAB*, 126 F.3d at 626–27. As Elevate

recognizes, "this Court is obligated not to stray from binding Fourth Circuit precedent." (Mem.

Supp. Rule 12(b)(2) Mot. 17, ECF No. 10.) Elevate nevertheless contends that *ESAB* is ripe for

reconsideration by the Fourth Circuit, or even the United States Supreme Court, because six

other United States Courts of Appeals have issued decisions contrary to *ESAB* in the twenty-

three years since that opinion was published. (*Id.*) Elevate seeks conditional interlocutory

appeal if this Court denies its Rule 12(b)(2) Motion. (*Id.* 17–18; Reply Rule 12(b)(2) Mot. 2–7,

ECF No. 23.) For the reasons that follow, the Court will deny the request for interlocutory

appeal.

### 1.      Legal Standard:  Rule 12(b)(2) Motion to Dismiss

"When personal jurisdiction is properly challenged under Rule 12(b)(2), the

jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately

to prove grounds for jurisdiction by a preponderance of the evidence." *Carefirst of Md., Inc. v.*

*Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). When, as here, a district

---

[28] Both counts survive Elevate's Rule 12(b)(6) Motion. The Court presumes that in later
briefing, the parties will address Plaintiffs' aiding and abetting theory that undergirds both of the
RICO claims.

court considers a challenge to personal jurisdiction without conducting an evidentiary hearing, the plaintiff need only make a prima facie showing of personal jurisdiction, rather than show jurisdiction by a preponderance of the evidence. *Id.*; *see also Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). "This '*prima facie* case' analysis resembles the plausibility inquiry governing motions to dismiss for failure to state a claim under Rule 12(b)(6)." *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 226 (4th Cir. 2019). "That is, the district court must determine whether the facts proffered by the party asserting jurisdiction—assuming they are true—make out a case of personal jurisdiction over the party challenging jurisdiction." *Id.* "If a plaintiff makes the requisite showing, the defendant then bears the burden of presenting a 'compelling case,' that, for other reasons, the exercise of jurisdiction would be so unfair as to violate due process." *Reynolds Foil, Inc. v. Pai*, No. 3:09cv657, 2010 WL 1225620, at *1 (E.D. Va. Mar. 25, 2010) (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 477–78 (1985)).

The Court "has considerable procedural leeway in choosing a methodology for deciding the [Rule 12(b)(2)] motion." 5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1351, at 305 (3d ed. 2004). A number of courts have identified three possible approaches: ruling on the written record, permitting discovery, or holding an evidentiary hearing. *See, e.g.*, *Williams v. FirstPlus Home Loan Tr. 1996-2*, 209 F.R.D. 404, 409 (W.D. Tenn. 2002) (stating that a court "may decide the motion upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions."). A hearing may be appropriate "in particularly complex cases." Wright & Miller, § 1351, at 305, 308. In straightforward cases, such as the one before the Court, "the Court may resolve the issue based on the affidavits and the supporting documents" without a hearing. *Initiatives Inc. v. Korea Trading Corp.*, 991 F. Supp. 476, 477–78 (E.D. Va. 1997).

When ruling on a Rule 12(b)(2) Motion to Dismiss, the Court "may also consider affidavits submitted by both parties, although it must resolve all factual disputes and draw all reasonable inferences in favor of the party asserting jurisdiction." *Hawkins*, 935 F.3d at 226; *see also* Wright & Miller, § 1351, at 305 ("The court may receive and weigh the contents of affidavits and any other relevant matter submitted by the parties to assist it in determining the jurisdictional facts."). "For purposes of the motion to dismiss, the reviewing court may presume that any uncontradicted evidence submitted by either party is true." *Reynolds Foil*, 2010 WL 1225620, at *1. "In considering whether the plaintiff has met this burden, the district court 'must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction.'" *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014) (quoting *Bakker*, 886 F.2d at 676). Still, a plaintiff cannot rely on "bare pleadings alone" after a defendant properly challenges personal jurisdiction. *Machulsky*, 210 F. Supp. 2d at 537 (quotation omitted). Instead, "the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits and competent evidence. . . . [A] plaintiff must respond with actual proofs, not mere allegations." *Id.* (quotation omitted); *see also FirstPlus*, 209 F.R.D. at 409–10 (concluding that a court need not "ignore undisputed factual representations of the defendant which are consistent with the representations of the plaintiffs." (quoting *Kerry Steel v. Paragon Indus.*, 106 F.3d 147, 153 (6th Cir. 1997))).

## 2.   Plaintiffs Make a Prima Facie Case that the Court May Exercise Personal Jurisdiction Over Elevate

The Court will decline Defendants' invitation to ignore the dictates of binding Fourth Circuit precedent. Plaintiffs establish a prima facie showing of personal jurisdiction over Elevate pursuant to the RICO statute and Fourth Circuit precedent. *See Carefirst*, 334 F.3d at 396. The

RICO statute authorizes service of process "in any judicial district in which [the defendant] . . . is found." 18 U.S.C. § 1965(d). "In *ESAB*, the Fourth Circuit ruled that § 1965(d) allows a plaintiff to establish personal jurisdiction over a defendant by effectuating service over the defendant in any district in which the defendant resides." *Gibbs v. Stinson*, 421 F. Supp. 3d 267, 307 n.59 (E.D. Va. 2019) (Lauck, J.), *aff'd sub nom. Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286 (4th Cir. 2020) (citing *ESAB*, 126 F.3d at 626–27).

Since *ESAB*, the Fourth Circuit has recast its interpretation of § 1965(d) in more general terms, holding: "[w]here a defendant has been validly served pursuant to a federal statute's nationwide service of process provision," such as the one under § 1965(d), "a district court has personal jurisdiction over the defendant so long as jurisdiction comports with the Fifth Amendment." *Trs. of the Plumbers & Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 443 (4th Cir. 2015). To lodge a Fifth Amendment[29] challenge to personal jurisdiction, a defendant must "show that the district court's assertion of personal jurisdiction over [them] would result in such extreme inconvenience or unfairness as would outweigh the congressionally articulated policy evidenced by a nationwide service of process provision." *Id.* at 444 (internal quotation marks and citations omitted); *accord* ESAB, 126 F.3d at 627. "Normally, when a defendant is a United States resident, it is 'highly unusual . . . that inconvenience will rise to a level of constitutional concern.'" *Plumbing Servs.*, 791 F.3d at 444 (quoting *ESAB*, 126 F.3d at 627).

Here, the record reflects that Elevate waived service of summons, a waiver that extended to any objections as to the propriety of the service of process. (Waiver of Service of Summons 1,

---

[29] The Fifth Amendment to the Constitution provides, in pertinent part: "No person shall be . . . deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V.

ECF No. 7.)  As a result, Elevate bears the burden of establishing "such extreme inconvenience

or unfairness" as to "outweigh the congressionally articulated policy" in RICO's "national

service of process provision." *Plumbing Servs.*, 791 F.3d at 443–44.  Elevate has not satisfied

this heavy burden.  As a Delaware corporation with its principal place of business in Texas,

(Separation and Distribution Agreement 3, ECF No. 5-14), Elevate does not argue that the

inconvenience of litigating this case in Virginia outweighs the federal policy authorizing

nationwide service of process in § 1965(d).  Given the absence of argument to that point,

asserting personal jurisdiction over Elevate comports with the Fifth Amendment. *See Plumbing*

*Servs.*, 791 F.3d at 444 (finding no constitutional concern with exercising personal jurisdiction

under RICO when the defendants' Fifth Amendment challenge failed).  Under *ESAB* and its

progeny, the Court therefore has personal jurisdiction over Elevate. *ESAB*, 126 F.3d at 626–27;

*Plumbing Servs.*, 791 F.3d at 443–44.  Accordingly, the Court will deny the Rule 12(b)(2)

Motion.[30]

--------

[30] To address any lingering doubt concerning jurisdiction, the Court observes that it may also exercise personal jurisdiction over Elevate consistent with Virginia law.  Under Virginia's long-arm statute, courts may assert personal jurisdiction over a defendant so long as doing so comports with the Due Process Clause of the Fourteenth Amendment. *See* Va. Code § 8.01-328.1(A); *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005).  Plaintiffs concede that this Court does not have general personal jurisdiction over Elevate, but they assert that specific jurisdiction is proper. (Resp. Rule 12(b)(2) Mot. 6–7, 7 n.3, ECF No. 21.)  To determine whether the exercise of specific jurisdiction comports with the Fourteenth Amendment, courts consider:  "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *New Wellington*, 416 F.3d at 294.

Upon consideration of these factors, the Court sees that it may exercise specific jurisdiction over Elevate based on the allegations in the Amended Complaint.  Under Fourth Circuit precedent, courts may impute to a defendant "constitutionally sufficient contacts with Virginia through the actions of their alleged coconspirators." *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013).  The Court makes such an imputation here.  As explained below, in the Court's discussion of the Rule 12(b)(6) Motion, Plaintiffs plausibly allege that Elevate conspired with Think Finance to collect unlawful debts.  Plaintiffs also allege sufficient

## 2.  The Court Declines to Certify an Interlocutory Appeal

Anticipating that the Court may find jurisdiction proper following *ESAB*, Elevate

conditionally requests interlocutory appeal under 28 U.S.C. § 1292.[31]  Elevate contends that

*ESAB* is ripe for reconsideration by the Fourth Circuit.  (Mem. Supp. Rule 12(b)(2) Mot. 17,

ECF No. 10.)  Since the Fourth Circuit decided *ESAB* in 1997, six other United States Courts of

Appeals have issued decisions to the contrary, concluding that § 1965(b),[32] rather than § 1965(d),

---

minimum contacts between Virginia and the Think Finance tribal lending conspiracy.  (Am.
Compl. ¶¶ 8–12, 26, 82, 85, 87, 89, 91–92.)  For example, Plaintiffs allege that Think Finance
collected $69,441,390.69 from Virginia consumers through Great Plains and Plain Green.  (*Id.*
¶¶ 82, 85.)  Because Plaintiffs' claims arise from the Think Finance conspiracy's constitutionally
sufficient contacts with Virginia, (Am. Compl. ¶¶ 98–100), this Court may exercise specific
jurisdiction over Elevate consistent with dictates of the Fourteenth Amendment and Virginia law.
*Chernuk*, 716 F.3d at 329; *New Wellington*, 416 F.3d at 294.

That the Court may exercise personal jurisdiction independent of *ESAB* constitutes
another reason for its decision not to certify Elevate's request for an interlocutory appeal.  It also
obviates the need to reach a determination on whether the ends of justice require the Court to
exercise personal jurisdiction over Elevate under 18 U.S.C. § 1965(b).  (Mem. Supp. Rule
12(b)(2) Mot. 16, ECF No. 10.)

[31] Section 28 U.S.C. 1292(b) reads, in relevant part,

> [w]hen a district judge, in making in a civil action an order not otherwise appealable
> under this section, shall be of the opinion that such order involves a controlling
> question of law as to which there is substantial ground for difference of opinion and
> that an immediate appeal from the order may materially advance the ultimate
> termination of the litigation, he shall so state in writing in such order. The Court of
> Appeals which would have jurisdiction of an appeal of such action may thereupon,
> in its discretion, permit an appeal to be taken from such order, if application is made
> to it within ten days after the entry of the order . . . .

28 U.S.C. § 1292(b).

[32] 18 U.S.C. § 1965(b) provides:

> In any action under section 1964 of this chapter in any district court of the United
> States in which it is shown that the ends of justice require that other parties residing
> in any other district be brought before the court, the court may cause such parties
> to be summoned, and process for that purpose may be served in any judicial district
> of the United States by the marshal thereof.

governs personal jurisdiction under RICO.  *See Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105, 117 (3d Cir. 2020) (noting the Second, Seventh, Ninth, Tenth, and D.C. Circuits have held that § 1965(b) governs personal jurisdiction under RICO and agreeing "with the majority approach"); Dep't of Justice, *Civil Rico:  A Manual for Federal Attorneys* 91 n.81 (2007) (noting that the interpretation of § 1965(d) in *ESAB* "arguably cannot be reconciled with the text of Section 1965 or its legislative history").  Conflict among the Circuits forms the basis of Elevate's request for interlocutory appeal.  (Reply Rule 12(b)(2) Mot. 2–7, ECF No. 23.)  But, because Fourth Circuit precedent binds this Court and this case does not present a novel or difficult issue of first impression, the Court will not grant Elevate's request for an interlocutory appeal.

Section 28 U.S.C. 1292(b) authorizes a district court, in rendering an otherwise unappealable order in a civil action, to state in writing that:  (1) "such order involves a controlling question of law"; (2) "as to which there is substantial ground for difference of opinion;" and, (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  The Court must begin a Section 1292(b) analysis "by emphasizing the gravity of the relief" sought in such a request.  *Cooke-Bates v. Bayer Corp.*, No. 3:10cv261, 2010 WL 4789838, at *2 (E.D. Va. Nov. 16, 2010).  "Section 1292(b) is not intended to allow interlocutory appeals in ordinary suits . . . but instead should be utilized for orders deemed pivotal and debatable."  *Virginia ex rel., Integra Rec LLC v. Countrywide Sec. Corp.*, No. 3:14cv706, 2015 WL 3540473, at *3 (E.D. Va. June 3, 2015) (internal citations omitted).  Indeed, the Fourth Circuit has repeatedly "cautioned 'that § 1292(b) should be used sparingly and thus that its requirements must be strictly construed.'"  *United States ex. rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 340 (4th Cir. 2017) (quoting *Myles v. Laffitte*, 881 F.2d 125, 127 (4th Cir. 1989)).  As a result, "[a] party seeking leave to file

an interlocutory appeal must establish all three elements to obtain the appeal." *Simpson v. Norfolk S. Ry. Co.*, No. 2:19cv17, 2020 WL 6047695, at *3 (W.D. Va. Oct. 13, 2020); *accord Cooke-Bates*, 2010 WL 4789838, at *2, *2 n.4.

Mindful of these principles, the Court will not certify an interlocutory appeal on the issue of which RICO provision—§ 1965(d) or § 1965(b)—governs personal jurisdiction because a substantial ground for difference of opinion does not exist. *See* 28 U.S.C. § 1292(b). A Circuit split alone does not create a substantial ground for difference of opinion under 28 U.S.C. § 1292(b). *United States ex rel. A1 Procurement, LLC v. Thermcor, Inc.*, 173 F. Supp. 3d 320, 323 (E.D. Va. 2016). Rather, "[a] substantial ground for disagreement may arise if there is a 'novel and difficult issue of first impression,' or if there is a circuit split *and the controlling circuit has not commented on the conflicting issue.*" *Id.* (quoting *Cooke-Bates*, 2010 WL 4789838, at *2) (emphasis added); *accord Midgett, Tr. Of Hardcastle Charitable Remained Annuity Tr. U/A Aug. 6, 2007 v. Hardcastle*, No. 2:17cv663, 2018 WL 4781178, at *4 (E.D. Va. Oct. 3, 2018); *Simpson*, 2020 WL 6047695, at *3.[33] Because the Fourth Circuit in *ESAB* held

---

[33] Since issuing *ESAB*, the Fourth Circuit has cited the opinion twenty-nine times, as recently as January 2021. *See, e.g., Receiver for Rex Venture Grp., LLC v. Banca Comerciala Victoriabank SA*, 843 F. App'x 485, 491 n.3 (4th Cir. 2021). The Fourth Circuit has had occasion to reconsider its decision, and presumably is aware that other circuits have analyzed the RICO statute in a different manner. *See Hawkins v. i-TV Digitalis Tavkorlesi zrt.*, 935 F.3d 211, 229–30 (4th Cir. 2019) (citing *ESAB* for the proposition that courts can exercise personal jurisdiction over defendants, despite insufficient contacts with the forum state, under statutes that authorize nationwide service of process). Likewise, the Eastern District of Virginia remains bound by *ESAB*, and courts here follow its precedent, citing *ESAB* more than 100 times. *See, e.g., Nunes v. Fusion GPS*, No. 1:19cv1148, 2021 WL 1225983, at *3 (E.D. Va. Mar. 31, 2021) ("But when federal law recognizes personal jurisdiction by authorizing nationwide service of process, the burden is on the defendant to show that the 'substantial weight' afforded to a Congressional policy choice should be set aside." (citing *ESAB*, 126 F.3d at 627)). A Circuit split does not warrant certifying an interlocutory appeal pursuant to § 1292(b) when Fourth Circuit precedent is clear. As the Fourth Circuit has instructed, interlocutory review must only "be used sparingly." *United States ex. rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 340 (4th Cir. 2017) (quoting *Myles*, 881 F.2d at 127).

that § 1965(d) controls when a court may exercise personal jurisdiction under RICO, this Court's controlling Circuit has commented on the issue for which Elevate requests interlocutory appeal. 126 F.3d at 626–27; *see also Thermcor*, 173 F. Supp. 3d at 323. No substantial ground for difference of opinion therefore exists, meaning this issue does not merit certification of an interlocutory appeal. *Id.*; 28 U.S.C. § 1292(b). The Court will thus deny Elevate's request to certify this issue for introductory appeal pursuant to § 1292(b).

### B. The Court Will Deny the Rule 12(b)(6) Motion Because Plaintiffs State Claims in Counts I and II at this Procedural Juncture

Because this Court has jurisdiction over Elevate, the Court turns next to the Rule 12(b)(6) Motion. In that motion, Elevate seeks dismissal of Counts I and II.[34] In Count II, the collection of an unlawful debt claim under RICO, Elevate argues that Plaintiffs fail to plausibly allege that Elevate participated in the Think Finance tribal lending enterprise, and that Elevate's conduct caused Plaintiffs RICO injuries. (Mem. Supp. Rule 12(b)(6) Mot. 17–25, ECF No. 12.) In Count I, the RICO conspiracy claim, Elevate contends that this claim must fail because of Plaintiffs' failure to state a claim under § 1962(a), (b), or (c). (*Id.* 25–28.) Even if Plaintiffs did state a claim under § 1962(c), Elevate maintains the implausibility of the RICO conspiracy claim in Count I because Plaintiffs allege no facts showing Elevate agreed to participate in the collection of unlawful debts. (*Id.* 25–28.) For the reasons that follow, the Court will deny Elevate's Rule 12(b)(6) Motion, finding that Plaintiffs state a claim in both counts.

---

[34] The Court addresses Count II, the collection of unlawful debt claim under § 1962(c), before Count I, the RICO conspiracy claim under § 1962(d), because RICO conspiracy claims generally depend on a predicate offense under § 1962(a), (b), or (c).

### 1.   Legal Standard:  Rule 12(b)(6) Motion to Dismiss

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).  To survive Rule 12(b)(6) scrutiny, a Complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief.").  Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555.  Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193 (citation omitted).  The Court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *see also Kensington*, 684 F.3d at 467 (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must

accept as true all of the factual allegations contained in the Complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *Kolon Indus.*, 637 F.3d at 440)).

"If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56" and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see also Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998); *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985). However, "a court may consider official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint [without converting a Rule 12(b)(6) motion into one for summary judgment] so long as the authenticity of these documents is not disputed." *Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 396–97 (4th Cir. 2006) (citations omitted). "[I]n the event of conflict between the bare allegations of the complaint and any attached exhibit . . . , the exhibit prevails." *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991).

### 2.    Plaintiffs State a Claim in Count II Because They Plausibly Allege a Claim for Collection of Unlawful Debt

Plaintiffs allege sufficient facts to state a claim in Count II.  In Count II, Plaintiffs allege that after the May 1, 2014 spin-off, "Elevate continued to aid, abet, assist, and facilitate Think Finance's unlawful collection of the usurious and illegal debts from consumers" in violation of 18 U.S.C. § 1962(c).  (Am. Compl. ¶ 121; *accord* ¶¶ 158–62.)  "To establish a violation of § 1962(c), Plaintiffs must allege that [a defendant] (1) conducted the affairs of an enterprise (2) through the collection of unlawful debt (3) while employed by or associated with (4) the enterprise engaged in, or the activities of which affect, interstate or foreign commerce." *Stinson*, 421 F. Supp. 3d at 312 (internal quotation marks and citation omitted).  In addition to the four

elements of a claim under § 1962(c), the Fourth Circuit "has reiterated and reinforced its application of the proximate cause requirement to civil RICO claims" generally. *Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 493 (4th Cir. 2018). Only § 1962(c)'s first element and the matter of causation remain at issue.[35] Plaintiffs allege sufficient facts to satisfy both.

> **a.** **Plaintiffs Adequately Allege that Elevate Participated in the Operation or Management of the Tribal Lending Enterprise, in Satisfaction of the First Element of a § 1962(c) Claim**

The first element of a § 1962(c) claim, that the defendant conducted the affairs of the enterprise, *Gibbs v. Stinson*, 421 F. Supp. 3d 267, 312 (E.D. Va. 2019) (Lauck, J.), *aff'd sub nom. Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286 (4th Cir. 2020), demands that a defendant "has participated in the operation or management of the enterprise itself," *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993). The "operation or management" test looks to whether a defendant functioned as a "direct participant in the affairs of the enterprise and not merely act[ed] in an advisory professional capacity (even if in a knowingly fraudulent way)." *Hengle v. Asner*, 433 F. Supp. 3d 825, 897 (E.D. Va. 2020) (internal quotation marks and citation omitted).

---

[35] No question exists that Plaintiffs sufficiently allege that the Think Finance tribal lending enterprise collected unlawful debts, the second element of a § 1962(c) claim; indeed, Plaintiffs allege that this enterprise charged annual interest rates ranging from 118% to 448%, far more than twice the statutory maximum in Virginia (12% per annum), Florida (18% per annum), and California (10% per annum). (Am. Compl. ¶¶ 90–99.) *See also* 18 U.S.C. § 1961(6) (defining "unlawful debt" as a debt carrying an interest rate "at least twice the enforceable rate").

As to whether Elevate associated with the Think Finance enterprise, the third element of a § 1962(c) claim, the Separation and Distribution Agreement and its ancillary agreements sufficiently allege that Elevate continued its association with Think Finance following the spin-off, at least temporarily. (*See generally* Separation and Distribution Agreement; Shared Services Agreement; Employee Matters Agreement; Data Sharing and Support Agreement; Credit Facility Agreement.) Finally, Plaintiffs, all of whom allegedly obtained a loan from Great Plains or Plain Green while residing in one of three different states, readily satisfy the interstate-commerce element of a § 1962(c) claim. (Am. Compl. ¶¶ 9–20, 91–97.)

This test prioritizes substance over form, focusing on an individual's direct participation in managing day-to-day affairs, instead of looking to titles or even whether the individual was legally an "outsider" to the enterprise. *Reves*, 507 U.S. at 184–85.

Elevate maintains that the Amended Complaint lacks any plausible allegation that the company participated in the operation or management of Think Finance. (Reply Rule 12(b)(6) Mot. 5, ECF No. 24.) Elevate concedes that the Amended Complaint alleges that employees and executives who transferred from Think Finance to Elevate remained involved in Think Finance's affairs after the spin-off. (Reply Rule 12(b)(6) Mot. 6, ECF No. 24; *see* Am. Compl. ¶¶ 134–35.) But Elevate contends that those allegations are conclusory and contradict the ancillary agreements Plaintiffs attach to the Amended Complaint. (Reply Rule 12(b)(6) Mot. 6–8, ECF No. 24.) Specifically, Elevate submits that the Employee Matters Agreement establishes that only Think Finance employees provided services for Think Finance after the spin-off. (*Id.* 6–7 (citing Separation and Distribution Agreement 123, ECF No. 5-14).) Because the Amended Complaint conflicts with the Employee Matters Agreement, Elevate urges the Court to disregard Plaintiffs' allegations about the ongoing involvement of Elevate employees in the affairs of Think Finance.

However, Plaintiffs' allegations, coupled with language in the other ancillary agreements, support the reasonable inference that Elevate facilitated "the operation or management of the [Think Finance Tribal lending] enterprise itself" after the spin-off. *Reves*, 507 U.S. at 183. For example, the Shared Services Agreement directed "Elevate" to provide operations services "for TCLS." (Separation and Distribution Agreement 146, ECF No. 5-14.) Those services included

> [t]echnical and procedural support for customer service; [a]ccess to testing services and updates as well as the documentation of results; [t]echnical writing support to assist in the timely development and publication of communication alerts and to

keep online database accurate and current as well as assistance with [standard operating procedures]; and [i]nfrastructure resources.

(*Id.*)  Some of these services plainly pertained to Think Finance customers, and others reasonably appear to have related to Think Finance's data and information systems.  By providing these operations services, Elevate plausibly aided, abetted, or facilitated Think Finances operations, *Reves*, 507 U.S. at 183 (emphasis added), which included "all of the . . . tainted assets, including all tribal-related products" (Sequoia Dec. 18, 2013 Email 2–3, ECF No. 5-12).[36]  The Shared Services Agreement therefore reasonably shows Elevate's facilitation of the Think Finance Tribal lending enterprise.

The Data Sharing and Support Agreement reinforces this conclusion.  Under that agreement, TCDS shared with EDS "certain data and information about the Plain Green, Great Plains and Mobiloans products."  (Separation and Distribution Agreement 54, ECF No. 5-14.)  The agreement circumscribed the use of that shared data "solely for the purpose of," among other things, "developing and validating underwriting."  (*Id.*)  That a subsidiary of Think Finance shared data about tribal Lending products with a subsidiary of Elevate for the express purpose of developing and validating loan underwriting plausibly suggests that Elevate aided, abetted, or facilitated "the operation" of the Think Finance tribal lending enterprise.  *Reves*, 507 U.S. at 183.

Think Finance funded the start of Elevate.  The two companies operated out of the same building. And, the companies shared employees, leadership, and operations.  Considering the allegations in the Amended Complaint together with the exhibits, the Court concludes that

---

[36] To the extent Elevate argues that the Shared Services Agreement cannot establish that Elevate provided services for Think Finance because only ECS and TCLS were parties to that agreement, the plain language of the agreement contradicts that argument.  The Shared Services Agreement expressly states, "SERVICES PROVIDED BY ELEVATE FOR TCLS."  (Separation and Distribution Agreement 146, ECF No. 5-14.)  The agreement clearly contemplated Elevate as the service provider, not ECS.

Plaintiffs have adequately pled facts that, read favorably, show that Elevate facilitated "the operation or management of the enterprise itself," which satisfies the first element of a § 1962(c) claim. *Id.*

    **b.**  **Plaintiffs Establish that Elevate's Participation in the Tribal Lending Scheme Proximately Caused their Injuries**

  Plaintiffs also adequately plead proximate causation.  To survive a motion to dismiss, "[a] RICO complaint must plead sufficient facts showing that the plaintiff is able to demonstrate a 'direct causal connection between the predicate offense and the alleged harm.'" *Nunes v. Fusion GPS*, No. 1:19cv1148, 2021 WL 1225983, at *12 (E.D. Va. Mar. 31, 2021) (quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 10–12 (2010)).  The proximate cause inquiry in the RICO context differs from ordinary proximate cause inquiry at common law.  "[R]ather than incorporating the concept of foreseeability or traceability of an injury to conduct, RICO causation requires a proximity of statutory violation and injury such that the injury is sequentially the direct result—generally at 'the first step' in the chain of causation." *Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 494 (4th Cir. 2018) (citation omitted).  In other words, "the central question . . . is whether the alleged violation led *directly* to the plaintiff's injuries." *Id.* at 493 (citation omitted).

  Read favorably and taken as true, Plaintiffs allege such a direct connection.  They contend that Elevate, through certain agreements, directly facilitated Think Finance's usurious lending practices.  (Am. Compl. ¶¶ 123, 127.)  For instance, the "Employee Matters Agreement" permitted the companies to share a "significant" number of employees.  (Am. Compl. ¶ 123.)  This, according to Plaintiffs, "allowed Think Finance to continue to facilitate [its] unlawful lending scheme" by allowing "high-level employees" such as Elevate's Chief Financial Officer, Chief Operating Officer, and Human Resources Director to continue to "work on the core

operations of both" Elevate *and* Think Finance.  (Am. Compl. ¶¶ 123–25.)  Indeed, according to the companies' "Separation and Distribution Agreement," Ken Rees continued to operate at the highest levels of both companies.  (Separation and Distribution Agreement 44, ECF No. 5-14.) The shareholders of the companies also remained virtually the same.  (*Id.* 26 ¶ 3.2(f); Am. Compl. ¶ 118.)  And Think Finance could send an "Observer" to attend Elevate subsidiary board meetings, participate in all decisions, and receive all copies of notices and reports in the same manner as any other director.  (Separation and Distribution Agreement 165–66, ECF No. 5-14.)

Plaintiffs aver that the companies' shared employees—who comprised seventy-seven percent of Think Finance's workforce—"provided services relating to nearly [all], if not all[,] aspects of" Think Finance's continued operations.  (Am. Compl. ¶¶ 124, 126.)  These services included:

> human resources (payroll and benefits administration, recruiting, time management, reporting and performance management, 401(k) administration); finance (accounting, treasury services, financial analysis and reporting); facilities management (mail distribution, janitorial services, receptionist duties, management of catering services, office furniture, equipment, and personnel); operations (customer service, technical writing support, assistance with operating procedures and infrastructure resources); and information technology ("IT") (staffing, data management services, technical support, access to Think Finance systems, data center, and platforms).

(Am. Compl. ¶ 126.)  In short, Plaintiffs plausibly allege that Elevate shared essential employees with Think Finance, without whom Think Finance would have been unable to continue to profit from issuing usurious loans.  (Am. Compl. ¶ 134.)[37]  At the very least, Elevate—including by

---

[37] Defendants point out that the Employee Matters Agreement technically lasted for only seven months.  (Mem. Supp. Rule 12(b)(6) Mot. 13, ECF No. 12.)  Even if the Court considered this extra-pleading contention, Plaintiffs still allege that, at the very least, it "allowed Think Finance to continue to facilitate the unlawful lending scheme" during the transfer.  (Am. Compl. ¶ 123.)

accepting Think Finance's $75 million line of credit "to provide needed working capital"—
allowed Think Finance to minimize its losses caused by the usurious loans. (Am. Compl. ¶ 132;
*accord id.* ¶ 113–19.) This in turn allowed Think Finance to continue its scheme. (*Id.*)

Plaintiffs also point to the "Data Sharing and Support Agreement," through which they
"agreed to share data and information relating to their respective products." (Am. Compl.
¶ 127.)[38] This agreement enabled Elevate and Think Finance to share data "for the purpose of
developing and validating underwriting, verifications, response, line assignment and fraud
models, processes and rules and [for] performing related analysis." (Am. Compl. ¶ 128.) In
other words, read favorably, through this agreement, Elevate "facilitated one of the core aspects
of Think Finance's business, *i.e.*, the *underwriting* of the illegal loans." (Pl. Mem. Opp. Def's
Mot. Dismiss 8, ECF No. 22 (emphasis added)).

Elevate's alleged facilitation of Think Finance's loan program calls to mind a similar
scheme in *Solomon v. American Web Loan*, No. 4:17cv145, 2019 WL 1320790 (E.D. Va. Mar.
22, 2019). There, several borrowers who executed loans with tribal lenders brought a RICO
action against financial backers of a company similar to Think Finance. *Id.* at *4. In denying the
financial backers' motion to dismiss, the court found that the borrowers adequately pled a direct
causal connection between their injuries and the financial backers' participation in the tribal
lending scheme. *Id.* at *11. For example, the borrowers alleged that the financial backers
extensively monitored their $22.9 million loan to the enterprise, had thorough knowledge of the
lending scheme, and exercised sufficient control over the relationship between the financial

---

[38] Defendants note that Elevate and Think Finance were not parties to this agreement.
(Mem. Supp. Rule 12(b)(6) Mot. 13–14, ECF No. 12.)   Again, even if the Court accepted this as
true, Defendants do not dispute that the agreement facilitated the transmission of Elevate's and
Think Finance's *data*. (*Id.*)

backers and the tribal lenders. *Id.* at \*9, 11. From these allegations, the court concluded that "[the borrowers] would not have been subjected to the allegedly usurious loans if [the financial backers] did not incentivize the profitability of those loans." *Id.* at \*11.

Plaintiffs here establish a similarly direct line of causation. Reading the facts favorably, Plaintiffs state a claim that Elevate facilitated Think Finance's usurious loan program by providing it with essential employees and data. (Am. Compl. ¶ 134.) Moreover, a Think Finance Board "Observer"—although he or she could not vote—could still attend each meeting, participate in every discussion, and receive all notices and reports just as any other Director could. (Separation and Distribution Agreement 165–66, ECF No. 5-14.) The companies' shareholders also remained essentially identical. (Am. Compl. ¶ 118.) And the $75 million line of credit Think Finance extended to Elevate made Elevate viable in the first place. (Am. Compl. ¶ 132.) Such contentions, viewed favorably to the Plaintiffs, suffice to maintain proximate causation. Accordingly, the Court will deny the Rule 12(b)(6) Motion as to Count II.

### 3.   Plaintiffs State a Claim in Count I Because They Plausibly Allege Elevate Knowingly Agreed to Participate in Think Finance's Collection of Unlawful Debts

As to Count I, Plaintiffs also state a viable RICO conspiracy claim. To prevail on a RICO conspiracy claim, a plaintiff must establish two elements: "(1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense." *Hengle v. Asner*, 433 F. Supp. 3d 825, 898 (E.D. Va. 2020).

Plaintiffs articulate facts that, read favorably, support the reasonable inference that Elevate agreed to engage in a conspiracy with Think Finance with knowledge that the objective of the conspiracy would be the collection of unlawful debts. *See id.* Plaintiffs allege that the Data Sharing and Support Agreement, Credit Facility Agreement, Shared Services Agreement,

and Employee Matters Agreement reflect Elevate's agreement to facilitate Think Finance's tribal lending business. (Am. Compl. ¶ 147.)  At the very least, the Shared Services and Data Sharing Support Agreements plausibly show that Elevate agreed to aid, abet, or facilitate Think Finance's tribal lending scheme for a period of time.  As discussed, the Shared Services Agreement directed Elevate to provide services for TCLS that clearly pertained to Think Finance customers, or appeared reasonably related to Think Finance tribal lending data and information systems. (Separation and Distribution Agreement 146, ECF No. 5-14.)  Likewise, the Data Sharing and Support Agreement contemplated EDS, a subsidiary of Elevate, using data from TCDS, a subsidiary of Think Finance, to develop and validate loan underwriting for Great Plains and Plain Green.  (Separation and Distribution Agreement 54, ECF No. 5-14.)  Moreover, Ken Rees signed the Employee Matters Agreement as President of both Think Finance and Elevate and signed the Data Sharing and Support Agreement as President of Think Finance and Elevate subsidiaries. (*See* Separation and Distribution Agreement 53, 128, ECF No. 5-14.)  In addition, the Employee Matters Agreement, Shared Services Agreement, and Data Sharing and Support Agreement all utilized a Steering Committee to make decisions regarding the continuation or cancellation of the services contemplated by each agreement.  (*Id.* 47, 123, 136.)  Finally, all four of the agreements required that any notices regarding the agreement be sent to the same building, one floor apart.  (*Id.* 49–50, 84–85, 125, 138–39.)

Taken together, these agreements support a reasonable inference that Elevate agreed to aid, abet, assist, or facilitate Think Finance's collection of unlawful debts because they enabled the usurious loan business to continue at Think Finance nearly unchanged, by minimizing any losses that would have taken the entire Think Finance company under.  (Am. Compl. ¶ 148.)  In other words, Plaintiffs state a claim that Elevate "agreed to commit a substantive RICO offense,"

the first element of a RICO conspiracy claim, when it participated in loan underwriting for Great

Plains and Plain Green as companies with shared owners, leadership, employees, funding,

operations, and location while the agreements were active. *Hengle*, 433 F. Supp. 3d at 898.

Plaintiffs also proclaim that Elevate continued that role over time. *See id.*

The Amended Complaint also states a claim that Elevate's knowledge of the substantive

RICO offense committed by the Think Finance tribal lending enterprise satisfies the second

element of a RICO conspiracy claim. Plaintiffs allege that before the spin-off, Think Finance

funded a lawsuit to establish the legality of the tribal lending business. (Am. Compl. ¶¶ 109–

112.) It was only after the failure of that lawsuit that Think Finance devised the plan to "separate

the tribal and non-tribal businesses" through the creation of Elevate. (Rees Nov. 2013 Mem. 4,

ECF No. 5-1.) Plaintiffs present a series of separation agreements between Elevate and Think

Finance to effectuate this plan. Ken Rees signed as both President of Elevate and Think Finance

for the vast majority of the agreements. (Am. Compl. ¶ 122; *see generally* Separation and

Distribution Agreement, ECF No. 5-14.) Following the corporate bifurcation, Think Finance

continued as "the company containing all of the (extremely profitable but) tainted assets,

including all tribal-related products." (Sequoia Dec. 18, 2013 Email 2–3, ECF No. 5-12.)

Meanwhile, Elevate retained the "good stuff"—the "only lending products with no grey area."

(*Id.* 3.) Read favorably, the Elevate spin-off demonstrates that the company "knew of and agreed

to the overall objective of the RICO offense" Think Finance continued to commit after the

corporate separation. *Hengle*, 433 F. Supp. 3d at 898.

Finally, to the extent Elevate argues that it withdrew from the Think Finance tribal lending enterprise upon termination of the ancillary agreements,[39] the Court will not resolve that issue at this procedural juncture. To effectuate a withdrawal, "a coconspirator must take affirmative actions inconsistent with the object of the conspiracy and communicate his [or her] intent to withdraw in a manner likely to reach his [or her] accomplices." *Hengle*, 433 F. Supp. 3d at 890 (internal quotation marks and citation omitted). Withdrawal is an affirmative defense, however, and resolving the merits of that issue is "better suited for summary judgment or trial" rather than a Rule 12(b)(6) motion to dismiss. *Id.* at 893. The Court will not address withdrawal at this early stage of the litigation.

---

[39] The Separation and Distribution Agreement, the Shared Services Agreement, the Data Sharing and Support Agreement, and the Credit Facility Agreement each contained language regarding the agreement's termination. (*See* Separation and Distribution Agreement 39 ¶ 8.1, 49, 69, 71, 137, ECF No. 14.) The Employee Matters Agreement did not contain similar language.

The Separation and Distribution Agreement stated: "This Agreement and any Ancillary Agreement may be terminated and the terms and conditions of the Distribution may be amended, modified or abandoned at any time prior to the Distribution Date by and in the sole and absolute discretion of the [Think Finance] Board without the approval of any Person, including Elevate, in which case no party will have any liability of any kind to any other party by reason of this Agreement. After the Distribution, this Agreement may not be terminated except by an agreement in writing signed by both parties." (Separation and Distribution Agreement 39 ¶ 8.1, ECF No. 5-14.)

The Shared Services Agreement stated: "The term of this Agreement ('Term') shall commence on the Effective Date [May 1, 2014] and continue in full force and effect for a period of six (6) calendar months or until all Shared Services have been terminated, whichever occurs first." (*Id.* 137.)

The Data Sharing and Support Agreement stated: "The term of this Agreement shall commence on the Effective Date [May 1, 2014] and shall end on the earlier to occur of (a) date for which the last Exhibit hereto remains in effect and (b) December 31, 2014." (*Id.* 49.)

The Credit Facility Agreement stated: "Borrower has authorized the issuance to Lender on the Closing Date of a subordinated secured promissory note in the principal amount up to [$75,000,000], to be dated the date of issue thereof, to mature on the Maturity Date . . . ." (*Id.* 71.) The Credit Facility Agreement defines "Maturity Date" as "the earlier of (a) April 30, 2018; and (b) such earlier date as the unpaid principal balance of the Note becomes due and payable pursuant to the terms of this Agreement and the Note." (*Id.* 69.)

Because the Amended Complaint states a claim that Elevate knowingly agreed to aid, abet, or facilitate the Think Finance tribal lending enterprise, a RICO conspiracy claim under § 1962(d) stands before this Court. *Id.* at 898. Accordingly, the Court will deny the Rule 12(b)(6) Motion as to Count I.

### III.  Conclusion

For the foregoing reasons, the Court will deny the Rule 12(b)(2) Motion, (ECF No. 9), as well as the Rule 12(b)(6) Motion, (ECF No. 11).

An appropriate Amended Order shall issue.

_____

M. Hannah Lauck
United States District Judge

Date: 10/17/2021
Richmond, Virginia

41